IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ALVION PROPERTIES, INC.            )        Chapter 11
                                   )
        Debtor.                    )        CASE NO. 15-40462
                                   )

## FIRST AMENDED DISCLOSURE STATEMENT

Debtor, Alvion Properties, Inc., (hereinafter "Alvion") files this Disclosure Statement pursuant to 11 U.S.C. § 1125. The purpose of this statement is to provide creditors with adequate information so that it can make an informed judgment about the Debtors' Plan of Reorganization. This First Amended Disclosure Statement is filed to include "page 5" which was inadvertently omitted in the original filing.

### INTRODUCTION

On May 14, 2014, Debtor filed its Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code. Since the filing, the Debtor has continued in possession of the property and continued to work and manage its finances as Debtor-in-Possession.

At the time of filing the Debtor retained attorney Douglas A. Antonik. Pursuant to a Court Order dated June 16, 2015, Douglas A. Antonik's employment by the Bankruptcy Court was approved. The creditor meeting was held on June 17, 2015. At the first meeting of creditors, attorney Antonik presented an overview for the reasons of the Debtor's filing a chapter 11 reorganization and what the Debtor hopes to accomplish through the reorganization plan.

### NATURE OF CHAPTER 11 REORGANIZATION PROCEEDINGS

Chapter 11 of the Bankruptcy Code is a remedial statute designed to effect the

statutory aims of a reorganization proceeding include the following:

a.    Preservation of the Debtor's business as a going concern;

b.    Avoidance of a forced and destructive liquidation of the Debtor's assets;

c.    The protection of the interest of creditors, both secured and unsecured;

d.    The restructuring of the debts and finances of the Debtor, such as would enable him to retain those assets necessary to rehabilitate his finances and at the same time produce the greatest recovery for his creditors.

The formulation and confirmation of a Plan of Reorganization is the principal function of a Chapter 11 case. Such a plan normally includes provisions for:

a.    Altering and modifying rights of creditors;

b.    Dealing with the property of the Debtor;

c.    Paying costs and expenses of administering of the Chapter 11 case; and

d.    Execution of the Plan.

The plan may affect the interests of all parties and creditors, reject executory contracts and leases, and provide for prosecution or settlement of claims belonging to the Debtors. In order to be confirmed by the court, the code requires there be a finding that the plan receive the votes of certain requisite classes and that the plan be "fair, equitable and feasible" as to any dissenting classes of creditors.

## DEFINITIONS

The following terms, when used in this Plan of Reorganization shall, unless the context otherwise requires, have the following meanings:

1.01. Chapter 11 shall mean Chapter 11 of the United States Bankruptcy Code, providing for reorganization proceedings.

2

1.02. Claim shall mean indebtedness of the Debtors which have been scheduled, or as to which a Proof of Claim has been filed by the creditor prior to the claim date and either has not been objected to by the Debtors or has been allowed by the Court.

1.03. Class shall mean any class into which allowed claims are classified pursuant to Article III.

1.04. Confirmation shall mean the entry of an Order by the Court confirming this Plan.

1.05. Court shall mean the United States Bankruptcy Court for the Southern District of Illinois.

1.06. Debtor shall mean the Debtor in possession herein, Alvion Properties, Inc.

1.07. Effective date shall mean that date on which the Order Confirming the Plan becomes final and non-appealable.

1.08. Plan shall mean the Plan of Reorganization.

1.09. Final Decree shall mean the entry of an Order closing this bankruptcy case.

1.10. Liquidation value shall mean the hypothetical liquidation of the Debtors' assets under a chapter 7 bankruptcy proceeding at the time of plan confirmation which shall include all hypothetical expenses a chapter 7 trustee would incur including chapter 7 trustee fees and any tax obligation incurred from the liquidation of the debtor(s) assets.

1.11. Duration of Chapter 11 Plan is and shall mean thirty days from the date creditors are paid in full under the Plan of Reorganization.

## PROCESS OF VOTING AND CONFIRMATION

A Plan of Reorganization is the method by which the claims of secured and unsecured creditors against the Debtor are satisfied. Whether a plan will be implemented depends on creditors' acceptance and court approval by confirmation of the Plan of Reorganization. The Bankruptcy Code provides that only creditors whose claims or interests are "impaired," as that term is defined by Bankruptcy Code § 1124, are entitled to vote on the plan. Creditors whose claims are not impaired are automatically deemed to have accepted the plan.

Each creditor will receive a ballot from the court. The Court will set a bar date for the filing of all ballots. Ballots must be returned to the Debtor's attorney by the bar date. Creditors may vote to accept the plan or to reject it. After balloting is completed, a tabulation of votes will occur. If the creditors whose claims are impaired vote to accept the plan and certain requirements set forth in Bankruptcy Code § 1129(a) are met, the Court will confirm the plan. An impaired class of creditors will have accepted the plan if two-thirds in dollar amounts and more than one-half in number of all allowed claimants in that class have voted to accept the plan.

If one or more impaired classes does not accept the plan, the Debtors may ask the Court to confirm the plan if at least one impaired class has accepted the plan and the plan satisfies the requirements of § 1129(b) of the Bankruptcy Code, "(Cram Down)."

If confirmed, the Plan will become effective after the Court's order of confirmation becomes final and non-appealable. If the plan is not confirmed, any party may propose an alternative plan.

## DISCLAIMERS

This Disclosure Statement contains information supplementary to the plan and is not intended to take the place of the plan itself. Each creditor is admonished to study the plan with his own counsel to determine the plan's impact upon his interest.

This Disclosure Statement and the plan are the only information which the Debtor has authorized to be distributed to the creditors. Representations other than those set forth in the Disclosure Statement or the Debtors' plan should not be relied upon when voting on the plan.

The figures presented in this Disclosure Statement are not audited and are taken from the Debtor's books and records.

## BACKGROUND INFORMATION AND BUSINESS OPERATIONS OF DEBTOR

Alvion Properties, Inc. is a Virginia Corporation formed in 1995 with the placement of the real property and mineral rights it owns today. The current stock holders are HM Reynolds and Shirley Medley. Reynolds and Don Medley purchased the stock of Alvion Properties, Inc. in 2000. Don Medley subsequently transferred his shares to his wife Shirley Medley due to health concerns. Alvion was purchased by the shareholders as an investment due to its significant coal reserves and other natural resources. Since Reynolds/Medley acquired Alvion, many significant events have occurred which will be discussed below.

A. Shareholders

Stockholder Harold M. (Jack) Reynolds is an electrical engineer with a degree from the highly regarded Georgia Tech College of Engineering. Reynolds was recently named to its engineering hall of fame. Reynolds has been in the coal business since 1972 as he was a various owner of several entities involved in the coal business.

Shirley Medley was in the banking business and became an owner and director of the Bank of Harrisburg and First Bank and Trust of Harrisburg in the 1980s. During that time the banks were responsible for lending to numerous Illinois coal projects. Shirley and her family also owned coal mines from 1970 to 2010.

B. The Properties

The assets of the Debtor consists of real estate and mineral interest owned in Scott County, Virginia. The Debtor owns 1,294 acres of real estate with the minerals which is undeveloped land which has significant coal reserves along with timber, building stone and quite possibly natural gas and oil. In addition to the fee simple land the Debtor owns 3,219 acres of mineral rights only of property to the north of its fee simple ownership. Again, significant coal reserves are present along with timber, building stone and perhaps natural gas and oil.

A significant coal assessment geographical survey was prepared by Dana Petway of Hendersonville, Tennessee in September, 2000. In his survey, estimates there are 115,704,000 tons of recoverable coal underlying the 4,513 acres. There is an additional 19,700,000 tons of coal that is not profitable to recover.

Alvion has also had an MAI appraisal on a consistent basis from September, 2000 through February 10, 2015 completed by Jack L. Bailey, MAI, SRA, of Brentwood, Tennessee. Bailey's latest appraisal considers the value to be $625,000,000.00 on the recoverable coal reserves. Bailey's appraisal did not include gas, oil, building stones, timber or silica sand which all said minerals are extractable from the property.

The depressed coal market and the cost of extracting the coal consistent with environmental cause and regulations has significantly affected the present market of the sale of this asset.

C. Unauthorized control of Alvion – Bern D. Weber-Chief Financial Officer and Director

In July, 2005 Alvion retained Bern D. Weber to be their chief director of finance to assist in monetizing the mineral rights of Alvion. Subsequently, Alvion granted an irrevocable stock power of attorney to Weber which authorized Weber to act on behalf of the company in a financing deal he was to consummate with New York Bank Mellon.

Unbeknownst to the Alvion shareholders, Weber, without authorization, transferred the assets of Alvion to a LLC he had formed, Alvion Partners, LLC, of which Weber was a sole member and director. In May, 2008, the Alvion principals learned of his unauthorized transfer and immediately removed Weber of his duties, his authority and demanded that all propriety information including assets be returned to Alvion Properties, Inc., the Debtor. It was also discovered that Weber was providing false invoices and making draws on a million dollar line of credit with the Farmers State Bank without authority of the Alvion principals and not for the benefit of the Debtor. In 2008, Alvion commenced a lawsuit against Weber in the United States District Court for the Middle District of Tennessee. Shareholders Reynolds and Medley joined the lawsuit. In December, 2012 an agreed judgment was entered in which Alvion received the return of its property with the declaration that Reynolds and Medley were and continue to be the rightful controlling owners of the assets of Alvion Properties, Inc.. The order also mandated that the entities formed by Weber, including Alvion Partners, LLC be dissolved. Subsequently, in April, 2013, a lawsuit that had been filed by Bern Weber in Virginia was dismissed declaring Reynolds and Medley the rightful owners of the stock of Alvion Properties, Inc. and in control of its assets.

D. Disputed Secured Interest-Farmers State Bank of Alto Pass

In October 2007, Alvion entered into a promissory note and mortgage with Farmers State Bank of Alto Pass for a $1,000,000.00 line of credit. This operating line of credit was to be used in assisting Alvion in its expenses to monetize its mineral assets.

Prior to the execution of the loan, the bank had ordered an appraisal of the land only, (no minerals) on the 1,432 acres of real estate Alvion owned in Virginia. Upon confirmation of the value well in excess of the $1,000,000.00 line of credit, the bank and Alvion agreed that Alvion would execute the line of credit and the mortgage as to the underlying "land only" not including the minerals. The loan and mortgage were executed on October 20, 2007.

Shortly thereafter, Alvion noticed that the standard language of the mortgage included the pledge of the mineral rights. Alvion contacted the bank to correct the mortgage as it was not to include the mineral rights. The bank officer confirmed in writing that the mortgage was not to include the mineral interest and set forth that statement in writing along with a promise to release the minerals upon Alvion's request. The bank had drafted a partial release of mortgage releasing the minerals. The letter stated that all Alvion had to do was request the release of the minerals and the bank would execute the partial release.

Subsequently, Alvion has demanded, two times, in writing, that the bank release the mineral interest. The bank has failed to do so.

As the result of the bank's actions in having the minerals included in the original mortgage and its failure to release the minerals, Alvion has suffered significant damages. In June 2013, Alvion entered into an agreement with Melland Group for 100,000,000.00 (one hundred million) (10 million down payment and estimation of 90 million to follow) which would be using the mineral rights of Alvion for the monetization. Upon the new investors due diligence in determining that the mineral interest was subject to the bank's mortgage, that investment opportunity failed.

E. CREARE Ltd. Certificate of Deposits

Alvion entered into a contractual agreement with CREARE, Ltd which purportedly is the holding company of Prosperitan Global Investment Bank, Roseau Valley, Dominica. Four certificates of deposit were issued by CREARE, Ltd. with each certificate paying $200,000.00 per month for thirty (30) years in addition to a bi-annual interest payment of $11,925,000.00. The pledge of these mineral rights reportedly was to allow the collateralization to underwrite insurance in exchange for the certificate of deposits.

Each certificate had a provision that if full payment is not made within a thirty (30) day grace period, Alvion has a right to cancel the certificates and the assets shall be released. Despite repeated promises by Michael Thomas, the contact and president and founder of Prosperitan Global Investment Bank, the funding never occurred and the whereabouts of Mr. Thomas is unknown. Mr. Thomas requested that as a condition to funding the replacement of this project, a $100,000.00 advance fee must be generated. Although Alvion did not incur any liability for using its personnel to find the resources to make that $100,000.00 commitment, the funding of the certificates never occurred, the monetization never took place and Michael Thomas whereabouts is unknown. Alvion personnel have turned the matter over to the United States Department of Justice for potential prosecution.

## SALE OF REAL ESTATE PURSUANT TO WEBB CREEK PROPOSAL

Webb Creek Management Group, LLC, located in Rome, Georgia, has submitted a detailed proposal to monetarize and sell approximately 1,248 acres plus all mineral rights from that acreage. The memorandum and description of the structural structure and monies realized is attached and incorporated herein. **All parties of interest are urged to read the memorandum and its attachment for a full description of the**

**transaction.**

The net proceeds the Debtor will realize from the transactions will be approximately 6,000,000.00 which will be sufficient to pay all creditors in full. The delivery of the funds to the Debtor's disbursing agent will occur prior to December 31, 2015. Payment to the creditors will be shortly after the receipt of the funds by the disbursing agent.

The investors identified in the memorandum have already been procured by Webb Creek. The details of the newly created LLC's and time frames will be revealed in a motion to sell to be filed by the Debtor. The motion to sell and the approval of the plan of reorganization are anticipated to occur simultaneously. The Debtor intends that the sale motion will include more details and safe guards for the Debtor to allow plan approval and the sale motion hearings to occur concurrently.

## APPOINTMENT OF DISBURSING AGENT

The Debtor will file a separate motion to appoint a disbursing agent to receive the sale proceeds and disburse the monies to the creditors pursuant to the approved plan of reorganization.

## TAX CONSEQUENCES OF WEBB CREEK TRANSACTIONS

The Debtor has consulted with a tax professional who advises there will be no adverse tax consequences with the series of transactions contemplated by the Webb Creek transactions.

## LEASES AND EXECUTORY CONTRACTS OF DEBTOR

The Debtor and Case Coal, LLC entered into a lease agreement on February 2,

2010 giving Case Coal the opportunity to mine the property owned by Alvion. The mining of the property never commenced despite the fact that Case Coal has received the necessary permits to mine the property. Royalty compensation for Alvion was to be 7% per ton of the gross sales price from strip mining activities. The auger method would 10% per ton of the gross sales price. Alvion was to receive a $60,000.00 non-refundable minimum royalty upon the execution of the lease and annually thereafter on the anniversary date. Alvion never received the first minimum royalty payment. Pursuant to the default and termination provisions of the lease, Alvion gave written notice of the default and its intention to terminate the lease on October 20, 2010 unless payment was made within the 20 day cure period of the lease. Case Coal did not make the required payment thus the lease terminated upon the expiration of the cure period. To be clear, the Debtor rejects any lease interest that may exist with Case Coal, LLC. The Debtor is not aware of any other executory contracts. The Debtor rejects any purported leases with, by or between George Howard and his corporation SWRR Properties, Inc. The Debtor rejects any unknown executory contract claim any entity may claim.

## PREFERENTIAL PAYMENT CAUSES OF ACTION

The debtor reserves the right to pursue any preferential payments and fraudulent conveyances that may be available to the estate prior to completion of the chapter 11 plan. The Debtor has not identified any such causes of action at this date.

## CAUSES OF ACTION

Debtor reserves the right to pursue any causes of action that may be available to the estate prior to completion of the Chapter 11 Plan. The Debtor has a cause of action against Bern Weber for fraud, embezzlement and mismanagement, against the Farmers

State Bank for failure to release its interest in minerals, Case Coal LLC for breach of lease and against George Howard for lease fees, timber and intentional inference with contractual relationships.     All causes of action that have been identified at this time shall continue and be viable claims post confirmation and post final decree as the liquidation of said causes of action are not necessary at this time to pay creditors in full and consummate the proposed chapter 11 plan of reorganization.

## SECURITY INTEREST

Upon completion of this Plan, creditors whose liens are deemed unsecured by the plan shall issue a termination statement to the Debtor to be filed in the appropriate recording office.   As for creditors who retain their lien throughout and beyond the duration of the Chapter 11 Plan, the holder of these claims shall release the lien and issue the appropriate termination or release documents upon payment in full of their claim as provided by this Chapter 11 Plan or any subsequent court-approved modification pursuant to Bankruptcy Code § 1129.  Except as provided for in this Plan, all other terms and conditions or mortgages, security agreements and promissory notes shall remain in effect.  No pre-petition lien shall extend to post-petition after acquired property in the event that any secured creditor claims a blanket security interest in any of the Debtor's assets.

## FINANCIAL INFORMATION

(A)     TAX RETURNS

Tax returns for 2013 and 2014 filed by the Debtor are available for inspection at the Antonik Law Offices, Mt. Vernon, Illinois.

(B)     FINANCIAL STATEMENTS - POST-PETITION

Monthly financial statements subsequent to the Debtors filing for reorganization are available for the creditor's inspection at the Antonik Law Offices, Mt. Vernon, Illinois, or the U.S. Trustee's office in Peoria, Illinois.

## LIQUIDATION ANALYSIS

The Debtor is liquidating enough of its assets to pay all creditors in full. Due to the depressed coal markets, Debtor does not believe the current market would realize any bid near the appraised value. As Debtor has received an offer to pay its creditors in full, the Debtor believes unsecured creditors would be paid in full in a hypothetical chapter 7 liquidation. **However, Debtor does advise that the Webb Creek offer is time sensitive and in all likelihood would not be able to be completed in a chapter 7 liquidation.**

The liquidation values and estimates are based on the date of confirmation and not on the date of filing pursuant to the provisions of 11 U.S.C. § 1129(a)(7). The estimated administrative fees of the Debtor's attorneys are subject to bankruptcy court approval and are reflected in a reduction of what the unsecured creditors would receive in a hypothetical Chapter 7 conducted at the time of plan confirmation.

## OBJECTIONS TO CLAIMS

The Debtor reserves the right to object to any claims filed post-confirmation for a period of ninety (90) days after the claim is filed. On September 10, 2015 George Howard has filed a mechanic lien claim for $4,500,250.00. The claim is totally baseless and the Debtor will file an objection to the claim.

## ADMINISTRATIVE CLAIMS

The Debtor has paid post-petition claims it has incurred as they became due except for professional fees which are subject to court approval. *The Debtor has paid interim draw attorney fees in accordance with a court order authorizing the same. The Debtor will be filing an attorney fee application subject to court approval to authorize payment of the fees it has paid plus additional fees. Debtor may occur accountant fees after the sale to Webb Creek which the hiring of the accountant and payment of accountant fees will be subject to court approval.* **The professional fees (attorney, accountant, broker, etc) outlined in the Webb Creek proposal will not be paid by the Debtor and will not be a liability of the bankruptcy estate should the transfer and sale not materialize. The fees incurred by Antonik Law Office will be charged to the bankruptcy estate and paid by the Debtor subject to court approval. Antonik Law anticipated fees are not included in the Webb creek outline.**

## CLASSIFICATION AND TREATMENT OF CLAIMS

As of September 3, 2015, the estimated claims and debts of Alvion to be paid is 2,366,419.20 not including administrative expenses which at this time are estimated to be under $10,000.00.

**CLASS 1:**    Class 1 creditors shall consist of all creditors with debts entitled to priority under § 507 of the Code (except administrative expense claims under § 507(a)(2), and priority tax claims under § 507(a)(8)). To the best of the Debtor's knowledge, no creditor holds any claim entitled to priority.

**CLASS 2:**    The Class 2 creditor shall be those creditors which hold secured claims against the Debtor.

**CLASS 2A:**  The Class 2A creditor shall consist of Farmers State Bank of Alto Pass which is secured by a real estate mortgage on the Debtor's real estate. Although the Debtor disputes whether this claim includes the mineral rights, nevertheless this claim is fully secured as the value of the real estate only is in excess of $1,600.000.00. The secured claim shall be paid in full, with interest, from the sale proceeds received from the Webb Creek transaction. This claim is unimpaired.

**Class 3** The Class 3 creditors shall consist of all creditors holding unsecured claims allowed under § 502 of the Code other than unsecured claims filed by taxing authorities and shall consist of all general unsecured creditors including any deficiency claims. Class 3 creditors' claims are as filed and allowed or as listed in the Debtors' Bankruptcy Schedule F and not contingent, un-liquidated or disputed. The Class 3 claimants will be paid in full, with interest, if their pre-petition contract provides for interest. The Class 3 claims shall be paid if full from the Webb Creek transaction. This class is unimpaired.

**CLASS 4:**    The Class 4 claimant shall consist of the Debtor and its stockholders and represents its interests. Debtor shall retain ownership of all property of the estate except as expressly provided for in this plan.

## MISCELLANEOUS PROVISIONS

Until all claims have been allowed and all disputes have been resolved, the Court will retain jurisdiction for at least the following purposes:

a)    The classification of the claim of any creditor and the re-examination of claims which have been allowed for purposes of voting, and the determination of such objections as may be filed to claims. The failure by the Debtor to object to any claim for the purpose of voting shall not be deemed to be a waiver of the Debtor's right to object to, or re-examine, the claim in whole or in part.

b)    Determination of all questions and disputes regarding title to, security interests in and liens against the assets, and determination of all causes of action, controversies, disputes, or conflicts, whether or not subject to an action pending as of Confirmation, between the Debtor and any other party, including, but not limited to, any right of the Debtor to recover assets and money pursuant to the provisions of Title 11 of the United States Code.

c)    The correction of any defect, the curing of any omission, or the reconciliation of any inconsistency in this Plan or the Order of Confirmation, as may be necessary to carry out the purpose and intent of this Plan.

d)    The modification of this Plan after the Confirmation pursuant to the Bankruptcy Rules and Title 11 of the United States Code.

e)    Entry of any order, including injunctions, necessary to enforce the title, rights, and powers of the Debtor and to impose such limitations, restrictions, terms and conditions on such title, rights, and powers as this Court may deem necessary.

f)    Entry of an Order concluding and terminating this case.

g)    Debtor reserves the right to prepay any indebtedness pursuant to the confirmed Chapter 11 Plan of Reorganization. Debtor will not accrue an interest penalty for early repayment.

The Debtor may propose amendments to or modifications of this Plan at any time prior to or after Confirmation pursuant to the Bankruptcy Rules and Title 11 of the United States Code.

Alvion Properties, Inc., Debtor

/s/ Shirley Karnes Medley
ALVION PROPERTIES, INC.

By    /s/ Douglas A. Antonik
DOUGLAS A. ANTONIK - #06190629

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing First Amended Disclosure Statement was served on:

Mark Skaggs, U.S. Trustees Office, 401 Main Street, Suite 1100, Peoria, IL 61602
Joel A. Kunin, Esq., The Kunin Law Offices, LLC, 1606 Eastport Plaza Drive, Ste. 110, Collinsville, IL 62234-6134
Ziemer, Stayman, Weitzel & Shoulders, LLP, Attn: Nick j. Cirignano, P.O. Box 916, Evansville, IN 47706-0916
The Coffman Law Firm, Richard Coffman, 505 Orleans, Suite 505, Beaumont, TX 77701
Clancy Covert, PO Box 15307, Chattanooga, TN 37415
Dana Petway, 250 Sandersferry Rd., Condo 29, Hendersonville, TN 37075
Darrell Dunham, PO Box 803, Carbondale, IL 62903
David Cox, PO Box 789, Harrisburg, IL 62946
Jack Harper, 400 S. Granger,      Harrisburg, IL 62946
Keith Grant, 633 Chestnut St., Ste. 700, Chattanooga, TN 37415
Robinson Smith and Wells, 633 Chestnut St., Ste. 700, Chattanooga, TN 37415
Ron Pickering, 214 Estate Dr., New Iberia, LA 70563
Alvion Properties, Inc., 22 S. Main St., Harrisburg, IL 62946

via electronic noticing and/or by U.S. mail on the 23rd day of September, 2015. The above is true and correct to the best of the undersigned's knowledge.

/s/ Alisha Finke
Alisha Finke

ANTONIK LAW OFFICES
3405 Broadway - PO Box 594
Mt Vernon, IL 62864
Phone: (618) 244-5739
Fax:   (618) 244-9633
antoniklaw@charter.net



## Webb Creek
MANAGEMENT GROUP

### MEMORANDUM

TO:        Doug Antonik

FROM:    Bryan Kelley, CEO, Webb Creek Management Group, LLC

DATE:    August 25, 2015

Dear Doug:

Webb Creek Management Group, LLC ("Webb Creek") is a Georgia-based property management, development, and conservation concern that specializes in helping landowners achieve their objectives with respect to real property. Webb Creek's service platform includes assistance to financially distressed landowners in the production of adequate funds to retire debt and accomplish other financial objectives of the landowner. In essence, Webb Creek uses its expertise to develop plans for real property that will provide an economic benefit to owners, and then invites investors to participate in ownership of the property by either raising capital from investors through a nation-wide broker dealer network or by identifying specific investor groups to provide capital outside of a broker-dealer network. Webb Creek enjoys a demonstrated record of success and is happy to discuss its history in detail.

Webb Creek is familiar with Alvion Properties, Inc. (the "Debtor" or "Alvion"), and has conducted due diligence with respect to the real property located in Scott County, Virginia (the "Property") belonging to the Debtor. Webb Creek cannot guarantee, but is confident that it can use the model set forth below to generate sufficient funds to pay all of Alvion's creditors as set forth in its Chapter 11 petition and in proofs of claim that have been filed, including potentially a 100% dividend to unsecured creditors, on or before December 31, 2015. Specifically, Webb Creek has identified an investor group ("Purchaser") that has expressed considerable interest in acquiring the Property. Prior to embarking on this journey, Webb Creek and the Purchaser seek adequate assurance from Alvion's creditors, from the United States Trustee appointed to Alvion's bankruptcy matter, and from the judge assigned to Alvion's case that the structure set forth below is appropriate within the confines of chapter 11 and will be permitted to close without objection or obstruction prior to December 31, 2015.

210 East Second Avenue – Suite 105 – Rome, GA 30161
Phone: 706-237-6100
www.webbcreekmanagement.com

The transactional structure that would be utilized is as follows:

1. Alvion would convey approximately 1,248 acres (being all of the acreage that is held by the Debtor in fee simple) and the mineral rights thereto into an LLC (herein, "PropCo") in exchange for 99% of the units of PropCo. Webb Creek Investments, LLC ("WCI") will contribute cash in an amount equivalent to 1% of the agreed-upon value of Alvion's aggregate capital contribution to PropCo. The capitalization of PropCo will be structured so as to qualify as a nontaxable exchange under 26 U.S.C. § 721. Webb Creek would serve as the manager of PropCo and would act according to rights and obligations set forth in PropCo's operating agreement and a separate management agreement that would be entered into by and among Webb Creek and the Debtor. WCI and Webb Creek have common ownership and are related entities. Any lien or other security interest that may currently encumber the Property would remain in place.

2. Webb Creek would create a second LLC ("InvestCo") that would be capitalized by Purchaser in the amount of approximately $9,400,000.00 in cash in exchange for 99% of the units of InvestCo. InvestCo will issue one (1) unit to WCI for purposes of complying with available securities registration exemptions with respect to InvestCo. Accordingly, InvestCo will be owned as follows: (1) 99% by Purchaser, and (2) 1% by WCI. Webb Creek will serve as the Manager of InvestCo.

3. PropCo and Alvion will enter into a Membership Unit Purchase Agreement ("MUPA") with InvestCo, under which InvestCo will agree to purchase 98 of the 99 PropCo units belonging to Alvion for approx. $6,000,000.00 (the "Unit Purchase Price"). The closing ("Closing") of the MUPA will take place on or before December 31, 2015.

4. Upon the Closing, the closing agent will remit the Unit Purchase Price to Alvion Properties, Inc. for deposit into its Debtor in Possession account. The balance of funds held by InvestCo would be used to further Purchaser's intended purposes with respect to the Property. The amount remitted to Alvion would be used to satisfy the claims of its creditors. Upon satisfaction of Alvion's creditors, it is imperative that all liens, encumbrances, or other security positions with respect to the Property that are held by Alvion's creditors be cancelled of record prior to December 31, 2015.

5. Following the Closing, PropCo will be held as follows: (1) 1% by Alvion, (2) 1% by WCI, and (3) 98% by members of InvestCo.

Attached hereto as Exhibit "A" is a draft of sources and uses of funds that is projected by Webb Creek with respect to this project. All figures are estimates for discussion purposes only and are subject to change.

A substantial amount of work by a number of individuals and professionals is required to complete the steps set forth above and remit funds to Alvion's debtor in possession account on or before December 31, 2015. Time is of the essence, but the threshold question for Webb Creek and Purchaser is whether adequate assurance can be given that they will be permitted to conduct this transaction to closing with the blessing of the court and without objection or other obstruction from Alvion's creditors or the United States Trustee. This memorandum is obviously a birds-eye view of this transaction and numerous questions may arise from Alvion's creditors, the United States Trustee, or the court. Webb Creek welcomes the opportunity to discuss these questions in full detail, and looks forward to receiving assurance that it can begin work on this project and produce a favorable result for everyone involved.

# EXHIBIT "A"

## Alvion, LLC
### Made Available Through
### Webb Creek Management Group, LLC
### 1,248 Acres - Scott County, Virginia

|  | Maximum 98 Units | Minimum 85 Units Proposal |
|---|---|---|
| **Estimated Cash Raise** | | |
| Unit Price | $    9,408,000 | $    9,312,000 |
| Units offered for Sale | $        96,000 | $        96,000 |
| Units to be Retained | 98 | 97 |
|  | 2 | 3 |

|  | | |
|---|---|---|
| Estimated Cash Raised * | $    9,408,000 | $    9,312,000 |
| Less Payoff's, Expenses & Reserves | | |
| Mortgages** | $              - | $              - |
| Legal, Professional Fees & Commissions | $   (2,069,480) | $   (2,063,720) |
| Working Capital & Development Expenses *** | $      (716,800) | $      (716,800) |
| Contingency Reserves | $      (600,000) | $      (600,000) |
| Other | $              - | $              - |
| Estimated Net Redemption Price to Sellers | $    6,021,720 | $    5,931,480 |

\* Hypothetical Cash Raise Estimates are for discussion purposes only. Actual cash raise will be determined after initial valuation.

\*\* All property liens will be satisfied at closing. No property liens have been identified by the seller. Satisfaction of property liens will reduce the Estimated Net Redemption Price to Sellers

\*\*\* Working Capital and Development Reserves will be used to pursue development options pursuant to a vote by the Members. The will evaluate, and present, various feasible uses for the property to the Members. Members will choose one of the following option

- Current Development
- Future Development
- Conservation Easement - §IRC 170(h)

Alvion, LLC
Made Available Through
Webb Creek Management Group, LLC
1,248 Acres - Scott County, Virginia

|  | Maximum 98 Units | Minimum 85 Units Proposal |
|---|---|---|
| **Estimated Cash Raise** | | |
| Unit Price | $ 9,408,000 | $ 9,312,000 |
| Units offered for Sale | 96,000 | $ 96,000 |
| Units to be Retained | 98 | 97 |
| | 2 | 3 |

**Estimated Legal, Professional Fees & Commissions**

|  |  |  |
|---|---|---|
| Project Management and Consulting Fee | $ 1,200,000 | $ 1,200,000 |
| Broker Placement Fee | 564,480 | 558,720 |
| Legal Fees | 200,000 | 200,000 |
| Accounting | 50,000 | 50,000 |
| Legal - Title Opinion | 5,000 | 5,000 |
| Appraisals & Review | 50,000 | 50,000 |
| Other | - | - |
| Total Fees, Expenses & Working Capital | $ 2,069,480 | $ 2,063,720 |

**Estimated Working Capital & Development Expenses**

|  |  |  |
|---|---|---|
| General Liability Insurance | | |
| Property Taxes - 2015 | $ 20,000 | $ 20,000 |
| Property Taxes - 2016 - 2020 | $ 20,000 | $ 20,000 |
| Accounting & Tax Preparation Expense - 2015 - 2020 | $ 100,000 | $ 100,000 |
| Management Fee 2016 - 2020 | $ 31,800 | $ 31,800 |
| General & Administrative Expenses | $ 120,000 | $ 120,000 |
| Development Expenses | $ 200,000 | $ 200,000 |
| Upfront cost Reimbursement | $ 125,000 | $ 125,000 |
| | $ 100,000 | $ 100,000 |
| Total Estimated Working Capital | $ 716,800 | $ 716,800 |

**Reimbursements (Items Paid by Manager in Advance)**

|  |  |  |
|---|---|---|
| Appraisals & Review | | |
| Legal | $ 30,000 | $ 30,000 |
| Land Trust | $ 5,000 | $ 5,000 |
| Escrow & Administrative | $ 12,500 | $ 12,500 |
| | $ 52,500 | $ 52,500 |
| Total | $ 100,000 | $ 100,000 |

For Discussion Purposes Only - All numbers are estimates