IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ALVION PROPERTIES, INC.     )    Chapter 11
    )
Debtor.     )    CASE NO. 15-40462
    )

## MOTION FOR ORDER AUTHORIZING SALE OF REAL PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS UNDER SECTION 363 OF THE BANKRUPTCY CODE

NOW COMES the Debtor, Alvion Properties, Inc. (Debtor), by and through its undersigned attorney, hereby moves this Court, pursuant to 11 U.S.C. §363 and Federal Rules of Bankruptcy Procedure 2002, 6004, 6006 and 9014, for an Order (the "Sale Motion") authorizing the sale of real property, as more particularly described hereinafter, free and clear of all liens, claims, encumbrances and interests.  In further support of this Sale Motion, the Debtor respectfully represents as follows:

### Background, Jurisdiction, And Venue

1.    On or about May 14, 2015, the Debtor filed its voluntary case under Chapter 11 of the United States Bankruptcy Code.

2.    The Court has jurisdiction over this motion pursuant to 28 U.S.C. §1334 and 11 U.S.C. §§105 and 363.

3.    This is a "core" proceeding within the contemplation of 28 U.S.C. §157(b)(2)(A) and (O).

## Summary of Relief Requested

4.      By this Motion, the Debtor seeks approval for the sale and transfer of real property and mineral interest in Scott County, Virginia as described on Exhibit A hereto (the "Property") to Alvion Properties II, LLC a Georgia limited liability company, or to a "Qualified Bidder" with a higher and better offer (the "Successful Bidder"). The net transaction proceeds realized by the Debtor from this transaction will be approximately $6,021,720.00. Should no objections or higher bids be received within the 21 day time period in which creditors and other parties in interest may object or place a higher bid, an appropriate order authorizing the sale and transfer shall be entered. If objections or higher bids are received, a hearing on the objections and the sale will be conducted on December 15, 2015 at the United States Bankruptcy Court for the Southern District of Illinois, 301 West Main Street, Benton, Illinois 62801.  The proposed transaction will generate significant value for the bankruptcy estate to pay all its creditors in full with a surplus remaining and is in the best interests of creditors, parties in interest and this Bankruptcy Estate.   A "Qualified Bidder" means a buyer who demonstrates to the satisfaction of the Debtor and the Unsecured Creditors Committee that it possesses the financial resources and ability to consummate the purchase of the Property according to the terms of the Membership Unit Purchase Agreement and the Alvion Properties II, LLC Operating Agreement (the "Sale Documents"), a copy of which is attached hereto as Exhibit B.

5.      The transaction will be a two-step process as required by the ultimate investor, Argos Investments, for tax purposes. This real estate transaction must close on or before December 21, 2015 unless extend by the parties, but no later than December

2

31, 2015 to enable Argos to acquire the tax benefits. After an order approving the sale is entered the following will occur to close the sale and net the Debtor its $6,021,720.00.

6.      The Debtor would convey approximately 1,228 acres (being all of the acreage that is held by the Debtor in fee simple except for 20 acres) and the mineral rights thereto into an LLC (herein, "PropCo") in exchange for 99% of the units of PropCo. PropCo will be named Alvion properties II, LLC, a Georgia limited liability company. Webb Creek Investments, LLC ("WCI") will contribute cash in an amount equivalent to 1% of the agreed-upon value of Debtor's aggregate capital contribution to PropCo. The capitalization of PropCo will be structured so as to qualify as a nontaxable exchange under 26 U.S.C. § 721. Webb Creek would serve as the manager of PropCo and would act according to rights and obligations set forth in PropCo's operating agreement (attached and incorporated herein) and a separate management agreement that would be entered into by and among Webb Creek and the Debtor (attached and incorporated herein). WCI and Webb Creek have common ownership and are related entities. Any lien or other security interest that may currently encumber the Property would remain in place.

7.      Webb Creek would create a second LLC ("InvestCo") that would be capitalized by Purchaser (Argos) in the amount of approximately $9,400,000.00 in cash in exchange for 99% of the units of InvestCo. InvestCo will issue one (1) unit to WCI for purposes of complying with available securities registration exemptions with respect to InvestCo. Accordingly, InvestCo will be owned as follows: (1) 99% by Purchaser, and (2) 1% by WCI. Webb Creek will serve as the Manager of InvestCo.

8.      PropCo and Debtor will enter into a Membership Unit Purchase Agreement ("MUPA") with InvestCo, under which InvestCo will agree to purchase 98 of the 99 PropCo

3

units belonging to Debtor for approx. $6,021,720.00 (the "Unit Purchase Price"). The closing ("Closing") of the MUPA will take place on or before December 21, 2015 unless extend by the parties, but no later than December 31, 2015.

9.      Upon the Closing, the closing agent will remit the Unit Purchase Price to Debtor for deposit into its Disbursing Agent's account or some other disinterested third party designated by order by the bankruptcy court. The balance of funds held by InvestCo would be used to further Purchaser's intended purposes with respect to the Property. The amount remitted to Debtor would be used to satisfy the claims of its creditors and any encumbrances or liens on the property. Upon the satisfactory closing and funding of this two-step transaction, it is imperative that all liens, encumbrances, or other security positions with respect to the Property that are held by Debtor's creditors be cancelled of record prior to December 21, 2015 unless extend by the parties, but no later than December 31, 2015.

## The Estate's Interest in the Property

10.      The Debtor owns approximately 1248 acres of unimproved real estate and mineral rights in Scott County, Virginia. This sale motion transfers 1228 acres fee simple with mineral rights with the debtor retaining 20 acres. Attached and incorporated herein as Exhibit A is the legal description of the property to be transferred as well as the 20 acres being retained.

## The Sale Documents-Membership Unit Purchase Agreement

11.      On November 10, 2015, the Debtor and the Purchaser entered into the Membership Purchase Agreement and Alvion Properties II, LLC Operating Agreement

4

under which, subject to Court approval, the Purchaser will purchase the Property from the Estate. References in this motion to "Sale Documents" mean both the Membership Purchase Agreement and Alvion Properties II, LLC Operating Agreement which are the operative documents to close the sale transaction.

12.    Pursuant to the Sale Documents, the Purchaser has offered to purchase the Property for the sum of $6,021,720.00. The descriptions in this Sale Motion of terms, provisions, conditions and transactions set forth in the Membership Purchase Agreement and Alvion Properties II, LLC Operating Agreement are qualified in their entirety by the attached Sale Documents and, in the event of any inconsistency between the discussion of the Sale Documents contained in this Sale Motion and in the Membership Purchase Agreement and Alvion Properties II, LLC Operating Agreement itself, the Membership Purchase Agreement and Alvion Properties II, LLC Operating Agreement governs.

13.    In connection with the purchase of the Property by the Purchaser, the Sale Documents provides, among other things, that the conditions set forth in the Sale Documents must occur or be waived prior to Closing, including, without limitation, entry of a satisfactory order of the Bankruptcy Court approving the Sale Documents and the transactions to be consummated pursuant thereto.

14.    Furthermore, the Sale Documents provides that at closing the proceeds of sale will be used to satisfy (a) the liens and encumbrances on the property and payment to the Bankruptcy Court's designated entity to receive the net proceeds of the sale. The Debtor estimates that the net return to the Estate from the sale of the Property will be approximately $6,021,720.00 after payment of applicable, customary costs and expenses associated with closing the sale.

## Necessity of Section 363 Sale

15.    The Debtor believes that without a sale under section 363 of the Bankruptcy Code it will be difficult to effectively sell the Property, and the return to the Estate from any other sale will be significantly diminished.  If the Debtor is not permitted to sell the Property pursuant to section 363, as contemplated in this Motion, the Property will be subjected to a distressed foreclosure sale or auction, which Debtor believes would be a significant reduction in the recovery by the Estate.

16.    The following encumbrances, liens, leases, or any other recordation of interest, will be extinguished and said property will be sold free and clear of all liens, encumbrances or other interest. Reference to the allowed amount of indebtedness means a claim filed and allowed in this Bankruptcy Proceeding.

17.    The following is a recorded interest in said property to be extinguished by the sale, the lien, if any, to attach to the sale proceeds.

- a. Deed of Trust dated October 20, 2007 in the principal amount of $1,000,000.00 to Farmers State Bank of Alto Pass. The allowed amount of this debt will be paid in full from the Sale Proceeds

- b. Unsigned memorandum of understanding with affidavit of George E. Howard to a promissory note in the principal sum of $2,000,000.00. The allowed amount of this debt will be paid in full from the Sale Proceeds.*

- c. Memorandum of leases to the following entities.

  (i)    Case Coal Lease dated September 12, 2006; - lease terminated by lessee's default pre-petition.

6

(ii)    Timber Lease dated November 12, 2006 with SWRR Properties;*
the allowed amount of this debt will be paid in full from the Sale
Proceeds.

(iii)   Building Stone Lease dated November 13, 2006 with SWRR
Properties;* the allowed amount of this debt will be paid in full
from the Sale Proceeds.

(iv)    Hunting Lease dated November 14, 2006 with SWRR
Properties;* the allowed amount of this debt will be paid in full
from the Sale Proceeds.

(v)     Water and Gas Lease dated November 15, 2006 with SWRR
Properties;* the allowed amount of this debt will be paid in full
from the Sale Proceeds.

(vi)    Fire, Clay and Building Material Lease dated November 16, 2006
with SWRR Properties;* the allowed amount of this debt will be
paid in full from the Sale Proceeds.

d.  Notice of Lis Pendens filed by H.M. Jack Reynolds in the amount of
$500,000.00.- A release will be recorded.

e.  Memorandum of Dispute and Flawed Land Registration with American
Gulf Finance Corporation. Extinguished by Order of the United States
District Court, in Nashville, Tennessee.

f.  Memorandum of Leases dated August 12, 2008 with George Howard.
The allowed amount of this debt will be paid in full from the Sale
Proceeds.*

7

g.  Memorandum of Lis Pendens for monies due filed by George Howard in a dismissed case CL09-43. The allowed amount of this debt will be paid in full from the Sale Proceeds.*

h.  Modification of Mortgage to Farmers State Bank of Alto Pass. Payment of 17(a) satisfies this modification.

i.  Mechanics Lien filed by Shirley Karnes Medley and Donald Medley.-A release will be recorded.

j.  Memorandum of Mechanics Lien filed by George E. Howard. The allowed amount of this debt will be paid in full from the Sale Proceeds.*

k.  Lis Pendens filed by George E. Howard. The allowed amount of this debt will be paid in full from the Sale Proceeds.*

l.  Notice of Attorney's Lien filed by Berkley Law and Technology Group, LLC. The allowed amount of this debt will be paid in full from the Sale Proceeds.

m.  Judgement in favor of Berkley Law and Technology Group, LLC. The allowed amount of this debt will be paid in full from the Sale Proceeds.

*-All released for $2,000,000.00 settlement with Howard/SWRR Properties.

### Marketing Efforts and the Offer by the Purchaser

18.     The Sale Documents were the product of arm's-length negotiation between the Debtor and the Purchaser.  Furthermore, the sale procedures provided for herein and in the Debtor's notice of this Motion permit other parties to submit competing bids for purchase of the Property.

8

19.    As described in more detail below, the Purchaser is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. The Purchaser is not affiliated with the Debtor or any of its principals as are no entities receiving commission, fees or any other interest or sum of money.

## Applicable Authority for Sale of Assets Under Section 363(b) of the Bankruptcy Code

20.    Section 363(b)(1) of the Bankruptcy Code provides that a Debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." Section 105(a) of the Bankruptcy Code provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

21.    A sale of assets should be authorized pursuant to section 363 of the Bankruptcy Code if a sound business purpose exists for doing so and if it benefits the Bankruptcy Estate.

22.    The Debtor has proposed the sale of the Property after thorough consideration of all viable alternatives, and has concluded that the sale is supported by a number of sound business reasons. Accordingly, a sale of the Property is appropriate under section 363(b) of the Bankruptcy Code.

23.    The Debtor has concluded that in light of liens against the Property and the alternative of a foreclosure sale, the sale of the Property contemplated herein and in the Sale Documents are in the best interests of creditors and the Estate. Maximization of

9

asset value for the benefit of all creditors is certainly a sound business purpose, warranting authorization of the proposed sale of the Property. Thus, there is more than adequate business justification to sell the Property to the Purchaser or to another Successful Bidder.

24.     The Debtor believes that the Purchaser's offer for the Sale Assets (the "Offer") is fair and reasonable and provides substantial value to the Estate.

25.     The Offer will also be subject to submission of competing bids by Qualified Bidders. Upon the conclusion of the sale process, the Debtor, the Court, and all parties in interest can be assured that the Property will be sold for fair market value, or at least as close to such value as possible. The fairness and reasonableness of the consideration to be received by the Debtor from either the Purchaser or the Successful Bidder(s) ultimately will be demonstrated by adequate "market exposure" and a sale process — the best means for establishing whether a fair and reasonable price is being paid.

### The Sale of Assets Is Free of Any Liens, Claims, Encumbrances and Interests

26.     The Purchaser would not have entered into the Sale Documents and would not consummate the purchase contemplated thereby, if the sale of the Property were not free and clear of all liens, claims, encumbrances and interests. Following the sale of the Property, the Purchaser should not be exposed to any alleged liens, claims, interests or encumbrances with respect to the Property. Thus, the purpose of the sale contemplated herein and in the Sale Documents are to permit a transfer of the Property to the Purchaser free of all such liens, claims, encumbrances and interests. Therefore, following the sale,

any person claiming such a lien, claim, encumbrance or interest in the Property shall have recourse only with respect to the proceeds of sale remitted to the Estate.

27.    The very purpose of an order authorizing the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against the Purchaser or the Successful Bidder(s).  Under section 363(f) of the Bankruptcy Code, the Purchaser or the Successful Bidder(s) are entitled to know that the Property is not infected with patent or latent claims that will be asserted under any theory of law or equity against the Purchaser or the Successful Bidder(s) after the proposed transaction is completed.

28.    The Purchaser is understandably unwilling to purchase assets from the Debtor, supposedly free and clear of certain claims, liens, rights, interests and encumbrances, only to be forced to repeatedly re-litigate the issue with the individual claimants after the sale is completed.  Accordingly, any potential claimants should be compelled to look exclusively to the proceeds of the sale for satisfaction of their claims, and any competing allegations should be resolved in the context of this Chapter 11 case.

### Good Faith under Section 363(m) of the Bankruptcy Code

29.  Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

The Sale Documents are an arm's-length transaction in which the Purchaser has, at all times, acted in good faith.  Specifically, the Purchaser has not engaged in fraud, nor

11

has it colluded with the Debtor or any other person to affect the sale price for the Property. Additionally, the Purchaser has made no attempt to take unfair advantage of other bidders; rather, the Purchaser will purchase the Property only after a bidding process that will give any interested party the opportunity to make competing bids and will maximize the return to the Estate. The Debtor requests that the Court make a finding that the Purchaser has purchased the Property in good faith within the meaning of section 363(m) of the Bankruptcy Code.

### The Form, Manner and Extent of Notice of the Motion and the Proposed Sale are Appropriate and Adequate under the Circumstances

30.     The Debtor will serve notice of this Sale Motion to all creditors and parties in interest in this case twenty-one (21) days prior to the deadline for objections and/or submissions of competing bids.

31.     The notice of the proposed sale given by the Debtor sufficiently describes the terms and conditions of the proposed sale.

32.     The notice of this Sale Motion that is being provided is "reasonably calculated" to apprise interested parties of the pendency of the matter and to afford them an opportunity to object. Parties in interest have been and should be found to have been afforded adequate notice of this Sale Motion.

33.     The Debtor submits that the notice he has provided and intends to provide both of the proposed sale and of this Sale Motion is reasonable and appropriate and should be approved by this Court as adequate and sufficient notice.

34.    The Debtor's proposed sale of the Property a as described in this Sale Motion is proper, necessary and serves the best interests of creditors, parties in interest and the Estate.  The relief requested in this Sale Motion will maximize recoveries for creditors of the Estate.  The Debtor thus requests that the Court approve the sale as requested.

WHEREFORE, Alvion Properties, Inc., respectfully requests that the Court enter an order: (i) granting this Sale Motion; (ii) approving the sale of the Property to the Purchaser on the terms and conditions set forth in the Sale Documents and (iii) approving the form and manner of notice thereof forever barring and estopping all persons and entities from asserting any claims, liens, interests or other encumbrances against the Property or against the Purchaser in connection therewith; (iv) authorizing the payments to the Bankruptcy Court entity authorized to receive the sale proceeds and (iv) granting such other and further relief as is just and proper.

ALVION PROPERTIES, INC., DEBTOR


BY:    /s/ Douglas A. Antonik
       DOUGLAS A. ANTONIK #06190629

ANTONIK LAW OFFICES
3405 Broadway
P.O. Box 594
Mt. Vernon, IL 62864
Telephone:    618-244-5739
Facsimile:    618-244-9633
antoniklaw@charter.net

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon:

13

Mark Skaggs, U.S. Trustee's Office, 401 Main Street, Suite 1100, Peoria, IL 61602

Ziemer, Stayman, Weitzel & Shoulders, LLP, Attn: Nick j. Cirignano, P.O. Box 916, Evansville, IN 47706-0916

Joel A. Kunin, Esq., The Kunin Law Offices, LLC, 1606 Eastport Plaza Drive, Ste. 110, Collinsville, IL 62234-6134

The Coffman Law Firm, Richard Coffman, 505 Orleans, Suite 505, Beaumont, TX 77701

Laura Hughes, Bryan Cave, LLP, One Metropolitan Square, 211 N. Broadway, Suite 3600, St. Louis, MO 63102

Bradford J. Sandler, Shirley S. Cho, Pachulski Stang Ziehl & Jones, LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19801

Clancy Covert, PO Box 15307, Chattanooga, TN 37415

Dana Petway, 250 Sandersferry Rd., Condo 29, Hendersonville, TN 37075

Darrell Dunham, PO Box 803, Carbondale, IL 62903

David Cox, PO Box 789, Harrisburg, IL 62946

Jack Harper, 400 S. Granger,        Harrisburg, IL 62946

Keith Grant, 633 Chestnut St., Ste. 700, Chattanooga, TN 37415

Robinson Smith and Wells, 633 Chestnut St., Ste. 700, Chattanooga, TN 37415

Ron Pickering, 214 Estate Dr., New Iberia, LA 70563

Robert Eggmann, Desai Eggmann Mason LLC, 7733 Forsyth Blvd., Suite 800, St. Louis, MO 63105

Alvion Properties, Inc., 22 S. Main St., Harrisburg, IL  62946

Farmers State Bank, Attn: Nick J. Cirignano, 20 NW 1st Street, 9th Floor, Evansville, IN 47708

George E. Howard, 1710 Skyland Falls Court, Kingsport, TN 37664

SWRR Properties, Inc., George E. Howard, 1710 Skyland Falls Court, Kingsport, TN 37660

Donald Medley, 313 Country Club Lane, Harrisburg, IL 62946

Shirley Medley, 313 Country Club Lane, Harrisburg, IL 62946

HM Jack Reynolds, PO Box 668, Dunlap, TN 37327

American Gulf Finance Corporation, PO Box 613, Kingstown, St. Vincent & the Grenadines

Case Coal, LLC, 207 Lewiston, Gross Pointe Farms. MI 48236

Webb Creek Management Group, LLC, 210 East Second Avenue, Suite 105, Rome, GA 30161

Brian Bojo, McRae, Stegall, Peek, Harman, Smith & Monroe, LLP, 100 E. 2nd Avenue, PO Box 29, Rome, GA 30161

ALL CREDITORS AND PARTIES OF INTEREST LISTED ON DEBTORS' MAILING MATRIX

either electronically or by enclosing in an envelope with postage fully prepaid and by depositing said envelope in a U. S. Post Office mail box in Mt. Vernon, Illinois, on the 20th day of November, 2015. The above is true and correct to the best of the undersigned's knowledge.

/s/ Alisha Finke

Alisha Finke

14



**EXHIBIT**

A

TRACT NO. 1:  BEGINNING at a stake on the bank of Laurel Fork of Stock Creek, 314 feet southwest of a maple; thence N 37 W 4520 feet to a spruce; thence N 43 15 E 3463 feet to a stake on the East side of Stock Creek, corner to what is known as the L.H. Horton 42 acres tract, and with line of same N 43 W 2212 feet to a stake; thence N 43 30 W 3207 feet to a stake on the bank of Stock Creek; thence N 31 W 1746 feet to a stake on Stock Creek; thence N 12 15 W 1762 feet to a stake on the bank of Stock Creek; thence N 30 30 E 392 feet to a stake; thence N 45 W 600 feet to a stake on the east side of Stock Creek; thence N 28 30 E 1308 feet to a stake on the east side of Stock Creek; thence N 17 30 W 380 feet to a stake on the east side of Stock Creek; thence S 46 15 W 180 feet to a stake on the west side of Stock Creek; thence N 35 15 W 3808 feet to a stake on top of Powell's Mountain; thence with the meanders of Powell's Mountain N 29 30 E 530 feet to a stake; thence N 57 30 E 231 feet to a stake; thence N 36 E 555 feet to a stake; thence N 26 E 385 feet to a stake; thence N 1 W 292 feet to a stake; thence N 70 E 129 feet to a stake; thence W 198 feet to a stake; thence N 48 E 759 feet to a stake; thence N 16 45 E 336 feet to a stake; thence N 35 45 E 300 feet to a stake; thence N 18 E 232 feet to a stake; thence N 46 E 541 feet to a stake; thence N 24 15 E 758 feet to a stake; thence N 55 15 E 373 feet to a stake; thence N 16 E 234 feet to a stake; thence N 35 E 730 feet to a stake; thence N 23 W 110 feet to a stake; thence S 84 30 E 383 feet to a stake; thence S 302 feet to a stake; thence S 38 W 200 feet to a stake; thence S 47 45 E 985 feet to a stake; thence N 89 15 E 305 feet to a stake; thence N 69 E 300 feet to a stake; thence N 54 30 E 253 feet to a stake; thence N 28 30 E 230 feet to a stake; thence N 61 45 E 176 feet to a stake; thence S 8 30 E 302 feet to a stake; thence S 12 E 234 feet to a stake; thence S 34 E 1023 feet to a stake; thence S 83 E 460 feet to a stake; thence N 31 E 618 feet to a stake; thence N 43 30 E 378 feet to a stake; thence N 81 30 E 253 feet to a stake; thence N 52 E 228 feet to a stake; thence S 71 E 443 feet to a stake; thence N 76 E 394 feet to a stake; thence S 57 E 209 feet to a stake; thence S

2

BOOK 433 PAGE 854 A

88 E 231 feet to stake; thence N 72 45 E 284 feet to a stake; thence S 51 15 E 86 feet to a stake; thence N 73 E 691 feet to a stake; thence S 44 45 W crossing eh head waters of Cove Creek 5849 feet to a stake; thence S 55 15 W 1696 feet to a stake; thence S 88 E 1808 feet to a stake; thence S 85 30 W 2227 feet to a stake; thence S 87 45 E crossing Cove Creek 4160 feet to a white oak, hickory and chestnut; thence S 1 45 W 5975 feet to a stake on Dry Fork of Cove Creek; thence S 7 E 793 feet to a stake on the left bank of Cove Creek; thence S 23 30 E 2423 feet to a stake on Dry Fork of Cove Creek; thence S 45 45 E 1610 feet to a stake on the East bank of Dry Fork; thence S 36 30 E 1744 feet on the East bank on Dry Fork of Cove Creek; thence S 80 15 W 2374 feet to a stake on Stone Mountain, and with the top of same S 54 W 616 feet to a stake; thence S 71 W 180 feet to a stake; thence leaving top of Stone Mountain with the line of the Mitchell tract N 33 30 E 2500 feet to a stake and continuing with boundary line of said Mitchell tract S 81 15 W 755 feet to a stake; thence continuing with the Mitchell line N 17 15 W 1071 feet to a stake and with the Mitchell line N 76 W 363 feet to a stake, and with line of Mitchell tract S 78 30 W 344 feet to a stake; thence with the Mitchell line W 221 feet to a stake in the L.H. Horton tract; thence S 33 15 E 3489 feet to a stake, corner to the Mitchell and Horton tracts, and with lines of same S 53 30 W 798 feet to a stake; thence S 23 30 E 1060 feet to a stake on top of Powell's Mountain, and leaving the Mitchell tract and continuing with the L.H. Horton tract S 69 30 E 1510 feet to a stake on Stone Mountain; thence with the line of the Horton tract 1052 feet to a stake; thence S 35 E 152 feet to a stake; thence S 54 30 E 70 feet to a stake; thence S 83 45 W 98 feet to a stake; thence S 43 30 E 219 feet to a stake; thence S 30 E 145 feet to a stake; thence S 37 15 E 143 feet to a stake; thence S 22 30 E 271 feet to a stake; thence S 47 E 82 feet to a stake; thence S 34 E 209 feet to a stake; thence S 37 E 214 feet to a stake; thence S 84 37 W feet to a stake; thence N 42 15 W 510 feet to a stake; thence N 34 30 W 101 feet to a stake; thence N 44 45 W 157 feet to a stake; thence S 28 30 E 650 feet to a stake, corner to the Hill lot; thence with the Hill lot S 70 W 184 feet to a stake and with line of said Hill lot

3

BOOK 433 PAGE 855 A

S 22 E 218 feet to a stake; thence with line of Hill lot
N 47 E 184 feet to a stake; thence leaving Hill lot S 23
E 515 feet to a stake; thence S 43 30 W 369 feet to a
stake; thence S 23 W 266 feet to a stake; thence S 38 W
929 feet to a stake; thence S 29 W 112 feet to a stake;
thence S 67 W 448 feet to a stake; thence S 33 W 507 feet
to a stake; thence S 29 E 325 feet to a stake in Stock
Creek; and leaving Stock Creek N 70 30 W 560 feet to a
stake; thence N 29 W 622 feet to a maple; thence S 44 W
314 feet to the BEGINNING, the grantors, however owing
only the mineral rights to the L.H. Horton 481.82 acres
within the above described boundary; never having owned
the surface.

TRACT NO. 2:  BEGINNING on the southern line at a corner
between the said Mitchell land and Interstate Coal & Iron
Co. tract of land on top of Stone Mountain, and running
N 33 30 W 2500 feet to a stake; thence S 81 15 W 755 feet
to a stake; thence N 17 15 W 1071 feet to a stake; thence
N 76 W 363 feet to a stake; thence S 78 300 W 344 feet to
a stake; hence Westwardly 221 feet to a corner in the
line of the L.H. Horton 481.82 acre tract; thence S 33 15
W 3488 feet along the line of the L.H. Horton 481.82 acre
tract to a stake; thence S 53 30 W 798 feet to a stake;
thence S 23 30 E 1060 feet to a corner on the south line
of the L.H. Horton tract; thence N 50 45 E 2127 feet to
the BEGINNING, containing 112.90 acres, more or less.

The above two tracts of land are all the lands, minerals and
mineral rights as set out and described in that certain deed dated
July 21, 1967, from C.J. Harkrader, et al, to N.D. Howard, J.C.
Howard and B.P. Howard, as recorded in Deed Book 240, at Page 115,
of the records of the Clerk's Office of Scott County, Virginia,
save and except the exceptions as set out in said deed.

4

BOOK 433 PAGE 856A

TRACT NO. 3: LOT NO. 5: BEGINNING of Lot No. 5 at a stake at
(8) in a line of widow's dower, S 38 3/4 E 61 poles to a stake
at (4), S 61 1/4 W 22 poles to a stake at (16), S 50 1/2 W 44
poles to tow small chestnuts on a spur, S 61 1/4 W 15 poles
and 9 links to a pine, S 27 1/4 W 90 poles to a stake in Stock
Creek; thence up Stock Creek N 11 1/2 W 17 poles and 15 links
to a stake, N 53 1/2 W 14 poles and 21 links to a stake, N 32
W 10 poles to a stake, N 44 1/2 W 14 1/2 poles to a stake at
(9), N 37 E 163 poles to the BEGINNING, containing 45.48
acres, more or less.

TRACT NO. 4: LOT NO. 6: BEGINNING on a stake at (17), N
80 1/4 E 67 poles to a stake at (18) S 13 3/4 E 14 1/2
poles to a hickory, corner of A.W. Prewitt at 19 and with
his line S 80 1/4 W 72 poles to a stake in the old
salting ground gap, N 7 E 14 1/2 poles to the BEGINNING,
containing 6.08 acres, more or less.

TRACT NO. 5: LOT NO. 9: BEGINNING at a stake at (8),
corner of Lot No. 2 and 5, N 54 E 37 poles to a stake at
(20), S 43 1/2 E 49 1/2 E 49 1/4 poles to a stake at
(17), S 7 W 14 1/2 poles at (2), S 67 3/4 W 15 poles and
18 links to a small chestnut on a rise at (3), S 30 3/4
W 12 poles to a stake, S 61 1/4 W 2 poles to a stake at
(4), N 38 3/4 W 61 poles to the BEGINNING, containing
12.35 acres, more or less.

TRACT NO. 6: All that certain tract or parcel of land as
located in Powell Mountain, near Mabe, adjoining the
lands of Harrison Pruitt; Jefferson National Forest, and
others; and being the same tract of land conveyed to J.F.
Sergent, Trustee, by A.W. Shupe, said deed of record in
the Clerk's Office of Scott County, Virginia in Deed Book
79, at Page 252, to which reference is hereby made,
containing one hundred and fifteen (115) acres, more or
less.

All property located in Scott County, Virginia.

**LEGAL DESCRIPTION FOR A** 20 ACRES
**PORTION OF THE ALVION PROPERTIES, INC. PROPERTY**
**SCOTT COUNTY, VIRGINIA** NOT BEING SOLD
(20 Acre Tract, minimum) NOT BEING SOLD

BEGINNING at a point which marks the intersection of the centerline of State Route 725 with the centerline of Forrest Service Road 239 (also centerline of permitted roadway shown on an Application Map submitted to the Commonwealth of Virginia Department of Mines, Minerals and Energy dated November 11, 2007); said point lying 3050 feet, more or less, northwesterly along the centerline of said State Route 725 from the intersection of the centerline of said State Route 725 with the centerline of State Route 653 at Mabe, Virginia; thence from said point of BEGINNING and running along the centerline of said State Route 725 in a southwesterly direction, a distance of 250 feet, more or less, to a point in the centerline of said road; thence leaving said road and running along severance lines thru Tract 1 of the Alvion Properties, Inc. property described in a deed recorded in Book 433, Page 852A, Registers Office of Scott County, Kentucky and shown as Tract 1 of a survey prepared by Fugate Land Surveying, Bristol, Virginia and dated June 13, 2000 and running in a westerly direction a distance of 100 feet, more or less, to a point which marks the intersection of the centerline of Stock Creek with the intersection of a small unnamed blue line stream which enters said Stock Creek from the northeast; thence running upstream along the centerline of said Stock Creek, a distance of 3450 feet, more or less, to a point in the center of said creek; thence leaving said creek and running in a northeasterly direction and along a line perpendicular to the said Forrest Service Road 239, a distance of 375 feet, more or less, to a point in the centerline of said Forrest Service Road 239, said point also lying in the centerline of said permitted roadway shown on the said above referenced Application Map; thence running in a southeasterly direction generally along the centerline of said Forrest Service Road 239 in part and along the centerline of the permitted roadway right-of-way for the total, a distance of 3400 feet, more or less, to the point of BEGINNING; containing a minimum of 20 Acres; (all distances and features taken from the above referenced Application Map prepared by Gress Engineering, Appalachia, Virginia for Case Coal, LLC and dated November 15, 2007)

Scott County, Virginia



EXECUTION VERSION

## MEMBERSHIP UNIT PURCHASE AGREEMENT

THIS MEMBERSHIP UNIT PURCHASE AGREEMENT (the "Agreement") is entered into effective as of the ___ day of November, 2015, by and among ALVION PROPERTIES, INC. ("Alvion"), an Illinois corporation, ALVION PROPERTIES II, LLC, a Georgia limited liability company (the "Company"), WEBB CREEK INVESTMENTS, LLC ("WCI"), a Georgia limited liability company, and ALVION INVESTMENTS, LLC ("Buyer"), a Georgia limited liability company. Alvion is sometimes referred to herein as the "Seller". Seller, the Company, the Buyer, and WCI are sometimes referred to herein each as a "Party" and together as the "Parties" to this Agreement. WCI enters into this Agreement in its capacity as a member of the Company and for the purpose of consenting to the transaction set forth herein.

## W I T N E S S E T H

WHEREAS, the Company's issued and outstanding membership units are owned as follows: (1) 99 units, being 99% of the issued and outstanding units of the Company, by Alvion, and (2) 1 unit, being 1% of the issued and outstanding units of the Company, by WCI; and

WHEREAS, Seller desires to sell to the Buyer 98 of the issued and outstanding units of the Company (the "Subject Units"), and the Buyer desires to purchase and acquire the Subject Units, all upon the terms and subject to the conditions set forth herein; and

WHEREAS, this Agreement is contingent on the completion of the private placement of membership units of Buyer (the "Offering") made in accordance with a confidential Private Placement Memorandum (the "PPM") dated November ___, 2015; and

WHEREAS, Seller has proposed the terms of this transfer to the Company, and the Company, by and through its members, have approved the proposed transfer in accordance with the terms of its operating agreement and in the manner set forth in this Agreement; and

NOW, THEREFORE, in consideration of the above premises and the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE 1.

## PURCHASE AND SALE

1.1     Purchase and Sale of the Subject Units. The Seller agrees to sell all of its right, title and interest in and to the Subject Units, and the Buyer agrees to purchase the Subject Units from the Seller, pursuant to the terms and conditions of this Agreement.

1.2     Purchase Price.

1.2.1     Amount of Purchase Price. The purchase price for the units shall be Six Million Twenty One Thousand Seven Hundred Twenty and 00/100 Dollars

1

EXECUTION VERSION

($6,021,720.00) (the "Purchase Price").

      1.2.2   Payment of Purchase Price. At the Closing of this Agreement, the Buyer shall pay to Seller the Purchase Price in cash.

      1.2.3

## ARTICLE 2.

## CLOSING

    2.1   Closing. The closing ("Closing") of the purchase and sale of the Subject Units pursuant to the terms of this Agreement shall take place at the county courthouse of Scott County, Virginia, on such date and time as may be agreed upon by the Parties, but in no event other than the express written consent of the Parties hereto shall the date of the Closing exceed Monday, December 21, 2015.

    2.2   Items to be Delivered at Closing. At the Closing, the Seller shall deliver to Buyer an Assignment of Membership Interest, which shall transfer and assign to, and vest in the Buyer all of Seller's right, title and interest in and to the Subject Units, and simultaneously with such delivery, all such steps will be taken as may be required to put the Buyer in actual possession of the Subject Units.

    2.3   The Company's most significant asset is real estate located in Scott County, Virginia, which is currently unencumbered. In the event the real estate was encumbered in some manner prior to the Closing, Seller shall provide cancellations or releases of the real property clearing any encumbrances on the real estate at or prior to Closing.

## ARTICLE 3.

## REPRESENTATIONS AND WARRANTIES

    3.1   Representations and Warranties of Seller. The Seller hereby represents and warrants to Buyer and Buyer's assigns and designees as follows:

      3.1.1   Organization and Power. The Seller is an Illinois business corporation, duly incorporated and in good standing with the state of Illinois, with full power and authority to conduct its business as it is now being conducted, and to own and use the properties and assets that it purports to own or use, including but not limited to the Subject Units. The President of the Seller is Shirley Karnes Medley, who is vested with full authority by the Seller to sign any and all documents necessary to consummate the transactions contemplated in this Agreement and to bind the Seller thereto.

2

3.1.2    Authority; No Conflict.

(a)    This Agreement constitutes the legal, valid, and binding obligation of the Seller, enforceable against it in accordance with its terms. Upon the execution and delivery by the Seller of the documents to be executed and delivered by it pursuant to this Agreement (collectively, the "Seller Closing Documents"), Seller Closing Documents will constitute the legal, valid, and binding obligations of the Seller enforceable against it in accordance with its terms. The Seller has the absolute and unrestricted right, power, authority, and capacity to execute and deliver this Agreement and Seller Closing Documents and to perform its obligations under this Agreement and the Seller Closing Documents.

(b)    The Seller has the full right, power, legal capacity and authority to enter into, and to perform its obligations under this Agreement and all other agreements and instruments to be executed by it pursuant to this Agreement. The Seller's execution, delivery, and performance of this Agreement and all other agreements, instruments and certificates to be executed by it pursuant to this Agreement will not violate any obligation of the Seller to any third party.

3.1.3    Title to Subject Units. The Seller has good, valid and marketable title to its interest in and to the Subject Units, free and clear of all encumbrances of any nature whatsoever.

3.1.4    Compliance with Legal Requirements; Governmental Authorizations. To Seller's actual knowledge, the Seller's present and continued ownership of its interest in and to the Subject Units does not violate any material law, ordinance, order, regulation, or other agreement affecting the Subject Units, and the Seller has not received written notice of any violations of any federal, state, county or municipal law, ordinance, order, regulation or requirement affecting any portion of the Subject Units or any of the assets of the Company. To the Seller's actual knowledge, the Seller has complied in all material respects with all federal, state, and local statutes, laws, rules and regulations affecting its ownership of the Subject Units and the assets of the Company.

3.1.5    Legal Proceedings; Orders. To the best of the Seller's actual knowledge, other than the proceeding referenced in 3.1.5(a) below, there is no pending proceeding (i) that has been commenced by or against the Seller or that otherwise relates to or may affect the Subject Units or any of the assets owned by the Company; or (ii) that challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the transactions contemplated by this Agreement. In addition, no such proceeding has been threatened, and no event has occurred or circumstance exists that may give rise to or serve as a basis for the commencement of any such proceeding. There is no rule, order, injunction, or similar requirement of any court, local, state, or federal, to which either Seller, all or any portion of the Subject Units, or any of the assets of the Company, is subject.

(a)    Seller hereby acknowledges that it is Debtor-in-Possession in case number 15-40462-kjm in the United States Bankruptcy Court in the Southern District of Illinois ("Seller's Bankruptcy Case"). Seller, by and through counsel, has undertaken action to receive all necessary consents and approvals of the bankruptcy court, the United States Trustee appointed to its case, and its creditors to enter into and consummate this transaction. Said

consent and approval is or shall be evidenced by an Order Granting Motion to Sell, which is or shall be attached hereto as Exhibit "A" prior to the Closing of this Agreement.

3.1.6    Brokers or Finders. The Seller has not incurred any obligation or liability, contingent or otherwise, for brokerage or finder's fees or agent's commissions or other similar payment in connection with this Agreement.

3.1.7    Completeness of Disclosure. No representation or warranty by Seller in this Agreement, nor any certificate, schedule, statement, document or instrument furnished or to be furnished to Buyer pursuant hereto, or in connection with the negotiation, execution or performance of this Agreement, contains or will contain any untrue statement of a material fact that omits or will omit to state a material fact required to be stated herein or therein or necessary to make any statement herein or therein not misleading.

3.1.8    The representations and warranties of the Seller hereunder shall survive the Closing of the transactions contemplated by this Agreement.

3.2    Representations and Warranties of Buyer. Buyer hereby represents and warrants to Seller as follows:

3.2.1    Corporate Existence. Buyer is a duly organized Georgia limited liability company, active and in good standing, having full power and authority to conduct its business as it is now being conducted, and to perform all of its obligations under this Agreement. The below-signed manager of the Buyer has full power and authority to bind the Buyer per the governing documents of the Buyer, copies of which shall be furnished to the Seller upon request.

3.2.2    Authority; No Conflict.

(a)    This Agreement constitutes the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms. Upon the execution and delivery by Buyer of the documents to be executed and delivered by Buyer pursuant to this Agreement (collectively, the "Buyer Closing Documents"), the Buyer Closing Documents will constitute the legal, valid, and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms. Buyer has the absolute and unrestricted right, power, authority, and capacity to execute and deliver this Agreement and the Buyer Closing Documents and to perform their obligations under this Agreement and the Buyer Closing Documents.

(b)    Neither the execution and delivery of this Agreement nor the consummation or performance of any of the transactions contemplated by this Agreement will, directly or indirectly (with or without notice or lapse of time) contravene, conflict with, or result in a violation of, or give any party the right to challenge any of the transactions contemplated by this Agreement or to exercise any remedy or obtain any relief under, any legal requirement or any order to which Buyer may be subject.

3.2.3    Brokers or Finders. Buyer has incurred no obligation or liability, contingent or otherwise, for brokerage or finder's fees or agent's commissions or other similar payment in connection with this Agreement.

4

3.2.4 <u>Financial Capability</u>. At Closing, provided the Buyer successfully completes the Offering, the Buyer will have the financial ability to deliver the Purchase Price in accordance with the terms of this Agreement.

3.2.5 <u>Completeness of Disclosure</u>. No representation or warranty by Buyer in this Agreement nor any certificate, schedule, statement, document or instrument furnished or to be furnished to Seller pursuant hereto, or in connection with the negotiation, execution or performance of this Agreement, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact required to be stated herein or therein or necessary to make any statement herein or therein not misleading.

3.2.6 The representations and warranties of Buyer hereunder shall survive the Closing of the transactions contemplated by this Agreement.

4. <u>Conditions Precedent to Buyers' Obligations</u>. All obligations of the Buyer under this Agreement are subject to the satisfaction, prior to or at the Closing, of each of the following conditions precedent:

4.1 <u>Representations and Warranties</u>. The representations and warranties of the Seller contained in this Agreement shall have been true on the date hereof and shall be true on the Closing with the same effect as though such representations and warranties were made as of the Closing.

4.2 <u>Compliance with this Agreement</u>. The Seller shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing.

4.3 <u>Closing Certificate</u>. Buyer shall have received a certificate from the Seller dated as of the Closing, certifying in such detail as the Buyer may reasonably request that the conditions specified in in this Agreement hereof have been fulfilled and certifying that the Seller has obtained any and all consents and approvals required to consummate the transactions contemplated by this Agreement.

4.4 <u>No Proceedings</u>. No Proceedings, other than the Seller's Bankruptcy Case, shall be pending or threatened (a) involving a challenge to, or seeking damages in connection with, the transaction contemplated by this Agreement, (b) that may have the effect of preventing, delaying, making illegal, or otherwise interfering with the transaction contemplated by this Agreement, or that may have the effect of adversely affecting the right of the Buyer to acquire or own or enjoy the value and benefit of the Subject Units.

4.5 <u>Successful Offering</u>. Buyer shall have no obligation to proceed under this Agreement unless the Offering is completed. If the Offering is terminated for any reason, this Agreement shall become null and void.

4.6 <u>Order on Motion to Sell</u>. Buyer shall have no obligation to proceed under this Agreement unless Seller procures an Order Granting a Motion to Sell or some substantially similar approval document in Seller's Bankruptcy Case that approves the

Closing of the transactions contemplated in this Agreement.

5.      Conditions Precedent to Seller's Obligations. All obligations of Seller under this Agreement are subject to the satisfaction, prior to or at the Closing, of each of the following conditions precedent:

5.1     Representations and Warranties. The representations and warranties of the Buyer contained in this Agreement shall have been true on the date hereof and shall be true on the Closing with the same effect as though such representations and warranties were made as of the Closing.

5.2     Compliance with this Agreement. The Buyer shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing.

5.3     Closing Certificate. Seller shall have received a certificate from the Buyer dated as of the Closing, certifying in such detail as Seller may reasonably request that the conditions specified in this Agreement have been fulfilled and certifying that the Buyer has obtained all consents and approvals required, including but not limited to a duly enacted resolution of the Buyer consenting to these transactions, to consummate the transactions contemplated by this Agreement.

5.4     No Proceedings. No Proceedings, other than the Seller's Bankruptcy Case, shall be pending or threatened (a) involving a challenge to, or seeking damages in connection with, the transaction contemplated by this Agreement, (b) that may have the effect of preventing, delaying, making illegal, or otherwise interfering with the transaction contemplated by this Agreement, or that may have the effect of adversely affecting the right of Buyer to acquire or own or enjoy the value and benefit of the Subject Units.

5.5     Payment of Purchase Price. The Buyer shall have delivered to Seller the Purchase Price in the manner provided herein by providing cash to the Closing Agent.

6.      Miscellaneous.

6.1     Where the Company may be required to determine the distributive share of partnership items under 26 U.S.C. § 702(a) with respect to a partner whose interest in the partnership changes during any taxable year, the Company agrees to use the interim closing method as set forth in 26 C.F.R. § 1.706-1(c)(2)(ii).

6.2     The representations, warranties, covenants, and agreements of the Seller set forth herein shall survive the conveyance of the Subject Units described herein and shall not be extinguished by the execution of that conveyance.

6.3     This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their heirs, legal representatives, successors and assigns.

EXECUTION VERSION

6.4     This Agreement shall be construed and governed in accordance with the laws of the State of Georgia.

6.5     This Agreement embodies the entire understanding and agreement of the parties hereto relating to the exchange contemplated herein. All prior understandings and agreements relating to the exchange contemplated herein are hereby expressly waived and terminated by the parties hereto.

6.6     In case one or more of the provisions contained in this Agreement shall be held to be invalid, illegal or unenforceable, for any reason and in any respect, the same shall not affect any other provision in this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

6.7     The headings are inserted herein for convenience and are not to be considered in construing this Agreement.

6.8     This Agreement and the rights and interests of a party hereunder may not be assigned, transferred, pledged or conveyed without the prior written consent of the other parties hereto.

6.9     By entering into the transactions contemplated by this Agreement, the Buyer assumes all duties and obligations of the Seller under the operating agreement of the Company, as is further evidence by the execution of an Amendment to the Company's operating agreement contemporaneously herewith. This Agreement is intended by the parties to fulfill the writing requirement of paragraph 4.5.2 of the Company's operating agreement.

6.10     The Seller and the Buyer hereby agree to indemnify and hold the Company and all its Members harmless from and against all loss or liability attributable to any change in the tax status of the Company resulting from the transfer.

6.11     The Buyer hereby agrees to protect, indemnify, and hold the Seller harmless from any and all liability whatsoever for liability pursuant to any securities laws of the United States, including but not limited to any regulations promulgated thereunder, and securities laws of any state, including but not limited to any regulations promulgated thereunder.

7.     Attorney's Fees.     Each party hereto shall be responsible for any and all attorneys' fees arising in connection with this Agreement which have been incurred on its behalf.

(SIGNATURES BEGIN ON FOLLOWING PAGE)

EXECUTION VERSION

IN WITNESS WHEREOF, the Buyer and the Seller have each executed and delivered this Membership Unit Purchase Agreement as of the date and year first shown above.

**SELLER:**

ALVION PROPERTIES, INC.

Signed, sealed and delivered
in the presence of:

_____

Unofficial Witness                              BY: SHIRLEY KARNES MEDLEY, President


_____

Notary Public
My Commission Expires: _____

**BUYER:**

Signed, sealed and delivered           ALVION INVESTMENTS, LLC
in the presence of:

_____       _____
Unofficial Witness                              BY: BRYAN W. KELLEY, Manager of Webb Creek
                                                Management Group, LLC, Manager of Buyer

_____
Notary Public
My Commission Expires:

**CONSENTED:**

WEBB CREEK INVESTMENTS, LLC

Signed, sealed and delivered
in the presence of:

_____       _____
Unofficial Witness                              BY: BRYAN W. KELLEY, Manager

_____
Notary Public
My Commission Expires:

(SIGNATURES CONTINUE ON FOLLOWING PAGE)

8

EXECUTION VERSION

**CONSENTED:**

Signed, sealed and delivered
in the presence of:

ALVION PROPERTIES II, LLC

_____
Unofficial Witness

_____
BY: BRYAN W. KELLEY, Manager of Webb Creek
Management Group, LLC, Manager of Alvion
Properties II, LLC

_____
Notary Public
My Commission Expires: GEORGIA

9

# OPERATING AGREEMENT

## OF

## ALVION PROPERTIES II, LLC

Effective as of December \_\_\_, 2015

LIMITED LIABILITY COMPANY INTERESTS IN ALVION PROPERTIES II, LLC, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR ANY APPLICABLE STATE SECURITIES LAWS ("THE STATE ACTS") AND, IF SOLD, HAVE BEEN SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND THE STATE ACTS, INCLUDING PARAGRAPH (14) OF CODE SECTION 10-5-11 OF THE GEORGIA UNIFORM SECURITIES ACT OF 2008, AS AMENDED, AND SECTION 4(a)(2) OF THE SECURITIES ACT. THE LIMITED LIABILITY COMPANY INTERESTS HAVE BEEN ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD OR TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS AGREEMENT AND IN A TRANSACTION WHICH IS EITHER EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND THE STATE ACTS OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER THE SECURITIES ACT AND THE STATE ACTS.

EXECUTION VERSION

## OPERATING AGREEMENT
## OF
## ALVION PROPERTIES II, LLC

This OPERATING AGREEMENT for ALVION PROPERTIES II, LLC (the *"Agreement"*) is made effective the ___ day of December, 2015, by the following initial members:

ALVION PROPERTIES, INC. and
WEBB CREEK INVESTMENTS, LLC

together with each and every member hereafter admitted to the Company as such being hereinafter individually referred to as a "Member" and collectively referred to as the "Members").

**NOW, THEREFORE, THIS AGREEMENT WITNESSES** that in consideration of the premises and mutual covenants herein contained, each of the parties hereto hereby covenants and agrees with the others as follows:

### ARTICLE I
### FORMATION

1.1.   ***Organization.***   The Members have previously hereby organized the Company as a Georgia limited liability company pursuant to the provisions of the Georgia Limited Liability Company Act set forth under O.C.G.A. Sections 14-11-100, et. seq. (the *"Act"*).

1.2.   ***Effective Date.***   The effective date of the Company is October 1, 2015.

1.3.   ***Agreement.***   The Members hereby agree to the terms and conditions of the Agreement, as it may from time to time be amended according to its terms. This Agreement constitutes the organization for the regulation and management of the Company as authorized by its Articles of Organization. This Agreement is adopted in order to fulfill the objectives of the Company as stated in the Act section 201, and to exercise the powers conferred upon the Company under the Act section 202. The parties desire to set out more fully in this Agreement, the purposes of the Company, the relationships among the Members, and other matters.

1.4.   ***Name.***   The name of the Company is ALVION PROPERTIES II, LLC. All business of the Company shall be conducted under its legal name or under such fictitious or assumed business names as may be determined by the Members.

1.5.   ***Scope of Business Activity of Company.*** The business of the Company is to engage in any business or activity permitted under the Act; and to engage in such other activity related to these activities as may be necessary, advisable or convenient to the promotion or conduct of the business of the Company.

1.6.   ***Articles of Organization.*** Articles of Organization (as so filed and as hereafter duly amended, the *"Articles"*), for the Company have been filed with the Secretary of State of Georgia. The Members agree to execute such further documents (including amendments to the Articles of Organization) and take such further action as is appropriate to comply with the requirements of law for the formation or operation of a limited liability company in all states, countries and other jurisdictions where the Company may conduct its business. The Members agree to cause such meetings of the Company to be held, resolutions passed, regulations enacted, agreements and other documents signed and things performed or done as may be required to implement the arrangements specified in this Agreement in connection with the affairs of the Company.

1.7.   ***Term.*** The term of the Company shall be perpetual. The Company shall be dissolved and its affairs wound up in accordance with the Act or this Agreement.

1.8.   ***Registered Agent and Office.*** The Company's registered office shall be at the office of its registered agent at 210 East 2nd Avenue, Rome, Floyd County, Georgia 30161. The name of its initial registered agent at such address is Bryan Kelley. The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Secretary of State of Georgia pursuant to the Act and the applicable rules promulgated thereunder.

1.9.   ***Principal Office.*** The principal office of the Company shall be located at 210 East 2nd Avenue, Rome, Georgia 30161. The principal office for the transaction of business of the Company may be changed and be located at such place as may be fixed from time to time by the Members or Manager. Branch offices and places of business may be established at any time by the Members or Manager at any place or places where the Company is qualified to do business, whether within or outside the State of Georgia.

1.10.   ***Accounting and Records.*** The Company shall maintain at its principal office such records as may be required by the Act or other applicable laws.

1.11. ***Persons Considered to be Members***. *"Member"* means a person who has agreed to be bound by this Agreement and who has been admitted as a member of the Company pursuant to the Act and this Agreement, but excludes a Dissociated Member.

1.12. ***Membership.***    The following Members shall own the following number of Membership Units in the Company:

| MEMBER | MEMBERSHIP UNITS |
| --- | --- |
| ALVION PROPERTIES, INC. | 99 |
| WEBB CREEK INVESTMENTS, LLC | 1 |

### ARTICLE II
### MEMBERS: RIGHTS, POWERS AND LIMITATIONS

2.1. ***Units***.    The Company shall be authorized to issue one class of Membership Units to be evidenced by Member Interest Certificates representing ownership interests in the Company namely "Membership Units" and to have those rights set forth below.

2.1.1. ***Membership Units.***  All of the voting rights and authority with respect to the Company and its operations including all rights to vote, control and participate in the management of the Company and its capital, operations and profits; appoint, elect and remove any Managers who may be responsible for managing the affairs and operations of the Company, and otherwise decide upon any matter or thing whatsoever affecting the Company and its operations shall be vested in the Members owning the Membership Units. No individual or entity holding or having claim to any Membership Units shall be entitled to exercise any voting rights attributable thereto unless and until such individual or entity is admitted as a Member of the Company in accordance with the provisions of this Agreement. Each Membership Unit shall be entitled to cast one vote and, unless otherwise specifically provided herein, a majority by number of the votes entitled to be cast shall control and determine the matter at issue. The Company may issue fractional shares of any Membership Unit. The owners of the Membership Units shall be entitled to all notices of all meetings of the Members and shall be entitled to vote on all questions or issues that may be presented to and decided upon by the Members of the Company.

3

2.2. ***Rights, Powers and Limitations of Members.*** Members are entitled to the rights and powers, and subject to the limitations provided by the Act, the Articles of Organization, and this Agreement.

2.3. ***Acts Requiring Member Action.*** The following acts require Member action.

2.3.1. ***Alterations or Amendments of Articles of Organization or This Agreement.*** The Articles of Organization and this Agreement will not be altered, amended, repealed, or restated, unless approved by a majority of the Members.

2.3.2. ***Merger.*** No merger, acquisition or consolidation of the Company into any other business entity will be approved except by a majority of the Members.

2.3.3 ***Additional Contribution of Capital.*** No additional contribution of capital to the Company will be issued or allotted, except with approval of a majority of the Members.

2.3.4. ***No Changes in Capital Structure.*** The capital of the Company will not be increased, reduced, converted, subdivided or consolidated, except with approval of a majority of the Members.

2.3.5. ***Rights and Options.*** The Company will not enter into any agreement or make any offer or grant any right capable of becoming an agreement to allot or issue additional interests in the Company to persons not currently Members, except with approval of a majority of the Members.

2.3.6. ***Sale of Undertaking.*** The Company will not sell, lease, exchange or dispose of its undertaking or any part thereof as an entirety or substantially as an entirety, except with the approval of a majority of the Members.

2.3.7. ***Public Offering.*** The Company will not take any action to authorize a public offering of its Membership Units, except with approval of all of the Members.

2.3.8. ***Transfer by Order of a Court of Competent Jurisdiction Due to a Proceeding Concerning Bankruptcy, Insolvency, Satisfaction of Judgment, Divorce or Dissolution of Marriage.*** The Company will not take any action to authorize or recognize any transfer in the interests of the Company by a court of competent jurisdiction concerning a bankruptcy, insolvency, satisfaction of judgment, divorce or

dissolution of marriage proceeding to a spouse or creditor of a Member, except with the approval of all of the Members.

2.4.    ***Procedure Rules at Meetings.***  The procedural reference authority for the Company is designated as the latest edition of **Robert's Rules of Order, Newly Revised**. It is understood that in the transaction of business, the meetings of the Company, including meetings of its Managers, Officers, or Members and any committees, may be conducted with informality whenever appropriate; however, this informality does not apply to procedural requirements required in the articles of organization, this Agreement, or the Act. When circumstances warrant, any meeting or a portion of a meeting will be conducted according to generally understood principles of parliamentary procedure as stated in the articles of organization, this Agreement, or the designated procedural reference authority.

2.5.    ***Meeting, Where Held.***  Any meeting of the Members of the Company, whether a regular meeting, an annual meeting or a special meeting, may be held either at the principal office of the Company or at any place in the United States within or outside the State of Georgia.

2.6.    ***Annual Meeting.***  The Members, by resolution or unanimous consent, may provide for annual meetings, which may be held without notice as and when scheduled in such resolution.

2.7.    ***Regular Meetings.***  The Members, by resolution or unanimous consent, may provide for regular meetings, which may be held without notice as and when scheduled in such resolution.

2.8.    ***Special Meetings.***  A special meeting of the Members, for any purpose or purposes whatsoever, may be called at any time by one or more Members holding not less than one-half of the voting power of the Company. Such a call for a special meeting must state the purpose of the meeting.

2.9.    ***Notice of Meetings.***  The procedures in Act section 311 govern notice of meetings, in addition to those regulations generally governing notice under this Agreement.

2.10. ***Waiver of Notice.***  Notice of any regular, annual or special meeting may be waived by any Member or Manager under Act section 312.

2.11. ***Quorum and Voting at Members' Meetings; Proxy.***  Quorum, voting rights and the use of proxies are as provided in Act sections 308, 309 and 310.

2.12. ***Presiding Officer and Secretary.*** At every meeting of Members, the Manager of the Company, or if that person is not present, then the appointee of the meeting, presides. The Officer exercising the duties of a secretary, or if that Officer is not present, then the appointee of the meeting, will record the minutes and take custody of all papers related to the meeting for delivery to the authorized Officer of the Company as soon as practicable. The Operating Manager has no vote, unless the presiding officer is a Member of the Company otherwise entitled to vote; in which case the presiding officer may cast a vote only when that Member's vote could create or deny the requisite majority required to approve any proposed action.

### ARTICLE III
### MEMBER INTEREST CERTIFICATES

3.1. ***Certificates of Interests.*** The Company will evidence the respective interests of Members in the Company by issuing Member Interest Certificates.

3.2. ***Form of Certificates; Contents.*** When Member Interest Certificates are issued, the Certificates are to be issued in such form as determined by the Manager, numbered consecutively or otherwise identified, and entered into the Member Interests Register of the Company as they are issued. Certificates of Interests are signed by the Manager and by the officer assigned with the responsibility of authenticating the records of the Company, and bear the seal of the Company or a facsimile thereof.

3.2.1. ***Contents.*** Each such certificate will state on its face the fact that the Company is organized under the Georgia Act, the name of the person to whom the certificate is issued, the number of Membership Units, the date of issue and whether the certificate Units are voting or nonvoting. Each certificate may include a statement that the interests are subject to the following restrictions:

"The interests represented in this certificate have been acquired for investment and have not been registered under the Georgia Uniform Securities Act of 2008, as amended, in reliance upon the exemptions contained in Section 10-5-11(14) of the Official Code of Georgia Annotated, nor under the Securities Act of 1933, as amended, in reliance upon the exemptions contained in Sections 4(a)(2) of that Act; the interests may not be sold or transferred except in transactions registered under the Securities Act of 1933, or exempted from registration under that Act, or otherwise in compliance with federal securities laws; or registered under

the Georgia Uniform Securities Act of 2008, or exempted from registration under that Act, or otherwise in compliance with Georgia securities laws. Copies of the Articles of Organization, Operating Agreement, and other documents, any of which may restrict transfers and affect voting and other rights, may be obtained by a Member on written request to the Company. The interests are transferable only upon compliance with the terms of the Articles of Organization of the Company, as on file with the Secretary of State of the State of Georgia, and with the terms of the Operating Agreement, as on file at the registered or principal office of the Company."

3.3.    ***Member Interests Register.***    The Company will keep at its principal office, or at the office of its transfer agent, wherever located, with a copy at the principal office of the Company, a book to be known as the Member Interests Register, containing in order of issuance the name of each Member of record, together with the Member's address, the number of Membership Units held by the Member, the Member's social security number or tax identification number and date of issue. The Member Interests Register is to be maintained in current condition. Any and all changes in Members or their amount of capital contribution are formalized by the execution and filing of an amendment to this Agreement. The Member Interests Register (or the duplicate copy maintained at the principal office of the Company) is available for inspection and copying by any Member at any meeting of the Members upon request, or at other times upon the written request of any Member. The Member Interests Register may be inspected and copied either by a Member, or by the Member's duly authorized attorney or agent in person. The information contained in the Member Interests Register may be stored electronically or on electronic media, or any other approved information storage devices related to electronic data processing equipment, provided that any method, device, or system employed is first approved by the Manager, and provided further that the same is capable of reproducing all information contained therein, in legible and understandable form, for inspection by Members or for any other proper corporate purpose.

3.4.    ***Transfers of Certificates.***    Any Member proposing a transfer or assignment of a member interest represented by a Certificate will first notify the Company, in writing, of all the details and consideration for the proposed transfer or assignment. If the transfer or assignment is made as originally proposed and the Manager fails to approve the transfer or assignment, the transferee or assignee has no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee or assignee is only entitled to receive the share of the profit or other compensation by way of income and the return of contributions to which that Member would otherwise be entitled.

EXECUTION VERSION

3.5.  ***Transfer Agent; Registrar.***  The Manager from time to time may appoint transfer agents and registrars for the certificates of Member Interests of the Company, and when any certificate, if issued, is countersigned by a transfer agent or registered by a registrar, the signature of any officer of the Company appearing thereon may be a facsimile signature. In case any officer who signed, or whose facsimile signature was placed upon, any such certificate has died or ceased to be such officer before such certificate is issued, it may nevertheless be issued with the same effect as if the officer continued to hold such office on the date of issue.

3.6.  ***Registered Members.***  Except as otherwise required by law, the Company is entitled to treat the person registered on its Member Interests Register as the Member of the Company to whom the rights of ownership of the pertinent proportion of the Member Interests in the Company belong, being the person exclusively entitled to receive notification and distributions, to vote (if a voting member) and to otherwise exercise all the rights and powers of ownership and is not bound to recognize any adverse claim.

3.7.  ***Lost Certificates.***  In the case of a lost, destroyed or mutilated certificate, a new one may be issued upon such terms and indemnity to the Company as the Members may prescribe. When a Member to whom a Certificate has been issued (based upon authorization for the issuance of such certificates by the Company) alleges it to have been lost, destroyed or wrongfully taken, and if the Company, transfer agent or registrar is not on notice that such certificate has been acquired by bona fide purchaser, a new certificate (if such are being issued by the Company) may be issued upon such owner's compliance with all of the following conditions:

      (i)  The Member files with the Company, and the transfer agent or the registrar, a request for the issuance of a new certificate, with an affidavit setting forth the time, place, and circumstances of the loss;

      (ii)  The Member also files with the officer maintaining the Member Interests Register of the Company at its principal office, and the transfer agent or the registrar, a bond with good and sufficient security acceptable to the Company and the transfer agent or the registrar, conditioned to indemnify and save harmless the Company and the transfer agent or the registrar from any and all damage, liability and expense of every nature whatsoever resulting from the Company's or the transfer agent's or the registrar's issuing a new certificate in place of the one alleged to have been lost; and

(iii)  The Member complies with such other reasonable requirements as the Manager of the Company, the transfer agent or the registrar shall deem appropriate under the circumstances.

3.8.  ***Replacement of Mutilated Certificates.***  Unless the Company has elected to no longer issue such Certificates, a new certificate may be issued in lieu of any certificates previously issued that may be defaced or mutilated upon surrender for cancellation of a part of the old certificate sufficient in the opinion of the appropriate officer and the transfer agent or the registrar to duly identify the defaced or mutilated certificate and to protect the Company and the transfer agent or the registrar against loss or liability. Where sufficient identification is lacking, a new certificate may be issued upon compliance with all of the conditions set for in this section.

3.9.  ***Facilitation of Member Interests Transfers.***  The Manager will sanction, approve, consent to and otherwise facilitate any transfer of Member Interests in the capital of the Company, made in compliance with, or which is required to be made by, any provision of this Agreement, the Act relating to the issuance of Member Interests, or by the Articles of Organization of the Company.

3.10. ***Restrictions on Transfer of Member Interests Due to Exemption from Securities Laws.***  No public offering will be made by the Company, and no member interests in the Company will be issued at any time in a manner which will require the registration of these securities under any federal or state law.

3.11. ***Restrictions.***  Member Interests in the Company may be transferred in accordance with Article IV of this Agreement.

### ARTICLE IV
### TRANSFER OF MEMBERSHIP INTERESTS

4.1.  ***Restrictions on Transfer.***  Except as otherwise specifically provided in this Agreement or in any other written Agreement entered into by all of the Members, no Member shall have the right to sell, dispose of, pledge, hypothecate, encumber or in any other manner transfer all or any part of his, her or its respective Membership Units or the Membership Interests represented thereby without the prior written consent of the Manager. Any attempted disposition of all or any part of a Member's Membership Units or the Membership Interest represented thereby other than as specifically and expressly permitted in this Article or approved in writing by the Manager shall be null and void ab initio and be of no effect whatsoever. Any disposition of any Membership Units for which the consent of the Manager is obtained shall be effectuated only after compliance with all conditions contained in Section 4.5 hereof.

EXECUTION VERSION

4.2    ***Permitted Transfers:***

Reserved.

4.3.    ***Successors in Interest.*** Each Member shall be entitled to cause his, her or its Membership Units in the Company to be transferred and assigned to such Member's Successor in Interest or pursuant to 4.2 above, that as a condition to such transfer and assignment, (i) all conditions imposed under Section 4.5 shall be satisfied, (ii) there shall be no increase in the liability and/or responsibility of the Company or any other Member as a result of such transfer and assignment, (iii) said transfer will in no way violate any and all exemptions from securities regulation.

4.4.    ***Assignment of Economic Rights.*** Each Member shall be entitled to voluntarily assign solely such Member's right to receive any distributions under this Agreement to such persons or entities selected by such Member provided, that as a condition to such transfer and assignment, there shall be no increase in the liability and or responsibility of the Company or any other Member as a result of such assignment or any other requirements or conditions imposed upon the Company to make any distributions hereunder. In the event of any Member's assignment of such Member's right to receive distributions hereunder, no assignee of any such rights shall thereafter be entitled to exercise any applicable voting rights, if any, or participate in any management decisions with respect to the Company or its operations.

4.5.    ***Conditions for Transfer.*** Notwithstanding anything contained herein to the contrary, no transferee, purchaser or recipient of any Membership Units in the Company will become a Member of the Company unless and until all of the following conditions are satisfied; provided, that all or any number of the following conditions may be waived in writing by the Members:

4.5.1. The transferring Member (or such Member's legal representative) must have executed a written instrument of transfer of such Member's Membership Units in form and substance reasonably satisfactory to the Manager;

4.5.2. The transferee must have executed a written agreement, in form and substance reasonably satisfactory to the Manager including the transferring Member (or such transferring Member's legal representative), to assume all of the duties and obligations of the transferring Member under this Agreement and to be bound by and subject to all of the terms and conditions of such agreement as applicable to the transferring Member or the transferring Member's Membership Units so transferred;

10

EXECUTION VERSION

4.5.3.  The transferring Member (or such transferring Member's legal representative) and the transferee must have executed a written agreement, in form and substance reasonably satisfactory to the Manager, to indemnify and hold the Company and all Members harmless from and against any loss or liability attributable to any change in the tax status of the Company resulting from the transfer;

4.5.4.  Upon request by the Manager, the transferring Member (or such transferring Member's legal representative) and the transferee must have delivered to the Company a written opinion of counsel for the Company or of other counsel reasonably satisfactory to the Members (which opinion shall be obtained at the expense of the transferring Member and the transferee) that such transfer will not result in (i) a violation of applicable law (including applicable securities laws) or this Agreement, (ii) the Company being classified as an association or other entity taxable as a corporation for any federal, state, local or other income tax purpose, or (iii) the Company being deemed terminated pursuant to Code Section 708 or any comparable future section of the Code.

4.6.  ***Transferee as Mere Holder.***  A transferee who does not become a substituted Member will be entitled to receive only that portion of the distributions or allocations to which the transferring Member would otherwise be entitled with respect to the Membership Units which are the subject of such transfer. If the requirements set forth in Section 4.5 are not satisfied, then the proposed transferee shall have no right to vote any Membership Units on any question relating to the Company, to otherwise participate in the management of the business and affairs of the Company, to otherwise exercise any right, power, privilege, or other incident of ownership regarding any proposed transferred Membership Units, or to become a Member but rather, the transferee shall merely be the holder of said Membership Units.

4.7.  ***Retroactive Allocations.***  No new Member of the Company shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Manager may, at its option, at the time a new member is admitted, close the Company books (as though the Company's tax year had ended) or make pro rata allocations of loss, income and expense deductions to a new Member for the portion of the Company's tax year in which such new Member was admitted in accordance with the provisions of 706(d) of the Code and the Regulations promulgated thereunder. No person or entity shall be admitted as a transferee until all of the requirements set forth in Section 4.5 are satisfied.

EXECUTION VERSION

### 4.8   *Put Right in Favor of Members.*

(a)   ***Put Right, Generally.***   At any time on or after Tuesday, April 16, 2019, each Member shall have the right (the "Put Right") to require the Company to purchase all of such Members' Membership Units (the "Put Interest") pursuant to the procedures and subject to the terms and conditions set forth in this Section 4.8.  The Put Right may be exercised by a Member by delivery of notice (the "Put Notice") to the Company of such Member's (the "Exercising Member") exercise of the Put Right.

(b)   ***Put Price.***   The purchase price (the "Put Price") for the Put Interest pursuant to this Section 4.8 shall be the then-determined fair value of the Exercising Member's interest, without taking into account discounts for lack of control, lack of marketability, or any such similar discounts.

(c)   ***Closing.***   The closing of any transfer of the Put Interest pursuant to this Section 4.8 shall take place at such time and place as the Company may designate by written notice to the Exercising Member at least fourteen (14) days prior to such date (the "Put Closing Date"), but in any event shall occur within sixty (60) days of the date on which the Put Notice has been delivered to the Company.  Unless the parties agree otherwise, the Put Price shall be payable by wire transfer of immediately available funds.

**4.9   *Post Redemption.***   From and after the closing of the Company's acquisition of the Put Interest, the Ownership Percentage of the Exercising Member shall be reduced to zero and the Ownership Percentage of the remaining Members shall be increased pro rata in accordance with their respective Ownership Percentages immediately prior to the Company's acquisition of the Put Interest.  At such time, the Exercising Member shall cease to be a Member and shall have no further rights or obligations with respect to the Company or any of the other Members.

### ARTICLE V
### RIGHTS AND DUTIES OF MANAGERS

5.1.   ***Designation of Management.***   The business and affairs of the Company are controlled by one or more Managers, as provided in the Act. Throughout the paragraphs contained in this Article of the Operating Agreement, the use of the phrase "all Managers" refers to the total number of managers that the Company would have if there were no vacancies.

5.2.   ***Qualifications, Number and Tenure.***   Each Manager, if an individual, is to be at least eighteen years of age. A Manager need not be a

EXECUTION VERSION

Member, a natural person, or a resident of Georgia. If the Manager is not a natural person, it must be a Georgia limited liability company and managed by the members of that company who are at least 18 years of age and residents of Georgia. Initially, there is one (1) Manager. Each Manager initially elected by the Members holds office until that Manager's successor is elected and qualified, or until that Manager's earlier resignation, removal from office, death, or dissolution. In such elections, there is no cumulative voting, and the persons having a plurality of votes are elected as Managers. The initial Manager is

WEBB CREEK MANAGEMENT GROUP, LLC

5.3.  ***Removal.***  Any one or more of the Managers or all of the Managers may be removed from office, with cause, by the affirmative vote of a the Members holding a majority of the membership units, said majority to be determined by number of membership units held. Notice of a proposal to remove one or more Managers shall be included in the notice of the meeting of Members. On or after December 22, 2015, Any one or more of the Managers or all of the Managers may be removed from office, with cause, by the affirmative vote of a the Members holding a majority of the membership units, said majority to be determined by number of membership units held. Notice of a proposal to remove one or more Managers shall be included in the notice of the meeting of Members.

5.4.  ***Vacancies.***  Any vacancy occurring among the Managers is filled by the vote of a majority of the interests of the Members.

5.5.  ***Authority of Managers to Bind the Company.***  Except as otherwise set forth in this Agreement, the Managers shall have the authority to bind the Company, and exercise such authority through officers, agents or committees of the Company designated by the Managers (but with respect to agents or committees, only to the extent of the authority granted). In particular and without limitation, the Manager has the authority to do any of the following:

5.5.1.  Institute, prosecute and defend any proceeding in the Company's name.

5.5.2.  Purchase, receive, lease or otherwise acquire, and sell, convey, mortgage, pledge, lease, exchange, and otherwise dispose of Company Property.

5.5.3.  Enter into contracts and guaranties (including but not limited to construction contracts), incur liabilities, borrow money, issue notes, bonds and other obligations, and secure any of its obligations by mortgage or pledge of any of the Company's Property or income.

13

5.5.4.    Manage and operate any Company Property.

5.5.5.    Establish Company offices and exercise the powers of the Company within or without the State of Georgia or any other jurisdiction in which the Company conducts business.

5.5.6.    Purchase insurance for the benefit of the Company.

5.5.7.    Make donations to the public welfare or for religious, charitable, scientific, literary or educational purposes provided that the amount of such donations does not exceed limits set by the Members from time to time.

5.5.8.    Generally do any other act that furthers the business and affairs of the Company that is not expressly required by the Agreement or applicable law to be approved by the Members.

5.5.9.    The authorization of any indemnification pursuant to this Agreement, other than any mandatory indemnification provided in this Agreement.

5.5.10.    Lending the Company's money, investing and reinvesting the Company's funds, and receiving and holding property as security for repayment of indebtedness owed to the Company, provided that no money shall be loaned to Members, Managers or Officers other than as advances for business expenses to be incurred in the ordinary course of business of the Company.

The Manager shall not exercise any of the powers set forth in paragraphs 5.5.1, 5.5.2, 5.5.3, 5.5.7, or 5.5.10 prior to January 1, 2016 without the express, written consent of a majority of Membership Interest in the Company.  On and after January 1, 2016, the Manager shall have authority to exercise said powers without obtaining said express written consent, except as may be otherwise provided by this Agreement.  Notwithstanding the foregoing, it is the express intention of the Members that the Manager shall have the authority to convey the Property to Alvion Properties, Inc. upon dissolution of the Company at any time on or after December 21, 2015.

5.6.    ***Meetings***.    Meetings of the Managers for such business as may properly come before the Managers may be called by any Manager. The times, dates, places and purposes of the Managers' meetings shall be designated in a written notice given in person or mailed by the person or persons calling the meeting to each other Manager, not less than two nor more than thirty days before the date of the meeting; if mailed, the notice shall be addressed to such

Manager at the Manager's address on the records of the Company. If a meeting is adjourned to a different date, time or place, notice need not be given of the new date, time or place if the new date, time or place is announced at the meeting before an adjournment is taken. Any Manager may waive notice of a meeting before or after the meeting. All waivers of notice must be in writing, be signed by the Manager entitled to the notice and be delivered to the Company for inclusion in the appropriate records. Neither the business to be transacted at, nor the purpose of, a meeting must be specified in a written waiver of notice. Attendance at a meeting shall constitute a waiver of notice of the meeting, unless at the beginning of the meeting the Manager gives written notice of objection to holding the meeting or transacting business at the meeting. A Manager may vote in person or by proxy. No proxy shall be valid for more than eleven months after the date of its execution unless a longer period is expressly provided in the appointment form. Any action required or permitted to be taken at a Managers' meeting may be taken without a meeting, without prior notice and without a vote if one or more written consents describing the action to be taken are signed and dated by a sufficient number of Managers authorized hereunder to take such action. Unless otherwise provided herein, the affirmative vote or consent by a Majority in Interest of the Managers shall be required to approve any matter presented to the Managers for vote.

5.7.    ___*Minutes*___. The Managers and each committee shall keep minutes of its proceedings, which shall be open for inspection by any Member or Manager upon reasonable prior notice to the Company.

5.8.    ___*Management Officers*___. The Company may, at the discretion of the Members, designate officers to exercise such offices and with such responsibilities as the Members deem appropriate for the Company. A person need not be a Member to be selected as an Officer except as otherwise provided herein, and the same person may hold two or more offices. The Managers will designate which officer of the Company has the responsibility for preparing minutes of the meetings of the Members and Managers, and for authenticating the records of the Company. The number and titles of officers of the Company and other persons who may act as authorized agents of the Company shall be fixed from time to time by the Managers. The officers shall have such titles, duties, authorities and responsibilities as may be delegated to them from time to time by the Managers. The officers shall be elected from time to time by, and serve at the pleasure of, the Managers. The Managers may remove an officer with cause, at any time, subject to any contractual rights of such officer. In the event of the death, resignation or removal of an officer, the Managers shall elect a successor who shall serve the remainder of the term of his or her predecessor.

5.9.    ***Limitation on the Powers of Managers.***   The authority of the Managers under this Agreement is limited by the provisions of the Act and the following:

5.9.1.    Without the written consent to the specific act by at least 99% of the outstanding Membership Interest of the Company, the Manager has no authority to:

5.9.1.1.    Do any act in contravention of this Agreement or the Articles of Organization, as each may be amended from time to time.

5.9.1.2.    Do any act that would make it impossible to carry on the ordinary business of the Company, provided that the resignation by a Manager as Manager upon written notice to all other Managers and Members is not restricted.

5.9.2.    The Manager has no authority to sell all or substantially all of the assets of the Company in a single transaction without the affirmative vote of at least 99% of the outstanding Membership Interest of the Company.

5.9.3.    The Manager has no authority to borrow funds on behalf of the Company except upon the affirmative vote of a majority of Membership Interests, as provided in the Act, or as provided in this Agreement.

5.10. ***Managers and Members Shall Have No Exclusive Duty To Company.***  A Manager or a Member may have other business interests and may engage in other activities in addition to those relating to the Company.  Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other activities or investments of a Member or the income or proceeds derived therefrom.  Neither a Member nor a Manager shall incur any liability to the Company or to any of the Members as a result of engaging in any other business.

5.11. ***Accounts.***  All funds of the Company shall be deposited in its name in an account or accounts as shall be designated from time to time by the Manager. All funds of the Company shall be used solely for the business of the Company. If any bank requires a prescribed form or forms of resolutions relating to such accounts of the Company or to any application, statement, instrument, or other documents connected with the accounts, the resolutions contained in any such prescribed form will be deemed to have been adopted by the Members, and the Manager of the Company is authorized to certify the adoption of any

EXECUTION VERSION

such resolution as though it were unanimously adopted by the Members, and to insert all such resolutions in the records of the Company.

5.12. ***Duties; Liability for Certain Acts.***  In managing the business or affairs of the Company, each Member, Manager, and officer of the Company shall act in the manner provided by Section 14-11-305 of the Act. Except for acts or omissions undertaken in contravention of this Agreement, no Member, Manager or officer shall be deemed to have guaranteed nor shall have any obligation with respect to the return of a Member's capital contributions in the Company or profits from the operation of the Company. Except for acts or omissions undertaken in contravention of this Agreement, each Member's, Manager's, and Officer's liability to the Company, the Members, and the other Managers and officers shall be limited and the Members, Managers, and officers shall be indemnified as set forth in this Agreement. No Member, Manager, or officer shall be liable, solely by reason of being a Member, Manager, officer, agent, or employee of the Company, under a judgment, decree, or order of a court, or in any other manner, for a debt, obligation, or liability of the Company, whether arising in contract, tort, or otherwise, or for the acts or omissions of any other Member, Manager, officer, agent, or employee of the Company, whether arising in contract, tort, or otherwise, except as provided in Section 14-11-408 of the Act (liability upon wrongful distributions).

5.13. ***General Authority.***  Unless expressly authorized to do so by this Agreement, no one or more of the Members, Managers, officers, employees or other agents of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

### ARTICLE VI
### LIMITATION OF LIABILITY OF MEMBERS

6.1. ***Limitation of Liability.***  No Member shall be personally liable as such for the liabilities of the Company including debts, losses, claims, judgments or any of the liabilities beyond the Member's contributions to the capital of the Company, except as provided by law.

6.2. ***Representations and Warranties.***    Each Member hereby represents and warrants to the Company and each other Member that the Member is acquiring such Member's Membership Units for the Member's own account as an investment and without an intent to distribute the Membership Units; and such Member acknowledges that the Membership Units have not been registered under the Securities Act of 1933 or any state securities laws, and that in addition to the other restrictions provided herein the Membership Units may not be resold or transferred by the Member without appropriate registration or the availability of an exemption from such requirements. Each Member agrees to hold harmless and indemnify the Company, its officers, directors, agents and

EXECUTION VERSION

other Members, from and against any loss or damages incurred as a result of any breach of such representation and warranty.

### ARTICLE VII
### CAPITAL CONTRIBUTIONS

7.1.    ***Capital Contributions***. The Members have made contributions of cash in exchange for Membership Units in the Company as shown on Exhibit "A" attached hereto and incorporated herein by reference.  No interest shall accrue on any capital contribution and no Member shall have the right to withdraw or be repaid any capital contribution except as provided in this Agreement.

7.2.    ***Additional Capital Contributions***.  Solely to the extent approved by the Members by the affirmative vote of a majority of units held from time to time, the Members may be permitted (but not required) to make additional capital contributions if and to the extent they so desire, and if the Members so determine that such additional capital contributions are necessary or appropriate in connection with the conduct of the Company's business (including without limitation, expansion or diversification), in such event, all Members shall have the opportunity (but not the obligation) to participate in such additional capital contributions on a pro rata basis in accordance with their relative Membership Interests determined as of the date such additional capital contributions are so approved. Except as otherwise agreed by the Members, no Member making any additional capital contributions hereunder shall be entitled to receive additional Membership Units in exchange therefore. Each Member acknowledges and agrees that should additional capital contributions be authorized hereunder in which a Member does not participate and should the Members agree by majority vote that any Member or Members making any such capital contributions should be entitled to receive additional Membership Units in exchange therefore, the Membership Interest of each Member who declines to participate in such capital contributions will be diluted as a result of such circumstances.

7.3.    ***Right to Raise Additional Capital***.

7.3.1.    ***Issuance of Units.***  If at any time and from time to time on or after January 1, 2016, the Members determine that additional funds are required by the Company for or in respect to its business for any of its obligations, expenses, costs, liabilities or expenditures, the Manager, upon the affirmative vote of a majority of Membership Interests, may cause the Company to sell additional Membership Units and admit additional Members upon the terms and conditions and, for such prices as are agreed to by the Managers. Any Person who acquires any Membership Units which have been offered in accordance with the provisions of this Section

7.3.1 may be admitted to the Company as a new Member (or if such Person is already a Member, his, her or its Membership Interest may be increased), and no further consent of such admission (or increase in an existing Member's Membership Interest) by the existing Members shall be required. By virtue of this provision, an existing Member's Membership Interest may be diluted upon the sale of such additional Membership Units, and each Member hereby consents to such dilution provided the conditions of this Section 7.3 have been satisfied.

7.3.2. ***Additional Members.*** Except as provided under Section 7.3.1., no additional person or entity shall be entitled to acquire or obtain any Membership Units or otherwise be admitted as a Member of the Company except as otherwise specifically permitted under this Agreement.

7.4. ***Loans to the Company***. If at any time and from time to time additional funds are required by the Company for or in respect to its business or any of its obligations, expenses, costs, liabilities or expenditures, in lieu of raising such additional funds from any bank or other financial institution or third party, the Company may obtain such loans in such amounts upon such terms and conditions and from such Members as the Manager shall deem appropriate. No Member shall be required to make any loan to the Company hereunder unless otherwise agreed to in writing by such Member. Any loan to the Company by a Member shall not be a capital contribution to the Company, but shall be a debt due such Member in his capacity as a creditor of the Company. Such loan(s) may have such preference, priority or security position as may be permissible under law and as may be determined by the Manager and as is acceptable to the Member or Members advancing the same.

7.5. ***Limits on Additional Capital Contributions***. Except as to (i) the initial capital contributions required to be made by any Member to the Company as set forth in Section 7.1 of this Agreement, (ii) any Member's obligation to pay the purchase price for any additional Membership Units purchased by such Member pursuant to Section 7.2 or 7.3 hereunder, or (iii) any obligation to make any loan to the Company which has been agreed to in writing by any Member in accordance with Section 7.4 hereof, no Member shall be required by any person or entity (including in the name or on behalf of the Company) to make any capital contributions or loans to the Company. This Section 7.5 shall inure to the benefit of each Member, it being the parties intention that no other third party shall constitute a third party beneficiary of any provisions of this Agreement and that neither the Company, nor any Member or Members nor any other creditor, person or entity be entitled or empowered to require any Member to make additional capital contributions or loans to the Company for any purpose whatsoever.

7.6.    ***Maintenance of Capital Accounts***.    The Company shall establish and maintain a capital account for each Member according to Code Section 704(b) and the Regulations under such Code Section.    A Member's capital account shall initially be the agreed value of the initial capital contributed by such Member. Each Member's capital account shall thereafter be credited with (i) the amount of the Member's additional cash contributions (if any), other than those required under Section 7.1,(ii) the agreed value of the Member's additional contributions of property or services (if any), other than those required under Section 7.1, and (iii) the Member's share of Tax Profits excluding Built-in Gains and Built-in Losses, and shall be debited with (i) the amount of cash withdrawals and distributions, (ii) the agreed value of property distributions and (iii) the Member's share of Tax Losses excluding Built-in Gains and Built-in Losses. The provisions of this Section and the other applicable sections of this Agreement shall be construed in a manner consistent with Regulations Sections 1.704-1(b).

7.6.1.    ***Distributions of Property***.    On the distribution of Property to a Member, prior to reducing such Member's capital account by the fair market value of the Property hereunder, the capital accounts shall first be adjusted to reflect the allocation of the Built-in Gain or Built-in Losses inherent in such Property (that has not previously been reflected in the capital accounts) as though the Property were sold on the distribution date at its fair market value.

7.6.2.    ***Adjustments***.    Adjustments to the capital accounts hereunder shall be made with reference to the federal tax treatment of the item giving rise to the adjustment at the Company level without regard to any elective tax treatment of such items at the Member level.

7.6.3.    ***Compliance with Treasury Regulations***.    The foregoing provisions and the other provisions of this Agreement relating to the maintenance of capital accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Members shall determine that it is prudent to modify the manner in which the capital accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Company or Members), are computed in order to comply with such Regulations, the Members may make such modifications as they deem reasonably necessary, provided that such modifications are not likely to have a material effect on the amounts distributable to any Member pursuant to this Agreement. The Members shall also make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Treasury Regulations Section 1.704-1(b).

EXECUTION VERSION

### ARTICLE VIII
### ALLOCATIONS AND DISTRIBUTIONS

8.1.   ***Allocations of Tax Profits and Tax Losses***.   Except as may be required by Section 704(c) of the Code and exclusive of any allocations required under Section 704(c), the allocations, Tax Profits and Tax Losses shall be allocated among the Members in proportion to the Members' respective Membership Interests.

8.2.   ***Built-in Gains and Built-in Losses***.   Built-in Gains and Built-in Losses shall be allocated to the Members according to the principles of Code Section 704(c) and the regulations thereunder.

8.3.   ***Mechanics of Allocations***.   The Members have the authority to vary the allocations provided hereunder to the extent necessary to comply with federal income tax laws, so long as there is no material adverse effect on the amounts distributable to any holder of any Membership Units. When the Company is dissolved and wound-up pursuant to this Agreement, all items of income, gain, loss and deduction not previously allocated shall be allocated to the Members pursuant to this Article VIII. Whenever a share of the Company's Tax Profits, Tax Losses, or other tax items is credited or charged to the capital account of a Member, every item of income, gain, loss or deduction entering into the computation of such Tax Profits, Tax Losses or other item (or other relevant period) shall be considered either credited or charged as the case may be, and every item of credit or tax preference relating to Tax Profits, Tax Losses, or other tax item and applicable to the period during which such Tax Profits, Tax Losses or other item as realized shall be allocated to the applicable capital account in the same proportion. Allocations made in this Article shall be made to each person or entity holding any Membership Units who or which has not been admitted as a Member hereunder to the same extent as such allocations would be made to a Member owning such Membership Units.

8.4.   ***Cash Distributions***.   The following shall apply to cash distributions:

8.4.1.   ***Timing.***   All cash distributions shall be distributed to the Members at such times as the Manager determines to be advantageous and practical for the Company. That portion of any distribution of Distributable Cash which is allocable to any Membership Interest shall be made to the Member who owns the Membership Units giving rise to such Membership Interest on the day of the distribution.

8.4.2. ***Fees; Reimbursements.*** Each Member shall be entitled to receive such compensation and such other fees in payment for all services rendered by such Member, in his, her or its capacity other than that of a Member, for and on behalf of the Company in such amount and at such time or times as an affirmative vote of at least 99% of the outstanding Membership Interest of the Company shall determine.

8.4.3. ***Distributions Upon Dissolution.*** Notwithstanding anything herein to the contrary, upon the occurrence of an event of dissolution as provided in Article XI hereof, cash distributions occurring in connection with such event of dissolution and thereafter shall be made in accordance with Article XI hereof.

8.4.4. ***Distributions After the Fiscal Year End.*** The Members may, to the extent consistent with this Article, elect to have distributions made after the end of a Fiscal Year relate back to such Fiscal Year, provided, however, that any such distribution must be made within forty-five (45) days after the end of such Fiscal Year.

8.4.5. ***Withholding.*** The Company shall be authorized to withhold from amounts to be distributed to any Member hereunder any withholding required by the Code or any provision of any statute or state or local tax law, and to pay such amounts to the Internal Revenue Service or other appropriate taxing authority. Any such amounts withheld shall be treated as having been distributed to such Member pursuant to this Article for all purposes of this Agreement.

8.4.6. ***Consent to Distributions.*** The methods set forth in this Article for distributions are hereby expressly consented to by each Member as an express condition to becoming a Member. Distributions required to be made under this Article shall be made to each holder of any one or more Membership Units who has not been admitted as a Member of the Company under this Agreement to the same extent as such distributions would be made to a Member owning such Membership Units.

### ARTICLE IX
### TAXES

9.1. ***Elections***. The Members may make any tax elections for the Company allowed under the Code or the tax laws of any state or other jurisdiction having taxing jurisdiction over the Company; provided, however, that the Members shall make any required elections and take any other steps

EXECUTION VERSION

required to cause the Company to be taxed as a partnership for Federal income tax purposes.

9.2.    ***Taxes of Taxing Jurisdictions***.  To the extent that the laws of any taxing jurisdiction require, each Member will submit an agreement indicating that the Member will make timely income tax payments to the taxing jurisdiction and that the Member accepts personal jurisdiction of the taxing jurisdiction with regard to the collection of income taxes attributable to the Member's income, and interest, and penalties assessed on such income.  The Company may, where permitted by the rules of any taxing jurisdiction, file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of the Members on such income to the taxing jurisdiction, in which case the Company shall inform the Members of the amount of such tax interest and penalties so paid.

**ARTICLE X**
**DISSOCIATION OF A MEMBER**

10.1.  ***Dissociation***.  A Member shall cease to be a Member upon the happening of any of the following events (a *"Dissociation"*):

10.1.1.    The attempted Transfer (other than as permitted under this Agreement) of any portion of a Member's Membership Units or the Membership Interest represented thereby; or

10.1.2.    The withdrawal of the Member in the exercise of such Member's statutory withdrawal right; or

10.1.3.    In the case of a Member that is a limited liability company or other separate organization other than a corporation or estate or trust, the dissolution and commencement of winding up of the Member; or

10.1.4.    In the case of a Member that is a corporation, the filing of articles of dissolution for the corporation or the revocation of its charter (except an involuntary administrative dissolution if the corporation is promptly reinstated after notice thereof, provided that applicable state law treats the reinstatement as relating back to and effective as of the effective date of the administrative dissolution); or

10.1.5.    A successful claim by any person of a right to all or any portion of the Member's Membership Units or the Membership Interest represented thereby on the basis that such interest has been transferred to

such claimant by operation of law or otherwise, except pursuant to a transfer permitted under this Agreement.

10.2. **_Rights of Dissociated Member_**.  In the event of the Dissociation of any Member (a *"Dissociated Member"*):

10.2.1.    If the Dissociation is followed by the winding up of the Company, the Dissociated Member shall be entitled to participate financially in the winding up of the Company to the same extent as any other Member except that, if the Dissociation is in violation of this Agreement, any distributions to which the Dissociated Member would have been entitled shall be reduced by the damages sustained by the Company as a result of the dissolution and winding up; or

10.2.2.    If the Dissociation is not followed by the winding up of the Company, the Dissociated Member shall have only the right to receive the allocations of profits or losses and the distributions payable with respect to the Dissociated Member's interest.

## ARTICLE XI
## DISSOLUTION AND WINDING UP

11.1. **_Dissolution_**.  The Company shall be dissolved and its affairs wound up, upon the first to occur of the following events (which, unless the Members agree to continue the business as provided below, shall constitute *"Dissolution Events"*):

11.1.1.    The expiration of the term set forth in this Agreement, unless the business of the Company is continued with the consent of the Members; and

11.1.2.    The written consent of at least 99% of outstanding Membership Interest of the Company.

11.2. **_Effect of Dissolution_**.  Upon dissolution, the Company shall cease all business except that incident to the winding up of its affairs, but the Company shall not be terminated, but shall continue in existence until the winding up of its affairs is completed and a Certificate of Termination has been issued by the Secretary of State of Georgia. The Manager as of the date of the Dissolution Event shall have full authority over all matters related to the winding up of the Company.

EXECUTION VERSION

11.3. ***Distribution of Assets on Dissolution***.  Upon dissolution of the Company for any reason, the Company shall promptly commence to wind-up its affairs. A reasonable period of time will be allowed for the orderly termination of the Company's business, the discharge of its liabilities and the distribution or liquidation of its remaining Property so as to enable the Company to minimize the normal losses attendant to the liquidation process. The Manager will cause a full accounting of the assets and liabilities of the Company as of the date of dissolution to be taken and a written statement thereof will be furnished to each Member within sixty (60) days after such date. Such accounting and statement will be prepared under the direction of the Manager or, if the Manager so determines, by a liquidating trustee selected by the Manager. In winding up the affairs of the Company, the Manager shall undertake the following:

11.3.1.    Sell, liquidate, or distribute in kind any or all of the Company's Property as promptly as practicable in a manner agreed upon by the affirmative vote of a majority of Membership Interests in the Company;

11.3.2.    Subject to Section 11.3.5 below, allocate any profit or loss resulting from such sales to the Members in accordance with Article VIII hereof;

11.3.3.    Discharge all liabilities of the Company, including liabilities to Members who are creditors, in the order of priority and to the extent otherwise permitted by law, other than liabilities to Members for distributions;

11.3.4.    Establish such Reserves as the Manager deems to be reasonably necessary;

11.3.5.    Subject to the provisions of 11.3.6 below, distribute the remaining Property in the following order:

(i)    If any Property of the Company is to be distributed in kind, the Appraised Value (net of any liability secured by such Property that the Member receiving the Property is considered to assume or take subject to under Code Section 752) of such Property as of the date of dissolution shall be determined in the manner provided in this Agreement. Such Property shall be deemed to have been sold as of the date of dissolution for its Appraised Value and the capital accounts of the Members shall be adjusted pursuant to the provisions of this Agreement to reflect such deemed sale.

EXECUTION VERSION

(ii)   The positive balance (if any) of each Members' remaining capital account (as determined after taking into account all capital account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed to the Members, either in cash or in kind, as determined by the Manager, with any Property distributed in kind being valued for this purpose at its Appraised Value. Any such distributions to the Members in respect of their capital accounts shall be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations.

(iii)   All remaining Property shall go and be distributed to all Members in proportion to their respective Membership Interests as determined on the date of such liquidation and distribution.

(iv)   To the extent that any event of dissolution involves the distribution of real property held by the Company to any of the Members, said distribution shall be made by the Company absent any attendant liabilities to said Member.   This provision shall not apply to any distribution to a Member who has otherwise consented in writing to the undertaking of any Company debt that may encumber any real property held by the Company.

11.3.6   Notwithstanding the foregoing, in the event of the initiation of dissolution of the Company on or before December 31, 2015, the contributions made by the Members as set forth on Exhibit A hereto shall be distributed to the Members such that the Members are returned to *status quo ante* prior to the formation of the Company.   To the extent this paragraph 11.3.6 is found to be inconsistent with any other provision of this Agreement, this paragraph 11.3.6 shall control.

11.4. ***Completion of Winding Up; Certificate of Dissolution***.   The winding up of the Company shall be completed when all debts, liabilities, and obligations of the Company have been paid and discharged or reasonably adequate provision therefor has been made, and all of the remaining property and assets of the Company have been distributed to the Members. Upon the completion of winding up of the Company, a Certificate of Dissolution shall be delivered to the Secretary of State of Georgia for filing. The Certificate of Dissolution shall set forth the information required by the Act.

11.5. ***Further Assurances.***   The Members shall comply with any applicable requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its Property.

EXECUTION VERSION

## ARTICLE XII
## INDEMNIFICATION

12.1. ***Indemnification of Members, Managers and Officers***.    The Company shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, including but not limited to an action by or in the right of the Company, by reason of the fact that such person is or was a Member, Manager or officer of the Company, or is or was serving at the request of the Company as a manager, director, officer, employee or agent of another company, corporation, partnership, joint venture, trust or other enterprise, against expenses, including attorneys' fees, judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding if such person acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful. This provision applies only to actions taking by the aforementioned parties where the actions in question are taken on or after December 22, 2015.    The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his or her conduct was unlawful.

## ARTICLE XIII
## SPECIAL COVENANTS

13.1. ***Conflicting Interest Transactions***.    The Members are hereby authorized to approve any "conflicting interest transaction" in the manner and to the extent provided for in Section 14-11-307 of the Act, as the same may be amended from time to time, and any successor provisions thereto.

13.2. ***Managers and Members Shall Have No Exclusive Duty to Company***.  A Manager or a Member may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have the right, by virtue of this Agreement, to share or participate in such other activities or investments of a Member or Manager or the income or proceeds derived therefrom. Neither a Member nor a Manager shall incur any liability to the Company or to any of the Members as a result of engaging in any other business.

EXECUTION VERSION

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

14.1. ***Partnership Intended for Tax Purposes***.   The Members expressly intend to have the Company treated as a partnership under the Code.

14.2. ***Rights of Creditors and Third Parties under Agreement***.   The Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assignees.   The Agreement is expressly not intended for the benefit of any creditor of the Company or any other person.   Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under the Agreement or any agreement between the Company and any Member with respect to any capital contribution or otherwise.

14.3. ***Miscellaneous Provisions.***

14.3.1. ***Entire Agreement.***   This Agreement constitutes the entire agreement between the parties and supersedes any prior understanding or agreement among them respecting the subject matter hereof or thereof.

14.3.2. ***Application of Georgia Law.***   This Agreement, and the application of interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of Georgia, and specifically the Act.

14.3.3. ***Construction.***   Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and the neuter genders and vice versa.

14.3.4. ***Headings.***   The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof.

14.3.5. ***Waivers.***   The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

14.3.6.    ***Rights and Remedies Cumulative.***    The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right not to use any or all other remedies. Such rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

14.3.7.    ***Severability.***    If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

14.3.8.    ***Heirs, Successors and Assigns.***    Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors and assigns. Except as permitted under Article IV no party shall assign its rights, entitlements, duties or obligations hereunder.

14.3.9.    ***Counterparts; Copies.***    This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. One or more copies of this Agreement may be executed but it shall not be necessary, in making proof of the existence of this Agreement, to provide more than one original copy.

14.3.10.    ***Amendments.***    Any amendment to this Agreement shall be made in writing and signed by at least 99% of the outstanding Membership Interest of the Company or their respective attorneys-in-fact. Under certain circumstances specified below, this Agreement may be amended, altered, restated, or repealed with the consent of the Manager and without the consent or approval of the Members. Amendments made under this section, if necessary to accomplish the objective of the amendment may have an effective date prior to the date of filing. These circumstances include:

(i)    *Change in Membership.*    To admit into the Company Substituted Members accepted by the Members or Manager by prior action or as allowed under this Agreement.

(ii)    *Clarification of Agreement Language.*    To clarify language in this Agreement provided that the substance of such provision is

not materially changed, and provided that the Company obtains the written opinion of its counsel that the amendment clarifies language in this Agreement without materially changing the substance of such provision.

(iii)    *Compliance with Tax or Securities Laws.*  To make any necessary or appropriate changes in this Agreement in order to comply with the requirements of the Code with respect to entities taxed as partnerships, to implement any future tax provisions governing the taxation of limited liability ompanies, as such, or the requirements of any federal or state securities laws or regulations, provided that any amendment does not adversely affect the interests of any Member.

Any amendment to this Agreement that increases the obligation of any Member to contribute to the Company or creates a responsibility of any Member for the liabilities of the Company, as a guarantor or otherwise, requires the written approval of any affected Member, the written approval of the Managers, and of a majority in Member interests of the Company.

14.3.11.    **_Notices._**  Except as may be otherwise set forth in this Agreement, whenever this Agreement requires notice to be given to any Member or Manager, the notice may be given by mail, in person by courier delivery, or by overnight delivery. All notices required hereunder shall be addressed and sent to the Member or Manager at his or her or its last known mailing address as it appears on the books of the Company. Any such written notice shall for all purposes of this Agreement be deemed as being delivered hereunder (i) if mailed, three (3) days after being deposited with the United States Postal Service, postage prepaid and designated as certified with return receipt requested, and properly addressed to the addressee, (ii) if sent via overnight delivery, one (1) day after being deposited with a nationally recognized next day delivery service with all delivery fees prepaid or (iii) if personally delivered, when so delivered. Any party may change the address located within the United States at which such party is to receive notice hereunder by delivery of notice of such change of address to the Company in accordance with this Section 14.3.11. Any party's failure or refusal to accept any notice or the inability to deliver notice to any address last reflected on the books and records of the Company shall constitute delivery of such notice to the party to whom addressed.

14.3.12.    **_No Engagement of Services._**  Nothing contained in this Agreement shall be construed to constitute or be evidence of an implied agreement or understanding on the part of the Company, to employ,

engage or retain any Member or Member's services for any specific period of time, except as expressly agreed to in writing.

14.3.13.    ***Representation and Warranties.***    Each party hereto hereby represents and warrants to the other parties that (i) the entering into by him, her or it of this Agreement, and the consummation by him, her or it of the transactions contemplated hereby, does not and shall not violate any agreement (whether express, implied or by operation of law) with any other person to which he, she or it is a party or subject, and, (ii) this Agreement is binding upon him, her or it pursuant to the laws of its domicile.

14.3.14.    ***Interpretation of Conflicting Provisions.***    If any conflict appears between the Articles of Organization of the Company or this Agreement, or the Act, the provisions of the Act govern the Articles of Organization or this Agreement, and the Articles of Organization govern this Agreement. Any such conflict is to be promptly resolved by the adoption of an amendment either to the appropriate provision of the Articles of Organization, or to the appropriate provision of this Agreement.

14.3.15.    ***Additional Parties.***    Additional persons may accede to and be added as parties to this Agreement as Members of the Company in accordance with this Agreement, the Articles of Organization and the Act. In addition to any other procedures and requirements specified elsewhere in this Agreement, the Articles of Organization, or the Act, the execution of an amendment to this Agreement is required, that states the modification to all pertinent provisions in this Agreement relevant to the addition of such person, signed by the person or persons to be added, and by the requisite number of Members who then hold sufficient interests in the Company to approve the addition of the new Members.

14.3.16.    ***Voting.***    Whenever a vote of the Members is required hereunder, said vote shall be based on a majority vote of the outstanding Membership Units voting in favor of the action to be taken unless otherwise provided for in this Agreement.

14.4.    ***Definitions***.    For purposes of this Agreement, unless the context clearly indicates otherwise, capitalized words or phrases are (unless otherwise defined in this Agreement) defined as follows:

14.4.1.    ***"Appraised Value"*** means with respect to any particular Company asset as of any particular date the fair market value of such asset as mutually agreed to in writing by the Members. If no such agreement is reached within fifteen (15) days from and after the request of

any Member that the Appraised Value of any asset be so agreed, then the Appraised Value of such asset shall be the fair market value thereof as determined by a duly qualified appraiser having a minimum of five (5) years' experience in making similar appraisals (a "Qualified Appraiser") as selected by the Members. Any determinations as to the value of any particular Company asset made pursuant to this Agreement by any Qualified Appraiser(s) shall be absolute, final and binding upon all of the parties hereto and shall not be subject to arbitration, appeal or change.

14.4.2. *"Built-in Gains"* means allocations, pursuant to Code Section 704(c), taken into account in determining Tax Profits or Tax Losses, to the extent such allocations are attributable to the excess of the agreed value over the tax basis of property contributed to the Company.

14.4.3. *"Built-in Losses"* means allocations pursuant to Code Section 704(c), taken into account in determining Tax Profits and Tax Losses, to the extent such allocations are attributable to the excess of the tax basis over the agreed value of property contributed to the Company.

14.4.4. **"Cash and Cash Equivalents"** means all cash available to the Company from all sources whatsoever including without limitation, any capital contributions made to the Company from its Members, all Reserves and all available borrowings or undrawn lines of credit available to the Company which borrowings or lines of credit have been approved by a Majority in Interest of the Members in their respective sole discretions.

14.4.5. *"Code"* and *"Regulations"* mean, respectively, the Internal Revenue Code of 1986, and the regulations promulgated thereunder, in either case as amended from time to time. A reference to a Section of the Code shall refer to the corresponding provision of any successor law. Any reference to a specific section or sections of the Code shall be deemed to include a reference to any corresponding provision of succeeding law.

14.4.6. **"Company"** means ALVION PROPERTIES II, LLC, a Georgia limited liability company.

14.4.7. **"Distributable Cash"** for any Fiscal year means all cash, revenues, proceeds and other funds received by the Company from its operations including without limitation those received from the sale or disposition of all or any part of the Company's Property (as hereinafter defined) and all debt proceeds received under financing secured by all or any part of the Company's Property, but excluding any and all capital contributions made to the Company by its members less the sum of the following to the extent paid or set aside by the Company: (i) all principal

and interest payments on indebtedness of the Company and all other sums due or paid to lenders of the Company; (ii) all cash expenditures (including expenditures for taxes, fees [including those fees paid to the Members other than in their capacities as Members of the Company hereunder], maintenance, capital improvements and other similar operating costs) incurred incident to the normal organization and operation of the Company's business; (iii) such reserves as the Manager deems reasonably necessary for the proper operation of the Company's business. Depreciation and other non-cash charges and distributions to Members shall not be considered in determining Distributable Cash. Any available cash in reduction of any capital reserve not considered a return of capital shall be considered Distributable Cash.

14.4.8.   *"Fiscal Year"* means the Company's fiscal year, which shall be the year ending December 31.

14.4.9.   *"Property"* at any particular time, shall mean the interest in all real and personal property of the Company and any other assets or property (tangible or intangible, choate, inchoate, fixed or contingent, including cash and cash equivalents) of the Company. It is specifically contemplated that the Company may own assets either directly in its own name or indirectly through its acquisition of an ownership interest in other third party entities with the express intention that the Company's interest in any and all third party entities shall constitute Property hereunder.

14.4.11.   *"Reserves"* shall mean with respect to any fiscal period, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts deemed sufficient or necessary by the Manager to meet the needs of the business of the Company, including: for (i) working capital to pay taxes, insurance, debt service or other costs or expenses incident to the ownership of operation of the Company's business and (ii) contingent and unforeseen liabilities incurred in the ownership or operation of the Company's business, in each case which may become due and payable with any period and for which the cash to make such payments may not be generated by operations during the period.

14.4.12.   *"Successor in Interest"* shall mean with respect to any Member, any entity succeeding to all or substantially all of the assets or properties owned by such Member by reason of any merger, stock sale, recapitalization, voluntary corporate reorganization (other than pursuant to any federal bankruptcy statutes or any other laws affecting creditor's rights or constituting an assignment for the benefit of creditors), consolidation or sale of all or substantially all of the assets of or involving such Member.

14.4.13. *"Tax Profits"* and *"Tax Losses"* for any taxable year mean the net income or loss of the Company as reported for federal income tax purposes as to such taxable year, calculated by (i) including all amounts allocated to all Members under Code Sections 702(a)(1) through 702(a)(8), (ii) increased by tax-exempt income and (iii) decreased by expenditures described in Code Section 705(a)(2)(B).

14.4.14. *"Transfer"* means any disposition, directly or indirectly, by operation of law or otherwise, voluntarily or involuntarily, by intestacy, will, trust or estate distribution, or inter vivos action, including any sale, assignment, gift, exchange, pledge, encumbrance or other creation of a security interest, attachment, creation of any interest in the Company or distribution from the Company for the benefit of creditors, or (without limitation) other transfer or disposition of a Member's interest in the Company or any right, title or interest therein, whether absolute or as security, whether voluntary or involuntary, including any Transfer by operation of law; *"Transfer"* when used as a verb means to effect or attempt to effect a Transfer.

(SIGNATURES APPEAR ON FOLLOWING PAGE)

EXECUTION VERSION

IN WITNESS WHEREOF, the parties have entered into this Agreement to be effective as of the date first above written. This Agreement is freely and voluntarily made by all of the parties after full and complete consideration of all relevant facts at hand, and in recognition of the benefits each will accrue from the terms of this Agreement.

ALVION PROPERTIES, INC.


_____
BY: SHIRLEY KARNES MEDLEY, President


WEBB CREEK INVESTMENTS, LLC


_____
BY: BRYAN W. KELLEY, Manager

EXECUTION VERSION

## EXHIBIT "A"

| Initial Member | Initial Capital Contribution | Initial Share of Total Capital |
|---|---|---|
| ALVION PROPERTIES, INC. | Real Property | 99% |
| WEBB CREEK INVESTMENTS, LLC | Cash | 1% |

36