# <u>EXHIBIT A</u>

PSZJ Edits

# OPERATING AGREEMENT

## OF

## ALVION PROPERTIES II, LLC

Effective as of December ___, 2015

LIMITED LIABILITY COMPANY INTERESTS IN ALVION PROPERTIES II, LLC, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR ANY APPLICABLE STATE SECURITIES LAWS ("THE STATE ACTS") AND, IF SOLD, HAVE BEEN SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND THE STATE ACTS, INCLUDING PARAGRAPH (14) OF CODE SECTION 10-5-11 OF THE GEORGIA UNIFORM SECURITIES ACT OF 2008, AS AMENDED, AND SECTION 4(a)(2) OF THE SECURITIES ACT. THE LIMITED LIABILITY COMPANY INTERESTS HAVE BEEN ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE OFFERED FOR SALE, PLEDGED, HYPOTHECATED, SOLD OR TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS AND CONDITIONS OF THIS AGREEMENT AND IN A TRANSACTION WHICH IS EITHER EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND THE STATE ACTS OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER THE SECURITIES ACT AND THE STATE ACTS.

EXECUTION VERSION

**OPERATING AGREEMENT**
**OF**
**ALVION PROPERTIES II, LLC**

This OPERATING AGREEMENT for ALVION PROPERTIES II, LLC (the *"Agreement"*) is made effective the ___ day of December, 2015, by the following initial members:

>ALVION PROPERTIES, INC., Chapter 11 Debtor and Debtor in Possession ("Alvion") and
>WEBB CREEK INVESTMENTS, LLC ("Webb Creek")

together with each and every member hereafter admitted to the Company as such being hereinafter individually referred to as a "Member" and collectively referred to as the "Members").

**NOW, THEREFORE, THIS AGREEMENT WITNESSES** that in consideration of the premises and mutual covenants herein contained, each of the parties hereto hereby covenants and agrees with the others as follows:

**ARTICLE I**
**FORMATION**

1.1.    ***Organization***.  The Members have previously hereby organized the Company as a Georgia limited liability company pursuant to the provisions of the Georgia Limited Liability Company Act set forth under O.C.G.A. Sections 14-11-100, et. seq. (the *"Act"*).

1.2.    ***Effective Date.***    The effective date of the Company is October 1, 2015.

1.3.    ***Agreement***. The Members hereby agree to the terms and conditions of the Agreement, as it may from time to time be amended according to its terms. This Agreement constitutes the organization for the regulation and management of the Company as authorized by its Articles of Organization. This Agreement is adopted in order to fulfill the objectives of the Company as stated in the Act section 201, and to exercise the powers conferred upon the Company under the Act section 202. The parties desire to set out more fully in this Agreement, the purposes of the Company, the relationships among the Members, and other matters.

1.4.    ***Name***.  The name of the Company is ALVION PROPERTIES II, LLC. All business of the Company shall be conducted under its legal name or under

1

EXECUTION VERSION

such fictitious or assumed business names as may be determined by the Members.

1.5. ***Scope of Business Activity of Company.*** The business of the Company is to engage in any business or activity permitted under the Act; and to engage in such other activity related to these activities as may be necessary, advisable or convenient to the promotion or conduct of the business of the Company.

1.6. ***Articles of Organization***. Articles of Organization (as so filed and as hereafter duly amended, the *"Articles"*), for the Company have been filed with the Secretary of State of Georgia. The Members agree to execute such further documents (including amendments to the Articles of Organization) and take such further action as is appropriate to comply with the requirements of law for the formation or operation of a limited liability company in all states, countries and other jurisdictions where the Company may conduct its business. The Members agree to cause such meetings of the Company to be held, resolutions passed, regulations enacted, agreements and other documents signed and things performed or done as may be required to implement the arrangements specified in this Agreement in connection with the affairs of the Company.

1.7. ***Term.*** The term of the Company shall be perpetual. The Company shall be dissolved and its affairs wound up in accordance with the Act or this Agreement.

1.8. ***Registered Agent and Office***. The Company's registered office shall be at the office of its registered agent at 210 East 2nd Avenue, Rome, Floyd County, Georgia 30161. The name of its initial registered agent at such address is Bryan Kelley. The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Secretary of State of Georgia pursuant to the Act and the applicable rules promulgated thereunder.

1.9. ***Principal Office***. The principal office of the Company shall be located at 210 East 2nd Avenue, Rome, Georgia 30161. The principal office for the transaction of business of the Company may be changed and be located at such place as may be fixed from time to time by the Members or Manager. Branch offices and places of business may be established at any time by the Members or Manager at any place or places where the Company is qualified to do business, whether within or outside the State of Georgia.

1.10. ***Accounting and Records.*** The Company shall maintain at its principal office such records as may be required by the Act or other applicable laws.

2

EXECUTION VERSION

1.11.  **_Persons Considered to be Members_**.  *"Member"* means a person who has agreed to be bound by this Agreement and who has been admitted as a member of the Company pursuant to the Act and this Agreement, but excludes a Dissociated Member.

1.12.  **_Membership._**  The following Members shall own the following number of Membership Units in the Company:

| MEMBER | MEMBERSHIP UNITS |
|---|---|
| ALVION PROPERTIES, INC. | 99 |
| WEBB CREEK INVESTMENTS, LLC | 1 |

**ARTICLE II**
**MEMBERS: RIGHTS, POWERS AND LIMITATIONS**

2.1.  **_Units_**.  The Company shall be authorized to issue one class of Membership Units to be evidenced by Member Interest Certificates representing ownership interests in the Company namely "Membership Units" and to have those rights set forth below.

2.1.1.  **_Membership Units._**  All of the voting rights and authority with respect to the Company and its operations including all rights to vote, control and participate in the management of the Company and its capital, operations and profits; appoint, elect and remove any Managers who may be responsible for managing the affairs and operations of the Company, and otherwise decide upon any matter or thing whatsoever affecting the Company and its operations shall be vested in the Members owning the Membership Units. No individual or entity holding or having claim to any Membership Units shall be entitled to exercise any voting rights attributable thereto unless and until such individual or entity is admitted as a Member of the Company in accordance with the provisions of this Agreement. Each Membership Unit shall be entitled to cast one vote and, unless otherwise specifically provided herein, a majority by number of the votes entitled to be cast shall control and determine the matter at issue. The Company may issue fractional shares of any Membership Unit. The owners of the Membership Units shall be entitled to all notices of all meetings of the Members and shall be entitled to vote on all questions or issues that may be presented to and decided upon by the Members of the Company.

3

EXECUTION VERSION

2.2.  **_Rights, Powers and Limitations of Members_**.  Members are entitled to the rights and powers, and subject to the limitations provided by the Act, the Articles of Organization, and this Agreement.

2.3.  **_Acts Requiring Member Action._** The following acts require Member action.

2.3.1.  **_Alterations or Amendments of Articles of Organization or This Agreement._**  The Articles of Organization and this Agreement will not be altered, amended, repealed, or restated, unless approved by a majority of the Members.

2.3.2.  **_Merger._**  No merger, acquisition or consolidation of the Company into any other business entity will be approved except by a majority of the Members.

2.3.3  **_Additional Contribution of Capital._**  No additional contribution of capital to the Company will be issued or allotted, except with approval of a majority of the Members.

2.3.4.  **_No Changes in Capital Structure._** The capital of the Company will not be increased, reduced, converted, subdivided or consolidated, except with approval of a majority of the Members.

2.3.5.  **_Rights and Options._**  The Company will not enter into any agreement or make any offer or grant any right capable of becoming an agreement to allot or issue additional interests in the Company to persons not currently Members, except with approval of a majority of the Members.

2.3.6.  **_Sale of Undertaking._**  The Company will not sell, lease, exchange or dispose of its undertaking or any part thereof as an entirety or substantially as an entirety, except with the approval of a majority of the Members.

2.3.7.  **_Public Offering._**  The Company will not take any action to authorize a public offering of its Membership Units, except with approval of all of the Members.

2.3.8.  **_Transfer by Order of a Court of Competent Jurisdiction Due to a Proceeding Concerning Bankruptcy, Insolvency, Satisfaction of Judgment, Divorce or Dissolution of Marriage._**  The Company will not take any action to authorize or recognize any transfer in the interests of the Company by a court of competent jurisdiction

4

EXECUTION VERSION

concerning a bankruptcy, insolvency, satisfaction of judgment, divorce or dissolution of marriage proceeding to a spouse or creditor of a Member, except with the approval of all of the Members.

2.4. ***Procedure Rules at Meetings.*** The procedural reference authority for the Company is designated as the latest edition of **Robert's Rules of Order, Newly Revised**. It is understood that in the transaction of business, the meetings of the Company, including meetings of its Managers, Officers, or Members and any committees, may be conducted with informality whenever appropriate; however, this informality does not apply to procedural requirements required in the articles of organization, this Agreement, or the Act. When circumstances warrant, any meeting or a portion of a meeting will be conducted according to generally understood principles of parliamentary procedure as stated in the articles of organization, this Agreement, or the designated procedural reference authority.

2.5. ***Meeting, Where Held.*** Any meeting of the Members of the Company, whether a regular meeting, an annual meeting or a special meeting, may be held either at the principal office of the Company or at any place in the United States within or outside the State of Georgia.

2.6. ***Annual Meeting.*** The Members, by resolution or unanimous consent, may provide for annual meetings, which may be held without notice as and when scheduled in such resolution.

2.7. ***Regular Meetings.*** The Members, by resolution or unanimous consent, may provide for regular meetings, which may be held without notice as and when scheduled in such resolution.

2.8. ***Special Meetings.*** A special meeting of the Members, for any purpose or purposes whatsoever, may be called at any time by one or more Members holding not less than one-half of the voting power of the Company. Such a call for a special meeting must state the purpose of the meeting.

2.9. ***Notice of Meetings.*** The procedures in Act section 311 govern notice of meetings, in addition to those regulations generally governing notice under this Agreement.

2.10. ***Waiver of Notice.*** Notice of any regular, annual or special meeting may be waived by any Member or Manager under Act section 312.

2.11. ***Quorum and Voting at Members' Meetings; Proxy.*** Quorum, voting rights and the use of proxies are as provided in Act sections 308, 309 and 310.

2.12. ***Presiding Officer and Secretary.***  At every meeting of Members, the Manager of the Company, or if that person is not present, then the appointee of the meeting, presides. The Officer exercising the duties of a secretary, or if that Officer is not present, then the appointee of the meeting, will record the minutes and take custody of all papers related to the meeting for delivery to the authorized Officer of the Company as soon as practicable. The Operating Manager has no vote, unless the presiding officer is a Member of the Company otherwise entitled to vote; in which case the presiding officer may cast a vote only when that Member's vote could create or deny the requisite majority required to approve any proposed action.

### ARTICLE III
### MEMBER INTEREST CERTIFICATES

3.1. ***Certificates of Interests.***  The Company will evidence the respective interests of Members in the Company by issuing Member Interest Certificates.

3.2. ***Form of Certificates; Contents.***  When Member Interest Certificates are issued, the Certificates are to be issued in such form as determined by the Manager, numbered consecutively or otherwise identified, and entered into the Member Interests Register of the Company as they are issued. Certificates of Interests are signed by the Manager and by the officer assigned with the responsibility of authenticating the records of the Company, and bear the seal of the Company or a facsimile thereof.

3.2.1. ***Contents.***  Each such certificate will state on its face the fact that the Company is organized under the Georgia Act, the name of the person to whom the certificate is issued, the number of Membership Units, the date of issue and whether the certificate Units are voting or nonvoting. Each certificate may include a statement that the interests are subject to the following restrictions:

"The interests represented in this certificate have been acquired for investment and have not been registered under the Georgia Uniform Securities Act of 2008, as amended, in reliance upon the exemptions contained in Section 10-5-11(14) of the Official Code of Georgia Annotated, nor under the Securities Act of 1933, as amended, in reliance upon the exemptions contained in Sections 4(a)(2) of that Act; the interests may not be sold or transferred except in transactions registered under the Securities Act of 1933, or exempted from registration under that Act, or otherwise in

6

EXECUTION VERSION

compliance with federal securities laws; or registered under the Georgia Uniform Securities Act of 2008, or exempted from registration under that Act, or otherwise in compliance with Georgia securities laws. Copies of the Articles of Organization, Operating Agreement, and other documents, any of which may restrict transfers and affect voting and other rights, may be obtained by a Member on written request to the Company. The interests are transferable only upon compliance with the terms of the Articles of Organization of the Company, as on file with the Secretary of State of the State of Georgia, and with the terms of the Operating Agreement, as on file at the registered or principal office of the Company."

     3.3. ***Member Interests Register.*** The Company will keep at its principal office, or at the office of its transfer agent, wherever located, with a copy at the principal office of the Company, a book to be known as the Member Interests Register, containing in order of issuance the name of each Member of record, together with the Member's address, the number of Membership Units held by the Member, the Member's social security number or tax identification number and date of issue. The Member Interests Register is to be maintained in current condition. Any and all changes in Members or their amount of capital contribution are formalized by the execution and filing of an amendment to this Agreement. The Member Interests Register (or the duplicate copy maintained at the principal office of the Company) is available for inspection and copying by any Member at any meeting of the Members upon request, or at other times upon the written request of any Member. The Member Interests Register may be inspected and copied either by a Member, or by the Member's duly authorized attorney or agent in person. The information contained in the Member Interests Register may be stored electronically or on electronic media, or any other approved information storage devices related to electronic data processing equipment, provided that any method, device, or system employed is first approved by the Manager, and provided further that the same is capable of reproducing all information contained therein, in legible and understandable form, for inspection by Members or for any other proper corporate purpose.

     3.4. ***Transfers of Certificates.*** Any Member proposing a transfer or assignment of a member interest represented by a Certificate will first notify the Company, in writing, of all the details and consideration for the proposed transfer or assignment. If the transfer or assignment is made as originally proposed and the Manager fails to approve the transfer or assignment, the transferee or assignee has no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee or assignee is only entitled to receive the share of the profit or other compensation by way of income

EXECUTION VERSION

and the return of contributions to which that Member would otherwise be entitled.

3.5. ***Transfer Agent; Registrar.***  The Manager from time to time may appoint transfer agents and registrars for the certificates of Member Interests of the Company, and when any certificate, if issued, is countersigned by a transfer agent or registered by a registrar, the signature of any officer of the Company appearing thereon may be a facsimile signature. In case any officer who signed, or whose facsimile signature was placed upon, any such certificate has died or ceased to be such officer before such certificate is issued, it may nevertheless be issued with the same effect as if the officer continued to hold such office on the date of issue.

3.6. ***Registered Members.***  Except as otherwise required by law, the Company is entitled to treat the person registered on its Member Interests Register as the Member of the Company to whom the rights of ownership of the pertinent proportion of the Member Interests in the Company belong, being the person exclusively entitled to receive notification and distributions, to vote (if a voting member) and to otherwise exercise all the rights and powers of ownership and is not bound to recognize any adverse claim.

3.7. ***Lost Certificates.***  In the case of a lost, destroyed or mutilated certificate, a new one may be issued upon such terms and indemnity to the Company as the Members may prescribe. When a Member to whom a Certificate has been issued (based upon authorization for the issuance of such certificates by the Company) alleges it to have been lost, destroyed or wrongfully taken, and if the Company, transfer agent or registrar is not on notice that such certificate has been acquired by bona fide purchaser, a new certificate (if such are being issued by the Company) may be issued upon such owner's compliance with all of the following conditions:

(i)    The Member files with the Company, and the transfer agent or the registrar, a request for the issuance of a new certificate, with an affidavit setting forth the time, place, and circumstances of the loss;

(ii)    The Member also files with the officer maintaining the Member Interests Register of the Company at its principal office, and the transfer agent or the registrar, a bond with good and sufficient security acceptable to the Company and the transfer agent or the registrar, conditioned to indemnify and save harmless the Company and the transfer agent or the registrar from any and all damage, liability and expense of every nature whatsoever resulting from the Company's or the transfer agent's or the registrar's issuing a new certificate in place of the one alleged to have been lost; and

8

EXECUTION VERSION

(iii)  The Member complies with such other reasonable requirements as the Manager of the Company, the transfer agent or the registrar shall deem appropriate under the circumstances.

3.8.  ***Replacement of Mutilated Certificates.***  Unless the Company has elected to no longer issue such Certificates, a new certificate may be issued in lieu of any certificates previously issued that may be defaced or mutilated upon surrender for cancellation of a part of the old certificate sufficient in the opinion of the appropriate officer and the transfer agent or the registrar to duly identify the defaced or mutilated certificate and to protect the Company and the transfer agent or the registrar against loss or liability. Where sufficient identification is lacking, a new certificate may be issued upon compliance with all of the conditions set for in this section.

3.9.  ***Facilitation of Member Interests Transfers.***  The Manager will sanction, approve, consent to and otherwise facilitate any transfer of Member Interests in the capital of the Company, made in compliance with, or which is required to be made by, any provision of this Agreement, the Act relating to the issuance of Member Interests, or by the Articles of Organization of the Company, including, without limitation, the transfer of certain Member Interests of Alvion as contemplated and required by that certain Membership Units Purchase Agreement dated November __, 2015 by and among Alvion, Alvion Investments, LLC (the "Unit Buyer"), and others (the "MUPA").

3.10.  ***Restrictions on Transfer of Member Interests Due to Exemption from Securities Laws.***  No public offering will be made by the Company, and no member interests in the Company will be issued at any time in a manner which will require the registration of these securities under any federal or state law.

3.11.  ***Restrictions.***  Member Interests in the Company may be transferred in accordance with Article IV of this Agreement.

**ARTICLE IV**
**TRANSFER OF MEMBERSHIP INTERESTS**

4.1.  ***Restrictions on Transfer***.  Except as otherwise specifically provided in this Agreement, the MUPA or in any other written Agreement entered into by all of the Members, no Member shall have the right to sell, dispose of, pledge, hypothecate, encumber or in any other manner transfer all or any part of his, her or its respective Membership Units or the Membership Interests represented thereby without the prior written consent of the Manager. Any attempted disposition of all or any part of a Member's Membership Units or the Membership

9

EXECUTION VERSION

Interest represented thereby other than as specifically and expressly permitted in this Article or approved in writing by the Manager shall be null and void ab initio and be of no effect whatsoever. Any disposition of any Membership Units for which the consent of the Manager is obtained shall be effectuated only after compliance with all conditions contained in Section 4.5 hereof.

4.2    **_Permitted Transfers_**:

Reserved.

4.3.    **_Successors in Interest_**.    Each Member shall be entitled to cause his, her or its Membership Units in the Company to be transferred and assigned to such Member's Successor in Interest [or pursuant to 4.2 above] **_[Note: Section 4.2 was deleted. See above.]_**, that as a condition to such transfer and assignment, (i) all conditions imposed under Section 4.5 shall be satisfied, (ii) there shall be no increase in the liability and/or responsibility of the Company or any other Member as a result of such transfer and assignment, (iii) said transfer will in no way violate any and all exemptions from securities regulation. For the avoidance of all doubt, the transfer of Membership Units in the Company that Alvion is required to assign and transfer to the Unit Buyer pursuant to the MUPA shall for all purposes hereof be deemed to satisfy all of the foregoing conditions.

4.4.    **_Assignment of Economic Rights_**.    Each Member shall be entitled to voluntarily assign solely such Member's right to receive any distributions under this Agreement to such persons or entities selected by such Member provided, that as a condition to such transfer and assignment, there shall be no increase in the liability and or responsibility of the Company or any other Member as a result of such assignment or any other requirements or conditions imposed upon the Company to make any distributions hereunder. In the event of any Member's assignment of such Member's right to receive distributions hereunder, no assignee of any such rights shall thereafter be entitled to exercise any applicable voting rights, if any, or participate in any management decisions with respect to the Company or its operations.

4.5.    **_Conditions for Transfer_**.    Notwithstanding anything contained herein to the contrary, no transferee, purchaser or recipient of any Membership Units in the Company will become a Member of the Company unless and until all of the following conditions are satisfied; provided, that all or any number of the following conditions may be waived in writing by the Members:

4.5.1.    The transferring Member (or such Member's legal representative) must have executed a written instrument of transfer of such Member's Membership Units in form and substance reasonably satisfactory to the Manager;

10

EXECUTION VERSION

4.5.2.   The transferee must have executed a written agreement, in form and substance reasonably satisfactory to the Manager including the transferring Member (or such transferring Member's legal representative), to assume all of the duties and obligations of the transferring Member under this Agreement and to be bound by and subject to all of the terms and conditions of such agreement as applicable to the transferring Member or the transferring Member's Membership Units so transferred;

4.5.3.   The transferring Member (or such transferring Member's legal representative) and the transferee must have executed a written agreement, in form and substance reasonably satisfactory to the Manager, to indemnify and hold the Company and all Members harmless from and against any loss or liability attributable to any change in the tax status of the Company resulting from the transfer; provided that, in connection with the transfer of Membership Units contemplated by the MUPA, it shall be sufficient if the transferee alone provides the foregoing indemnification of the Company and its Members;

4.5.4.   Upon request by the Manager, the transferring Member (or such transferring Member's legal representative) and the transferee must have delivered to the Company a written opinion of counsel for the Company or of other counsel reasonably satisfactory to the Members (which opinion shall be obtained at the expense of the transferring Member and the transferee) that such transfer will not result in (i) a violation of applicable law (including applicable securities laws) or this Agreement, (ii) the Company being classified as an association or other entity taxable as a corporation for any federal, state, local or other income tax purpose, or (iii) the Company being deemed terminated pursuant to Code Section 708 or any comparable future section of the Code. Notwithstanding the foregoing, the opinion contemplated by this Section 4.5.4 shall not be required in connection with the transfer of Membership Units by Alvion contemplated and required by the MUPA.

4.6.   ***Transferee as Mere Holder.***   A transferee who does not become a substituted Member will be entitled to receive only that portion of the distributions or allocations to which the transferring Member would otherwise be entitled with respect to the Membership Units which are the subject of such transfer. If the requirements set forth in Section 4.5 are not satisfied, then the proposed transferee shall have no right to vote any Membership Units on any question relating to the Company, to otherwise participate in the management of the business and affairs of the Company, to otherwise exercise any right, power, privilege, or other incident of ownership regarding any proposed transferred

11

EXECUTION VERSION

Membership Units, or to become a Member but rather, the transferee shall merely be the holder of said Membership Units.

4.7. ***Retroactive Allocations.*** No new Member of the Company shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Manager may, at its option, at the time a new member is admitted, close the Company books (as though the Company's tax year had ended) or make pro rata allocations of loss, income and expense deductions to a new Member for the portion of the Company's tax year in which such new Member was admitted in accordance with the provisions of 706(d) of the Code and the Regulations promulgated thereunder. No person or entity shall be admitted as a transferee until all of the requirements set forth in Section 4.5 are satisfied.

**4.8    *Put Right in Favor of Members.***

(a)    ***Put Right, Generally.***  At any time on or after Tuesday, April 16, 2019, each Member shall have the right (the "Put Right") to require the Company to purchase all of such Members' Membership Units (the "Put Interest") pursuant to the procedures and subject to the terms and conditions set forth in this Section 4.8.  The Put Right may be exercised by a Member by delivery of notice (the "Put Notice") to the Company of such Member's (the "Exercising Member") exercise of the Put Right.

(b)    ***Put Price***.  The purchase price (the "Put Price") for the Put Interest pursuant to this Section 4.8 shall be the then-determined fair value of the Exercising Member's interest, without taking into account discounts for lack of control, lack of marketability, or any such similar discounts.

(c)    ***Closing***.  The closing of any transfer of the Put Interest pursuant to this Section 4.8 shall take place at such time and place as the Company may designate by written notice to the Exercising Member at least fourteen (14) days prior to such date (the "Put Closing Date"), but in any event shall occur within sixty (60) days of the date on which the Put Notice has been delivered to the Company.  Unless the parties agree otherwise, the Put Price shall be payable by wire transfer of immediately available funds.

**4.9    *Post Redemption.***  From and after the closing of the Company's acquisition of the Put Interest, the Ownership Percentage of the Exercising Member shall be reduced to zero and the Ownership Percentage of the remaining Members shall be increased pro rata in accordance with their respective Ownership Percentages immediately prior to the Company's acquisition of the Put Interest.  At such time, the Exercising Member shall

12

EXECUTION VERSION

cease to be a Member and shall have no further rights or obligations with respect to the Company or any of the other Members.

**ARTICLE V**
**RIGHTS AND DUTIES OF MANAGERS**

5.1.    ***Designation of Management***.    The business and affairs of the Company are controlled by one or more Managers, as provided in the Act. Throughout the paragraphs contained in this Article of the Operating Agreement, the use of the phrase "all Managers" refers to the total number of managers that the Company would have if there were no vacancies.

5.2.    ***Qualifications, Number and Tenure.***    Each Manager, if an individual, is to be at least eighteen years of age. A Manager need not be a Member, a natural person, or a resident of Georgia. If the Manager is not a natural person, it must be a Georgia limited liability company and managed by the members of that company who are at least 18 years of age and residents of Georgia.  Initially, there is one (1) Manager.  Each Manager initially elected by the Members holds office until that Manager's successor is elected and qualified, or until that Manager's earlier resignation, removal from office, death, or dissolution. In such elections, there is no cumulative voting, and the persons having a plurality of votes are elected as Managers. The initial Manager shall be Robert Eggman; provided that, effective immediately and automatically upon the transfer of the Membership Units Alvion is required to transfer to the Unit Buyer and consummation of the transaction contemplated by the MUPA, such initial Manager shall be deemed to have resigned and withdrawn as a Manager of the Company and been concurrently replaced by the following entity:  is

WEBB CREEK MANAGEMENT GROUP, LLC

If requested by any of Members, the initial Manager shall execute and deliver a written acknowledgment (in form and content reasonably requested by such Members) that such initial Manager has so resigned and withdrawn as a Manager of the Company.

5.3.    ***Removal.***  Any one or more of the Managers or all of the Managers may be removed from office, with cause, by the affirmative vote of a the Members holding a majority of the membership units, said majority to be determined by number of membership units held.  Notice of a proposal to remove one or more Managers shall be included in the notice of the meeting of Members.  On or after December 22, 2015, Any one or more of the Managers or all of the Managers may be removed from office, with cause, by the affirmative vote of a the Members holding a majority of the membership units, said majority to be determined by

13

number of membership units held.  Notice of a proposal to remove one or more Managers shall be included in the notice of the meeting of Members.

5.4.  ***Vacancies.***  Any vacancy occurring among the Managers is filled by the vote of a majority of the interests of the Members.

5.5.  ***Authority of Managers to Bind the Company***.  Except as otherwise set forth in this Agreement, the Managers shall have the authority to bind the Company, and exercise such authority through officers, agents or committees of the Company designated by the Managers (but with respect to agents or committees, only to the extent of the authority granted). In particular and without limitation, the Manager has the authority to do any of the following:

5.5.1.  Institute, prosecute and defend any proceeding in the Company's name.

5.5.2.  Purchase, receive, lease or otherwise acquire, and sell, convey, mortgage, pledge, lease, exchange, and otherwise dispose of Company Property.

5.5.3.  Enter into contracts and guaranties (including but not limited to construction contracts), incur liabilities, borrow money, issue notes, bonds and other obligations, and secure any of its obligations by mortgage or pledge of any of the Company's Property or income.

5.5.4.  Manage and operate any Company Property.

5.5.5.  Establish Company offices and exercise the powers of the Company within or without the State of Georgia or any other jurisdiction in which the Company conducts business.

5.5.6.  Purchase insurance for the benefit of the Company.

5.5.7.  Make donations to the public welfare or for religious, charitable, scientific, literary or educational purposes provided that the amount of such donations does not exceed limits set by the Members from time to time.

5.5.8.  Generally do any other act that furthers the business and affairs of the Company that is not expressly required by the Agreement or applicable law to be approved by the Members.

14

EXECUTION VERSION

5.5.9.    The authorization of any indemnification pursuant to this Agreement, other than any mandatory indemnification provided in this Agreement.

5.5.10.    Lending the Company's money, investing and reinvesting the Company's funds, and receiving and holding property as security for repayment of indebtedness owed to the Company, provided that no money shall be loaned to Members, Managers or Officers other than as advances for business expenses to be incurred in the ordinary course of business of the Company.

The Manager shall not exercise any of the powers set forth in paragraphs 5.5.1, 5.5.2, 5.5.3, 5.5.7, or 5.5.10 prior to January 1, 2016 without the express, written consent of a majority of Membership Interest in the Company.  On and after January 1, 2016, the Manager shall have authority to exercise said powers without obtaining said express written consent, except as may be otherwise provided by this Agreement.  Notwithstanding the foregoing, it is the express intention of the Members that the Manager shall have the authority to convey the Property to Alvion Properties, Inc. upon dissolution of the Company at any time on or after December 21, 2015 or upon any failure of the transactions contemplated by the MUPA to be fully-consummated by such date.

5.6.    ***Meetings***.    Meetings of the Managers for such business as may properly come before the Managers may be called by any Manager. The times, dates, places and purposes of the Managers' meetings shall be designated in a written notice given in person or mailed by the person or persons calling the meeting to each other Manager, not less than two nor more than thirty days before the date of the meeting; if mailed, the notice shall be addressed to such Manager at the Manager's address on the records of the Company.  If a meeting is adjourned to a different date, time or place, notice need not be given of the new date, time or place if the new date, time or place is announced at the meeting before an adjournment is taken.  Any Manager may waive notice of a meeting before or after the meeting.  All waivers of notice must be in writing, be signed by the Manager entitled to the notice and be delivered to the Company for inclusion in the appropriate records.  Neither the business to be transacted at, nor the purpose of, a meeting must be specified in a written waiver of notice.  Attendance at a meeting shall constitute a waiver of notice of the meeting, unless at the beginning of the meeting the Manager gives written notice of objection to holding the meeting or transacting business at the meeting.  A Manager may vote in person or by proxy.  No proxy shall be valid for more than eleven months after the date of its execution unless a longer period is expressly provided in the appointment form.  Any action required or permitted to be taken at a Managers' meeting may be taken without a meeting, without prior notice and without a vote if one or more written consents describing the action to be taken are signed and

15

EXECUTION VERSION

dated by a sufficient number of Managers authorized hereunder to take such action.  Unless otherwise provided herein, the affirmative vote or consent by a Majority in Interest of the Managers shall be required to approve any matter presented to the Managers for vote.

5.7.  **_Minutes_**.  The Managers and each committee shall keep minutes of its proceedings, which shall be open for inspection by any Member or Manager upon reasonable prior notice to the Company.

5.8.  **_Management Officers._**  The Company may, at the discretion of the Members, designate officers to exercise such offices and with such responsibilities as the Members deem appropriate for the Company. A person need not be a Member to be selected as an Officer except as otherwise provided herein, and the same person may hold two or more offices. The Managers will designate which officer of the Company has the responsibility for preparing minutes of the meetings of the Members and Managers, and for authenticating the records of the Company. The number and titles of officers of the Company and other persons who may act as authorized agents of the Company shall be fixed from time to time by the Managers.  The officers shall have such titles, duties, authorities and responsibilities as may be delegated to them from time to time by the Managers.  The officers shall be elected from time to time by, and serve at the pleasure of, the Managers. The Managers may remove an officer with cause, at any time, subject to any contractual rights of such officer.  In the event of the death, resignation or removal of an officer, the Managers shall elect a successor who shall serve the remainder of the term of his or her predecessor.

5.9.  **_Limitation on the Powers of Managers._**   The authority of the Managers under this Agreement is limited by the provisions of the Act and the following:

5.9.1.    Without the written consent to the specific act by at least 99% of the outstanding Membership Interest of the Company, the Manager has no authority to:

5.9.1.1.    Do any act in contravention of this Agreement or the Articles of Organization, as each may be amended from time to time.

5.9.1.2.    Do any act that would make it impossible to carry on the ordinary business of the Company, provided that the resignation by a Manager as Manager upon written notice to all other Managers and Members is not restricted.

16

5.9.2.    The Manager has no authority to sell all or substantially all of the assets of the Company in a single transaction without the affirmative vote of at least 99% of the outstanding Membership Interest of the Company.

5.9.3.    The Manager has no authority to borrow funds on behalf of the Company except upon the affirmative vote of a majority of Membership Interests, as provided in the Act, or as provided in this Agreement.

5.10.  ***Managers and Members Shall Have No Exclusive Duty To Company***.  A Manager or a Member may have other business interests and may engage in other activities in addition to those relating to the Company.  Neither the Company nor any Member shall have any right, by virtue of this Agreement, to share or participate in such other activities or investments of a Member or the income or proceeds derived therefrom.  Neither a Member nor a Manager shall incur any liability to the Company or to any of the Members as a result of engaging in any other business.

5.11.  ***Accounts.***  All funds of the Company shall be deposited in its name in an account or accounts as shall be designated from time to time by the Manager. All funds of the Company shall be used solely for the business of the Company. If any bank requires a prescribed form or forms of resolutions relating to such accounts of the Company or to any application, statement, instrument, or other documents connected with the accounts, the resolutions contained in any such prescribed form will be deemed to have been adopted by the Members, and the Manager of the Company is authorized to certify the adoption of any such resolution as though it were unanimously adopted by the Members, and to insert all such resolutions in the records of the Company.

5.12.  ***Duties; Liability for Certain Acts***.  In managing the business or affairs of the Company, each Member, Manager, and officer of the Company shall act in the manner provided by Section 14-11-305 of the Act. Except for acts or omissions undertaken in contravention of this Agreement, no Member, Manager or officer shall be deemed to have guaranteed nor shall have any obligation with respect to the return of a Member's capital contributions in the Company or profits from the operation of the Company. Except for acts or omissions undertaken in contravention of this Agreement, each Member's, Manager's, and Officer's liability to the Company, the Members, and the other Managers and officers shall be limited and the Members, Managers, and officers shall be indemnified as set forth in this Agreement. No Member, Manager, or officer shall be liable, solely by reason of being a Member, Manager, officer, agent, or employee of the Company, under a judgment, decree, or order of a court, or in any other manner, for a debt, obligation, or liability of the Company, whether arising in contract, tort, or otherwise, or for the acts or omissions of any other

17

Member, Manager, officer, agent, or employee of the Company, whether arising in contract, tort, or otherwise, except as provided in Section 14-11-408 of the Act (liability upon wrongful distributions).

5.13. ***General Authority.***   Unless expressly authorized to do so by this Agreement, no one or more of the Members, Managers, officers, employees or other agents of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

### ARTICLE VI
### LIMITATION OF LIABILITY OF MEMBERS

6.1.   ***Limitation of Liability***.   No Member shall be personally liable as such for the liabilities of the Company including debts, losses, claims, judgments or any of the liabilities beyond the Member's contributions to the capital of the Company, except as provided by law.

6.2.   ***Representations and Warranties***.   Each Member hereby represents and warrants to the Company and each other Member that the Member is acquiring such Member's Membership Units for the Member's own account as an investment and without an intent to distribute the Membership Units; and such Member acknowledges that the Membership Units have not been registered under the Securities Act of 1933 or any state securities laws, and that in addition to the other restrictions provided herein the Membership Units may not be resold or transferred by the Member without appropriate registration or the availability of an exemption from such requirements.  Each Member agrees to hold harmless and indemnify the Company, its officers, directors, agents and other Members, from and against any loss or damages incurred as a result of any breach of such representation and warranty.

### ARTICLE VII
### CAPITAL CONTRIBUTIONS

7.1.   ***Capital Contributions***.  The Members have made contributions of cash in exchange for Membership Units in the Company as shown on Exhibit "A" attached hereto and incorporated herein by reference.   No interest shall accrue on any capital contribution and no Member shall have the right to withdraw or be repaid any capital contribution except as provided in this Agreement.

7.2.   ***Additional Capital Contributions***.   Solely to the extent approved by the Members by the affirmative vote of a majority of units held from time to time, the Members may be permitted (but not required) to make additional capital contributions if and to the extent they so desire, and if the Members so determine that such additional capital contributions are necessary or appropriate

in connection with the conduct of the Company's business (including without limitation, expansion or diversification), in such event, all Members shall have the opportunity (but not the obligation) to participate in such additional capital contributions on a pro rata basis in accordance with their relative Membership Interests determined as of the date such additional capital contributions are so approved. Except as otherwise agreed by the Members, no Member making any additional capital contributions hereunder shall be entitled to receive additional Membership Units in exchange therefore. Each Member acknowledges and agrees that should additional capital contributions be authorized hereunder in which a Member does not participate and should the Members agree by majority vote that any Member or Members making any such capital contributions should be entitled to receive additional Membership Units in exchange therefore, the Membership Interest of each Member who declines to participate in such capital contributions will be diluted as a result of such circumstances.

7.3.   ***Right to Raise Additional Capital***.

7.3.1.   ***Issuance of Units.***   If at any time and from time to time on or after January 1, 2016, the Members determine that additional funds are required by the Company for or in respect to its business for any of its obligations, expenses, costs, liabilities or expenditures, the Manager, upon the affirmative vote of a majority of Membership Interests, may cause the Company to sell additional Membership Units and admit additional Members upon the terms and conditions and, for such prices as are agreed to by the Managers. Any Person who acquires any Membership Units which have been offered in accordance with the provisions of this Section 7.3.1 may be admitted to the Company as a new Member (or if such Person is already a Member, his, her or its Membership Interest may be increased), and no further consent of such admission (or increase in an existing Member's Membership Interest) by the existing Members shall be required. By virtue of this provision, an existing Member's Membership Interest may be diluted upon the sale of such additional Membership Units, and each Member hereby consents to such dilution provided the conditions of this Section 7.3 have been satisfied.

7.3.2.   ***Additional Members.***   Except as provided under Section 7.3.1., no additional person or entity shall be entitled to acquire or obtain any Membership Units or otherwise be admitted as a Member of the Company except as otherwise specifically permitted under this Agreement.

7.4.   ***Loans to the Company***.   If at any time and from time to time additional funds are required by the Company for or in respect to its business or any of its obligations, expenses, costs, liabilities or expenditures, in lieu of raising such additional funds from any bank or other financial institution or third party,

the Company may obtain such loans in such amounts upon such terms and conditions and from such Members as the Manager shall deem appropriate. No Member shall be required to make any loan to the Company hereunder unless otherwise agreed to in writing by such Member. Any loan to the Company by a Member shall not be a capital contribution to the Company, but shall be a debt due such Member in his capacity as a creditor of the Company. Such loan(s) may have such preference, priority or security position as may be permissible under law and as may be determined by the Manager and as is acceptable to the Member or Members advancing the same.

7.5.  **_Limits on Additional Capital Contributions_**.  Except as to (i) the initial capital contributions required to be made by any Member to the Company as set forth in Section 7.1 of this Agreement, (ii) any Member's obligation to pay the purchase price for any additional Membership Units purchased by such Member pursuant to Section 7.2 or 7.3 hereunder, or (iii) any obligation to make any loan to the Company which has been agreed to in writing by any Member in accordance with Section 7.4 hereof, no Member shall be required by any person or entity (including in the name or on behalf of the Company) to make any capital contributions or loans to the Company. This Section 7.5 shall inure to the benefit of each Member, it being the parties intention that no other third party shall constitute a third party beneficiary of any provisions of this Agreement and that neither the Company, nor any Member or Members nor any other creditor, person or entity be entitled or empowered to require any Member to make additional capital contributions or loans to the Company for any purpose whatsoever.

7.6.  **_Maintenance of Capital Accounts_**.  The Company shall establish and maintain a capital account for each Member according to Code Section 704(b) and the Regulations under such Code Section.  A Member's capital account shall initially be the agreed value of the initial capital contributed by such Member. Each Member's capital account shall thereafter be credited with (i) the amount of the Member's additional cash contributions (if any), other than those required under Section 7.1,(ii) the agreed value of the Member's additional contributions of property or services (if any), other than those required under Section 7.1, and (iii) the Member's share of Tax Profits excluding Built-in Gains and Built-in Losses, and shall be debited with (i) the amount of cash withdrawals and distributions, (ii) the agreed value of property distributions and (iii) the Member's share of Tax Losses excluding Built-in Gains and Built-in Losses. The provisions of this Section and the other applicable sections of this Agreement shall be construed in a manner consistent with Regulations Sections 1.704-1(b).

7.6.1.  **_Distributions of Property._**  On the distribution of Property to a Member, prior to reducing such Member's capital account by the fair market value of the Property hereunder, the capital accounts shall

EXECUTION VERSION

first be adjusted to reflect the allocation of the Built-in Gain or Built-in Losses inherent in such Property (that has not previously been reflected in the capital accounts) as though the Property were sold on the distribution date at its fair market value.

7.6.2.  **Adjustments.**  Adjustments to the capital accounts hereunder shall be made with reference to the federal tax treatment of the item giving rise to the adjustment at the Company level without regard to any elective tax treatment of such items at the Member level.

7.6.3.  **Compliance with Treasury Regulations.**  The foregoing provisions and the other provisions of this Agreement relating to the maintenance of capital accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Members shall determine that it is prudent to modify the manner in which the capital accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Company or Members), are computed in order to comply with such Regulations, the Members may make such modifications as they deem reasonably necessary, provided that such modifications are not likely to have a material effect on the amounts distributable to any Member pursuant to this Agreement. The Members shall also make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Treasury Regulations Section 1.704-1(b).

## ARTICLE VIII
## ALLOCATIONS AND DISTRIBUTIONS

8.1.  **Allocations of Tax Profits and Tax Losses**.  Except as may be required by Section 704(c) of the Code and exclusive of any allocations required under Section 704(c), the allocations, Tax Profits and Tax Losses shall be allocated among the Members in proportion to the Members' respective Membership Interests.

8.2.  **Built-in Gains and Built-in Losses**.  Built-in Gains and Built-in Losses shall be allocated to the Members according to the principles of Code Section 704(c) and the regulations thereunder.

8.3.  **Mechanics of Allocations**.  The Members have the authority to vary the allocations provided hereunder to the extent necessary to comply with federal income tax laws, so long as there is no material adverse effect on the amounts

21

EXECUTION VERSION

distributable to any holder of any Membership Units. When the Company is dissolved and wound-up pursuant to this Agreement, all items of income, gain, loss and deduction not previously allocated shall be allocated to the Members pursuant to this Article VIII. Whenever a share of the Company's Tax Profits, Tax Losses, or other tax items is credited or charged to the capital account of a Member, every item of income, gain, loss or deduction entering into the computation of such Tax Profits, Tax Losses or other item (or other relevant period) shall be considered either credited or charged as the case may be, and every item of credit or tax preference relating to Tax Profits, Tax Losses, or other tax item and applicable to the period during which such Tax Profits, Tax Losses or other item as realized shall be allocated to the applicable capital account in the same proportion. Allocations made in this Article shall be made to each person or entity holding any Membership Units who or which has not been admitted as a Member hereunder to the same extent as such allocations would be made to a Member owning such Membership Units.

8.4.    ***Cash Distributions***.  The following shall apply to cash distributions:

8.4.1.    ***Timing.***  All cash distributions shall be distributed to the Members at such times as the Manager determines to be advantageous and practical for the Company. That portion of any distribution of Distributable Cash which is allocable to any Membership Interest shall be made to the Member who owns the Membership Units giving rise to such Membership Interest on the day of the distribution.

8.4.2.    ***Fees; Reimbursements.***  Each Member shall be entitled to receive such compensation and such other fees in payment for all services rendered by such Member, in his, her or its capacity other than that of a Member, for and on behalf of the Company in such amount and at such time or times as an affirmative vote of at least 99% of the outstanding Membership Interest of the Company shall determine.

8.4.3.    ***Distributions Upon Dissolution.***  Notwithstanding anything herein to the contrary, upon the occurrence of an event of dissolution as provided in Article XI hereof, cash distributions occurring in connection with such event of dissolution and thereafter shall be made in accordance with Article XI hereof.

8.4.4.    ***Distributions After the Fiscal Year End.***  The Members may, to the extent consistent with this Article, elect to have distributions made after the end of a Fiscal Year relate back to such Fiscal Year, provided, however, that any such distribution must be made within forty-five (45) days after the end of such Fiscal Year.

22

EXECUTION VERSION

8.4.5.  ***Withholding.***  The Company shall be authorized to withhold from amounts to be distributed to any Member hereunder any withholding required by the Code or any provision of any statute or state or local tax law, and to pay such amounts to the Internal Revenue Service or other appropriate taxing authority. Any such amounts withheld shall be treated as having been distributed to such Member pursuant to this Article for all purposes of this Agreement.

8.4.6.  ***Consent to Distributions.***  The methods set forth in this Article for distributions are hereby expressly consented to by each Member as an express condition to becoming a Member. Distributions required to be made under this Article shall be made to each holder of any one or more Membership Units who has not been admitted as a Member of the Company under this Agreement to the same extent as such distributions would be made to a Member owning such Membership Units.

**ARTICLE IX**
**TAXES**

9.1.  ***Elections***. The Members may make any tax elections for the Company allowed under the Code or the tax laws of any state or other jurisdiction having taxing jurisdiction over the Company; provided, however, that the Members shall make any required elections and take any other steps required to cause the Company to be taxed as a partnership for Federal income tax purposes.

9.2.  ***Taxes of Taxing Jurisdictions***.  To the extent that the laws of any taxing jurisdiction require, each Member will submit an agreement indicating that the Member will make timely income tax payments to the taxing jurisdiction and that the Member accepts personal jurisdiction of the taxing jurisdiction with regard to the collection of income taxes attributable to the Member's income, and interest, and penalties assessed on such income.  The Company may, where permitted by the rules of any taxing jurisdiction, file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of the Members on such income to the taxing jurisdiction, in which case the Company shall inform the Members of the amount of such tax interest and penalties so paid.

23

EXECUTION VERSION

## ARTICLE X
## DISSOCIATION OF A MEMBER

10.1.  ***Dissociation***.    A Member shall cease to be a Member upon the happening of any of the following events (a *"Dissociation"*):

10.1.1.    The attempted Transfer (other than as permitted under this Agreement) of any portion of a Member's Membership Units or the Membership Interest represented thereby; or

10.1.2.    The withdrawal of the Member in the exercise of such Member's statutory withdrawal right; or

10.1.3.    In the case of a Member that is a limited liability company or other separate organization other than a corporation or estate or trust, the dissolution and commencement of winding up of the Member; or

10.1.4.    In the case of a Member that is a corporation, the filing of articles of dissolution for the corporation or the revocation of its charter (except an involuntary administrative dissolution if the corporation is promptly reinstated after notice thereof, provided that applicable state law treats the reinstatement as relating back to and effective as of the effective date of the administrative dissolution); or

10.1.5.    A successful claim by any person of a right to all or any portion of the Member's Membership Units or the Membership Interest represented thereby on the basis that such interest has been transferred to such claimant by operation of law or otherwise, except pursuant to a transfer permitted under this Agreement.

10.2.  ***Rights of Dissociated Member***.    In the event of the Dissociation of any Member (a *"Dissociated Member"*):

10.2.1.    If the Dissociation is followed by the winding up of the Company, the Dissociated Member shall be entitled to participate financially in the winding up of the Company to the same extent as any other Member except that, if the Dissociation is in violation of this Agreement, any distributions to which the Dissociated Member would have been entitled shall be reduced by the damages sustained by the Company as a result of the dissolution and winding up; or

24

10.2.2.    If the Dissociation is not followed by the winding up of the Company, the Dissociated Member shall have only the right to receive the allocations of profits or losses and the distributions payable with respect to the Dissociated Member's interest.

**ARTICLE XI**
**DISSOLUTION AND WINDING UP**

11.1.  **_Dissolution_**.  The Company shall be dissolved and its affairs wound up, upon the first to occur of the following events (which, unless the Members agree to continue the business as provided below, shall constitute _"Dissolution Events"_):

11.1.1.    The expiration of the term set forth in this Agreement, unless the business of the Company is continued with the consent of the Members; and

11.1.2.    The written consent of at least 99% of outstanding Membership Interest of the Company.

11.2.  **_Effect of Dissolution_**.  Upon dissolution, the Company shall cease all business except that incident to the winding up of its affairs, but the Company shall not be terminated, but shall continue in existence until the winding up of its affairs is completed and a Certificate of Termination has been issued by the Secretary of State of Georgia. The Manager as of the date of the Dissolution Event shall have full authority over all matters related to the winding up of the Company.

11.3.  **_Distribution of Assets on Dissolution_**.  Upon dissolution of the Company for any reason, the Company shall promptly commence to wind-up its affairs. A reasonable period of time will be allowed for the orderly termination of the Company's business, the discharge of its liabilities and the distribution or liquidation of its remaining Property so as to enable the Company to minimize the normal losses attendant to the liquidation process. The Manager will cause a full accounting of the assets and liabilities of the Company as of the date of dissolution to be taken and a written statement thereof will be furnished to each Member within sixty (60) days after such date. Such accounting and statement will be prepared under the direction of the Manager or, if the Manager so determines, by a liquidating trustee selected by the Manager. In winding up the affairs of the Company, the Manager shall undertake the following:

11.3.1.    Sell, liquidate, or distribute in kind any or all of the Company's Property as promptly as practicable in a manner agreed upon

25

by the affirmative vote of a majority of Membership Interests in the Company;

11.3.2.    Subject to Section 11.3.5 below, allocate any profit or loss resulting from such sales to the Members in accordance with Article VIII hereof;

11.3.3.    Discharge all liabilities of the Company, including liabilities to Members who are creditors, in the order of priority and to the extent otherwise permitted by law, other than liabilities to Members for distributions;

11.3.4.    Establish such Reserves as the Manager deems to be reasonably necessary;

11.3.5.    Subject to the provisions of 11.3.6 below, distribute the remaining Property in the following order:

(i)    If any Property of the Company is to be distributed in kind, the Appraised Value (net of any liability secured by such Property that the Member receiving the Property is considered to assume or take subject to under Code Section 752) of such Property as of the date of dissolution shall be determined in the manner provided in this Agreement. Such Property shall be deemed to have been sold as of the date of dissolution for its Appraised Value and the capital accounts of the Members shall be adjusted pursuant to the provisions of this Agreement to reflect such deemed sale.

(ii)    The positive balance (if any) of each Members' remaining capital account (as determined after taking into account all capital account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed to the Members, either in cash or in kind, as determined by the Manager, with any Property distributed in kind being valued for this purpose at its Appraised Value. Any such distributions to the Members in respect of their capital accounts shall be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations.

(iii)    All remaining Property shall go and be distributed to all Members in proportion to their respective Membership Interests as determined on the date of such liquidation and distribution.

EXECUTION VERSION

(iv)   To the extent that any event of dissolution involves the distribution of real property held by the Company to any of the Members, said distribution shall be made by the Company absent any attendant liabilities to said Member.  This provision shall not apply to any distribution to a Member who has otherwise consented in writing to the undertaking of any Company debt that may encumber any real property held by the Company.

11.3.6     Notwithstanding the foregoing, in the event of the initiation of dissolution of the Company on or before December 31, 2015, the contributions made by the Members as set forth on Exhibit A hereto shall be distributed to the Members such that the Members are returned to *status quo ante* prior to the formation of the Company.  To the extent this paragraph 11.3.6 is found to be inconsistent with any other provision of this Agreement, this paragraph 11.3.6 shall control.

11.4.  ***Completion of Winding Up; Certificate of Dissolution***.  The winding up of the Company shall be completed when all debts, liabilities, and obligations of the Company have been paid and discharged or reasonably adequate provision therefor has been made, and all of the remaining property and assets of the Company have been distributed to the Members. Upon the completion of winding up of the Company, a Certificate of Dissolution shall be delivered to the Secretary of State of Georgia for filing. The Certificate of Dissolution shall set forth the information required by the Act.

11.5.  ***Further Assurances***.   The Members shall comply with any applicable requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its Property.

**ARTICLE XII**
**INDEMNIFICATION**

12.1.  ***Indemnification of Members, Managers and Officers***.   The Company shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, including but not limited to an action by or in the right of the Company, by reason of the fact that such person is or was a Member, Manager or officer of the Company, or is or was serving at the request of the Company as a manager, director, officer, employee or agent of another company, corporation, partnership, joint venture, trust or other enterprise, against expenses, including attorneys' fees, judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such action, suit or proceeding if such person acted in

EXECUTION VERSION

good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful. This provision applies only to actions taking by the aforementioned parties where the actions in question are taken on or after December 22, 2015.   The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his or her conduct was unlawful.

**ARTICLE XIII**
**SPECIAL COVENANTS**

13.1. ***Conflicting Interest Transactions.***    The Members are hereby authorized to approve any "conflicting interest transaction" in the manner and to the extent provided for in Section 14-11-307 of the Act, as the same may be amended from time to time, and any successor provisions thereto.

13.2. ***Managers and Members Shall Have No Exclusive Duty to Company.***  A Manager or a Member may have other business interests and may engage in other activities in addition to those relating to the Company. Neither the Company nor any Member shall have the right, by virtue of this Agreement, to share or participate in such other activities or investments of a Member or Manager or the income or proceeds derived therefrom. Neither a Member nor a Manager shall incur any liability to the Company or to any of the Members as a result of engaging in any other business.

13.3  **Overriding Provision**.  Notwithstanding anything to the contrary in any provision of this Agreement, Webb and the initial Manager hereby expressly acknowledge that Alvion has joined in this Operating Agreement and cooperated in structuring the purchase and sale transactions provided for in the MUPA as an accommodation to Webb and the Unit Buyer and, accordingly, Alvion shall have no monetary or other obligations or liabilities of any kind under or pursuant to this Agreement, whether as a Member of the Company or otherwise, with  all such monetary and other liabilities and obligations to be borne and performed by the other Members of the Company.  For the avoidance of all doubt, however, nothing in this Section 13.3 shall be deemed to limit or excuse Alvion's obligation to consummate the transaction contemplated by, and in accordance with and subject to the terms and conditions of, the MUPA.

28

EXECUTION VERSION

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

14.1. ***Partnership Intended for Tax Purposes***.    The Members expressly intend to have the Company treated as a partnership under the Code.

14.2. ***Rights of Creditors and Third Parties under Agreement***.    The Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assignees.    The Agreement is expressly not intended for the benefit of any creditor of the Company or any other person.    Except and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under the Agreement or any agreement between the Company and any Member with respect to any capital contribution or otherwise.

14.3. ***Miscellaneous Provisions.***

14.3.1. ***Entire Agreement.***    This Agreement constitutes the entire agreement between the parties and supersedes any prior understanding or agreement among them respecting the subject matter hereof or thereof.

14.3.2. ***Application of Georgia Law.***    This Agreement, and the application of interpretation hereof, shall be governed exclusively by its terms and by the laws of the State of Georgia, and specifically the Act.

14.3.3. ***Construction.***    Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and the neuter genders and vice versa.

14.3.4. ***Headings.***    The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof.

14.3.5. ***Waivers.***    The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

14.3.6. ***Rights and Remedies Cumulative.***    The rights and remedies provided by this Agreement are cumulative and the use of any

29

one right or remedy by any party shall not preclude or waive the right not to use any or all other remedies. Such rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

14.3.7.    **_Severability._**  If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

14.3.8.    **_Heirs, Successors and Assigns._**  Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Agreement, their respective heirs, legal representatives, successors and assigns. Except as permitted under Article IV no party shall assign its rights, entitlements, duties or obligations hereunder.

14.3.9.    **_Counterparts; Copies._**   This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. One or more copies of this Agreement may be executed but it shall not be necessary, in making proof of the existence of this Agreement, to provide more than one original copy.

14.3.10.    **_Amendments._**  Any amendment to this Agreement shall be made in writing and signed by at least 99% of the outstanding Membership Interest of the Company or their respective attorneys-in-fact. Under certain circumstances specified below, this Agreement may be amended, altered, restated, or repealed with the consent of the Manager and without the consent or approval of the Members. Amendments made under this section, if necessary to accomplish the objective of the amendment may have an effective date prior to the date of filing. These circumstances include:

(i)    _Change in Membership._  To admit into the Company Substituted Members accepted by the Members or Manager by prior action or as allowed under this Agreement.

(ii)    _Clarification of Agreement Language._  To clarify language in this Agreement provided that the substance of such provision is not materially changed, and provided that the Company obtains the written opinion of its counsel that the amendment clarifies language

30

EXECUTION VERSION

in this Agreement without materially changing the substance of such provision.

(iii) _Compliance with Tax or Securities Laws_. To make any necessary or appropriate changes in this Agreement in order to comply with the requirements of the Code with respect to entities taxed as partnerships, to implement any future tax provisions governing the taxation of limited liability ~~ompanies~~companies, as such, or the requirements of any federal or state securities laws or regulations, provided that any amendment does not adversely affect the interests of any Member.

Any amendment to this Agreement that increases the obligation of any Member to contribute to the Company or creates a responsibility of any Member for the liabilities of the Company, as a guarantor or otherwise, requires the written approval of any affected Member, the written approval of the Managers, and of a majority in Member interests of the Company.

14.3.11. **_Notices._** Except as may be otherwise set forth in this Agreement, whenever this Agreement requires notice to be given to any Member or Manager, the notice may be given by mail, in person by courier delivery, or by overnight delivery. All notices required hereunder shall be addressed and sent to the Member or Manager at his or her or its last known mailing address as it appears on the books of the Company. Any such written notice shall for all purposes of this Agreement be deemed as being delivered hereunder (i) if mailed, three (3) days after being deposited with the United States Postal Service, postage prepaid and designated as certified with return receipt requested, and properly addressed to the addressee, (ii) if sent via overnight delivery, one (1) day after being deposited with a nationally recognized next day delivery service with all delivery fees prepaid or (iii) if personally delivered, when so delivered. Any party may change the address located within the United States at which such party is to receive notice hereunder by delivery of notice of such change of address to the Company in accordance with this Section 14.3.11. Any party's failure or refusal to accept any notice or the inability to deliver notice to any address last reflected on the books and records of the Company shall constitute delivery of such notice to the party to whom addressed.

14.3.12. **_No Engagement of Services._** Nothing contained in this Agreement shall be construed to constitute or be evidence of an implied agreement or understanding on the part of the Company, to employ, engage or retain any Member or Member's services for any specific period of time, except as expressly agreed to in writing.

31

14.3.13.    ***Representation and Warranties.***    Each party hereto hereby represents and warrants to the other parties that (i) the entering into by him, her or it of this Agreement, and the consummation by him, her or it of the transactions contemplated hereby, does not and shall not violate any agreement (whether express, implied or by operation of law) with any other person to which he, she or it is a party or subject, and, (ii) this Agreement is binding upon him, her or it pursuant to the laws of its domicile.

14.3.14.    ***Interpretation of Conflicting Provisions.***    If any conflict appears between the Articles of Organization of the Company or this Agreement, or the Act, the provisions of the Act govern the Articles of Organization or this Agreement, and the Articles of Organization govern this Agreement. Any such conflict is to be promptly resolved by the adoption of an amendment either to the appropriate provision of the Articles of Organization, or to the appropriate provision of this Agreement.

14.3.15.    ***Additional Parties.***    Additional persons may accede to and be added as parties to this Agreement as Members of the Company in accordance with this Agreement, the MUPA, the Articles of Organization and the Act. In addition to any other procedures and requirements specified elsewhere in this Agreement, the Articles of Organization, or the Act, the execution of an amendment to this Agreement is required, that states the modification to all pertinent provisions in this Agreement relevant to the addition of such person, signed by the person or persons to be added, and by the requisite number of Members who then hold sufficient interests in the Company to approve the addition of the new Members.

14.3.16.    ***Voting.***    Whenever a vote of the Members is required hereunder, said vote shall be based on a majority vote of the outstanding Membership Units voting in favor of the action to be taken unless otherwise provided for in this Agreement.

14.4.    ***Definitions***.    For purposes of this Agreement, unless the context clearly indicates otherwise, capitalized words or phrases are (unless otherwise defined in this Agreement) defined as follows:

14.4.1.    ***"Appraised Value"*** means with respect to any particular Company asset as of any particular date the fair market value of such asset as mutually agreed to in writing by the Members. If no such agreement is reached within fifteen (15) days from and after the request of any Member that the Appraised Value of any asset be so agreed, then the

32

Appraised Value of such asset shall be the fair market value thereof as determined by a duly qualified appraiser having a minimum of five (5) years' experience in making similar appraisals (a "Qualified Appraiser") as selected by the Members. Any determinations as to the value of any particular Company asset made pursuant to this Agreement by any Qualified Appraiser(s) shall be absolute, final and binding upon all of the parties hereto and shall not be subject to arbitration, appeal or change.

14.4.2.  *"Built-in Gains"* means allocations, pursuant to Code Section 704(c), taken into account in determining Tax Profits or Tax Losses, to the extent such allocations are attributable to the excess of the agreed value over the tax basis of property contributed to the Company.

14.4.3.  *"Built-in Losses"* means allocations pursuant to Code Section 704(c), taken into account in determining Tax Profits and Tax Losses, to the extent such allocations are attributable to the excess of the tax basis over the agreed value of property contributed to the Company.

14.4.4.  **"Cash and Cash Equivalents"** means all cash available to the Company from all sources whatsoever including without limitation, any capital contributions made to the Company from its Members, all Reserves and all available borrowings or undrawn lines of credit available to the Company which borrowings or lines of credit have been approved by a Majority in Interest of the Members in their respective sole discretions.

14.4.5.  *"Code"* and *"Regulations"* mean, respectively, the Internal Revenue Code of 1986, and the regulations promulgated thereunder, in either case as amended from time to time.  A reference to a Section of the Code shall refer to the corresponding provision of any successor law. Any reference to a specific section or sections of the Code shall be deemed to include a reference to any corresponding provision of succeeding law.

14.4.6.  **"Company"** means ALVION PROPERTIES II, LLC, a Georgia limited liability company.

14.4.7.  **"Distributable Cash"** for any Fiscal year means all cash, revenues, proceeds and other funds received by the Company from its operations including without limitation those received from the sale or disposition of all or any part of the Company's Property (as hereinafter defined) and all debt proceeds received under financing secured by all or any part of the Company's Property, but excluding any and all capital contributions made to the Company by its members less the sum of the following to the extent paid or set aside by the Company: (i) all principal and interest payments on indebtedness of the Company and all other sums

EXECUTION VERSION

due or paid to lenders of the Company; (ii) all cash expenditures (including expenditures for taxes, fees [including those fees paid to the Members other than in their capacities as Members of the Company hereunder], maintenance, capital improvements and other similar operating costs) incurred incident to the normal organization and operation of the Company's business; (iii) such reserves as the Manager deems reasonably necessary for the proper operation of the Company's business. Depreciation and other non-cash charges and distributions to Members shall not be considered in determining Distributable Cash. Any available cash in reduction of any capital reserve not considered a return of capital shall be considered Distributable Cash.

14.4.8.   *"Fiscal Year"* means the Company's fiscal year, which shall be the year ending December 31.

14.4.9.   *"Property"* at any particular time, shall mean the interest in all real and personal property of the Company and any other assets or property (tangible or intangible, choate, inchoate, fixed or contingent, including cash and cash equivalents) of the Company. It is specifically contemplated that the Company may own assets either directly in its own name or indirectly through its acquisition of an ownership interest in other third party entities with the express intention that the Company's interest in any and all third party entities shall constitute Property hereunder.

14.4.11.   *"Reserves"* shall mean with respect to any fiscal period, funds set aside or amounts allocated during such period to reserves which shall be maintained in amounts deemed sufficient or necessary by the Manager to meet the needs of the business of the Company, including: for (i) working capital to pay taxes, insurance, debt service or other costs or expenses incident to the ownership of operation of the Company's business and (ii) contingent and unforeseen liabilities incurred in the ownership or operation of the Company's business, in each case which may become due and payable with any period and for which the cash to make such payments may not be generated by operations during the period.

14.4.12.   *"Successor in Interest"* shall mean with respect to any Member, any entity succeeding to all or substantially all of the assets or properties owned by such Member by reason of any merger, stock sale, recapitalization, voluntary corporate reorganization (other than pursuant to any federal bankruptcy statutes or any other laws affecting creditor's rights or constituting an assignment for the benefit of creditors), consolidation or sale of all or substantially all of the assets of or involving such Member.

14.4.13.  **"Tax Profits"** and **"Tax Losses"** for any taxable year mean the net income or loss of the Company as reported for federal income tax purposes as to such taxable year, calculated by (i) including all amounts allocated to all Members under Code Sections 702(a)(1) through 702(a)(8), (ii) increased by tax-exempt income and (iii) decreased by expenditures described in Code Section 705(a)(2)(B).

14.4.14.  **"Transfer"** means any disposition, directly or indirectly, by operation of law or otherwise, voluntarily or involuntarily, by intestacy, will, trust or estate distribution, or inter vivos action, including any sale, assignment, gift, exchange, pledge, encumbrance or other creation of a security interest, attachment, creation of any interest in the Company or distribution from the Company for the benefit of creditors, or (without limitation) other transfer or disposition of a Member's interest in the Company or any right, title or interest therein, whether absolute or as security, whether voluntary or involuntary, including any Transfer by operation of law; *"Transfer"* when used as a verb means to effect or attempt to effect a Transfer.

(SIGNATURES APPEAR ON FOLLOWING PAGE)

35

EXECUTION VERSION

IN WITNESS WHEREOF, the parties have entered into this Agreement to be effective as of the date first above written. This Agreement is freely and voluntarily made by all of the parties after full and complete consideration of all relevant facts at hand, and in recognition of the benefits each will accrue from the terms of this Agreement.

ALVION PROPERTIES, INC., Chapter 11 Debtor and Debtor in Possession

_____

BY: SHIRLEY KARNES MEDLEY, President

WEBB CREEK INVESTMENTS, LLC

_____

BY: BRYAN W. KELLEY, Manager [*Insert Name of Debtor's Disbursing Agent Here*]Robert Eggman, as Manager

36

EXECUTION VERSION

## EXHIBIT "A"

| Initial Member | Initial Capital Contribution | Initial Share of Total Capital |
| --- | --- | --- |
| ALVION PROPERTIES, INC. | Real Property | 99% |
| WEBB CREEK INVESTMENTS, LLC | Cash | 1% |

37